Michael I. Levin, Esquire
**LEVIN LEGAL GROUP, P.C.**
**1402 Masons Mill Business Park**
**1800 Byberry Road**
**Huntingdon Valley,  PA  19006**
**215-938-6378**
**(Counsel for Defendant)**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID ANGSTADT, et al.,           :
    *Plaintiffs*                            :
                          :  4:CV-02-0145   FILED
                             :              WILLIAMSPORT, PA
    vs.                                     :
                             :              FEB 0 4 2002
MIDD-WEST SCHOOL DISTRICT,   :
    *Defendant*                            :              MARY E. D'ANDREA, CLERK
                             :              Per _____
                             :                        Deputy Clerk

### Defendant's Memorandum of Law, Proposed Findings of Fact
### And Conclusions of Law Opposing Plaintiffs'
### Motion for Preliminary Injunction

### History of the Case

Pending for disposition by the Court is the Plaintiffs' Motion for a preliminary injunction seeking to compel the Midd-West School District (hereafter "Midd-West") to allow Megan Angstadt (hereafter "Megan") to fully participate in the activities of Midd-West's junior varsity basketball team.

Procedurally, a Complaint; an Application for Temporary Restraining Order Pursuant to F.R.C.P. 65; and proposed orders were filed by Megan on January 29, 2002. A telephone conference was conducted by the Court on January 30, 2002, for purposes of establishing the timing and nature of further proceedings in this case. By Order dated January 31, 2002,[1] the

---

[1] An error is contained in the January 31, 2002 Order.  The Order incorrectly states that "Alan Levin" participated in the telephone conference.  Instead, Midd-West was represented by "Michael Levin" at that conference.

Plaintiffs' Application For A Temporary Restraining Order was denied and it was ordered that the Application For A Temporary Restraining Order would be considered as a motion for a preliminary injunction. A hearing on the Motion for Preliminary injunction was scheduled for February 4, 2002 and the parties were directed to file briefs prior to the hearing. This Memorandum of Law in opposition to the Motion for Preliminary Injunction is being submitted by the Defendant as ordered.

Chronologically, Megan is fifteen (15) years old, having been born on January 31, 1987. Megan is a resident of Midd-West. Megan has continuously been "home schooled"[2] between third and eighth grades, inclusive. Moreover, she was approved for home schooling for the current school year (*i.e.*, 2001-2002).

The board of directors of Midd West has had a home schooling policy that has consistently precluded home schoolers from participating in school district activities. The policy was originally adopted on December 16, 1985 and revised on February 20, 1995. The relevant language of the policy provides that: "[s]tudents approved for home education programs shall not be eligible to participate in extra-curricular and athletic activities offered in the Midd-West School District." (Policy137, p.4)

When Megan was at the chronological age for seventh grade[3], her mother, knowing the policy prohibiting home schoolers from participation in extra-curricular activities,

---

[2] "Home schooling" is authorized by the Public School Code as a legitimate means of fulfilling compulsory school attendance requirements, provided numerous conditions are satisfied. *See,* 24 P.S. §13-1327.1. Home schoolers have no "right" to participate in any of the school district's programs, including extra-curricular athletics. Instead, local school districts have the option to permit participation subject to locally elected conditions.

[3] Grade levels are not assigned to home schoolers. There are no requirements in the home schooling law that the subjects or curriculum that are provided in the home school by the parents be at particular levels or be consistent with a school district's curriculum. Instead, the home schooling law speaks in terms of "the elementary school level" and the "secondary school level" and requires that certain minimum courses be taught, such as four years of

appealed to the school board that the policy be changed. At the school board's public meeting on August 16, 1999, Midd-West's board of directors debated whether to revise its home school policy or grant an exception to the policy.   After debate, a motion to change the policy was defeated by a vote of 4 to 4.   The board then voted to grant to Megan an exception to the policy and to allow her to play basketball for that year with the 7th and 8th grade girl's basketball team. A letter dated August 17, 1999 was sent to Megan's mother advising her of the exception to the policy. In relevant part, Megan's mother was advised as follows:  "[b]y Board action on Monday, August 16, 1999, an exception to Policy Guide 137 was granted for the 1999-2000 school year that will allow your daughter, Megan, the opportunity to participate in the junior high girls basketball program at Middleburg High School."  The letter also set forth a number of conditions with which Megan was required to comply, such as being transported to games, providing weekly documentation of academic progress and the like.  Megan played on the 7th and 8th grade team during the 1999-2000 school year.

Megan also played basketball in the 7th and 8th grade team during the 2000-2001 school year, although that was in violation of the policy.   Simply stated, the school district administrators responsible for implementing school district policy made an error and allowed Megan to play, even though it was in violation of policy and no exception was granted by the school board for the 2000-2001 school year.   The 2001-2002 school year, however, was different.

In accordance with the home schooling statute, Megan applied for and was granted permission to be a home schooler for the 2001-2002 school year.  However, knowing that Megan would not be permitted to play basketball because of Midd-West's policy, Megan's mother

---

English.  24 P.S. §1301327.1(c) & (d).  There is absolutely no requirement, however, that those courses have any relationship to what is being taught in the public schools.

appealed to the school board again. At a public school board meeting on September 17, 2001, Megan's mother expressed her concerns about the policy prohibiting her daughter from participation on the junior varsity basketball team and she proposed that the school board institute a trial period for the 2001-2002 school year to allow home schoolers to participate in extracurricular activities. The school board did not act on that request.

Although Megan began the current school year as a "home schooler", confronting the fact that she had not right to participate in basketball as a home schooler, she enrolled in a so-called cyber charter school. By letter dated October 1, 2001, to Midd-West's Assistant Superintendent, Megan's mother wrote:

> "This is to inform you that as of September 28, 2001, Megan Angstadt is no longer a homeschooled student but is enrolled as a public school student in Western Pennsylvania Cyber Charter School. As such she is entitled to participate in extracurricular activities in Midd-West School District, her district of residence. She will be signing up for basketball for the 2001-2002 school year."

The Western Pennsylvania Cyber Charter School is a creation of the Midland School District in Western Pennsylvania. It purports to operate pursuant to the Charter School Law. *See,* 24 P.S. §17-1701-A, *et seq.* However, as will be discussed fully in the argument section of this brief, such cyber schools are not authorized under the Charter School Law and, it is respectfully contended, the Western Pennsylvania Cyber Charter School is unlawful. Factually, the following facts about cyber schools are important to understand.

With respect to cyber schools in general and the Western Pennsylvania Cyber School in particular, there is no school building! There is no classroom! Megan has no face-to-face contact with her teachers! Megan stays at home and interacts with the cyber entity over the Internet. The cyber school is nothing more than an Internet portal, just like AOL.com or Amazon.com. Rather than offering commercial material, this Internet portal offers educational

materials.   Because the current state of the law has not kept pace with technological advancements, there are no laws permitting such schools and such schools cannot meet many legal requirements.  For example, such basic legal requirements as the attendance regulations of the State Board of Education are being violated.  In these programs, the parents are the teachers and are required for supervising the students.

Notwithstanding the fact that cyber schools are not lawful entities, Midd-West made a determination to allow Megan to participate provided that she met the same conditions for participation as are required to be met by students enrolled in Midd-West.  Those conditions are contained in two letters that had been sent to the Western Pennsylvania Cyber School—one dated October 23, 2001, and the other dated November 30, 2001.  Although the conditions are set forth in twenty-nine (29) separate number paragraphs in the two letters, there are actually only five (5) categories of requirements that have been set forth. The twenty-nine (29) numbered paragraphs merely provides detail about each of the five (5) conditions.  The five (5) conditions are as follows:

1.    Megan must have achieved at least the 9th grade level academically[4];

2.    Megan's curriculum must be similar to the curriculum, including the physical education course, for the students enrolled in Midd-West[5];

3.    Verifiable attendance documentation must be provided[6];

4.    On-going passing grades must be documented[7];

---

[4]  This requirement was set forth in paragraph 1 of the November 30, 2001, letter.

[5] This requirement was set forth in paragraphs 6, 12, 13 and 15 of the November 30, 2001 letter.

[6]  This requirement was set forth in paragraphs 1, 2, 6, 7, 8, 9, 10, 11, 12, and 13 of the October 23, 2001 letter and paragraphs 7, 10, 11,14, and 16 of the November 30, 2001 letter.

[7] This requirement was set forth in paragraph 3 of the October 23, 2001, letter and paragraphs 8 and 11 of the November 30, 2001 letter.

5.    An average or above citizenship grade must be maintained by Megan.[8]

With respect to children enrolled in Charter Schools, local school boards have the right to require that the Charter School student meet the same requirements or conditions for participation required of its own students.  The Charter School Law expressly provides that participation in extracurricular activities of a school district is permitted only if "the student is able to fulfill all of the requirements of participation in such activity . . .." 24 P.S. §17-1719-A(14).  Each of the five conditions described above, and as detailed in the letters to Western Pennsylvania Cyber Charter School on October 23 and November 30, 2001, are requirements that are applicable to students enrolled in Midd-West.   Some of these requirements are established by the Pennsylvania Interscholastic Athletic Association (hereafter "PIAA") and some by the school district.

With respect to grade level and attendance requirements, the PIAA bylaws provide that "[i]n order to be eligible to participate in any interscholastic athletic contest, a pupil must have been regularly enrolled in a secondary school and in full-time attendance."  PIAA Bylaws, Article III, Section 1.  These are two requirements that are applicable at bar—that the student be enrolled in a "secondary school" and that the student is in "full-time attendance."   Moreover, the school district Student Handbook contains the following attendance requirements: "[s]tudents have the responsibility to comply with all attendance laws, regulations and policies." (Student Handbook, p.12)  More specifically, the student handbook provides that "[s]tudents must be in attendance at school ALL DAY in order to participate in games, practices, rehearsals, activities, etc." (emphasis in the original)( Student Handbook, p. 18)   These are the requirements referenced as conditions numbered 1 and 3 above.

---

[8] This requirement was set forth in paragraphs 4 and 5 of the October 23, 2001, letter and in paragraph 3 of the November 30, 2001 letter.

With respect to curriculum, the PIAA requirements state:

"To be eligible for interscholastic athletic competition, a pupil must pursue a curriculum defined and approved by the principal as a full-time curriculum. Where required, this curriculum or its equivalent must be approved by, and conform to, the regulations of the State Board of Education and the Pennsylvania School Code, *as well as any local policies established by the local school board.*" (italics added) PIAA Bylaws, Article IX, Section 1.

This requirement is the requirement referenced in condition number 2 above.

With respect to passing grades, the PIAA requirements provide that "[t]he pupil must be passing at least four full-credit subjects, or the equivalent. Eligibility shall be cumulative from the beginning of a grading period, shall be reported on a weekly basis, and shall be filed in the principal's office." PIAA Bylaws, Article IX, Section 1. Midd-West, however, has imposed a higher standard for its students.[9] Rather than four credits, students must take five credits. (Midd-West Student Handbook, p. 18) Moreover, the Student Handbook sets forth the additional eligibility requirements for Midd-West's student athletes:

"To be and remain eligible, a student must:

1.    be passing five credits.

2.    carry a card if the academic average is below 74%. The card shall be signed by each teacher and presented to the office every Friday. Teachers shall sign 'yes' if the student's grade is passing or 'no' if the student's grade is failing. The teacher's statement shall indicate the student's grade cumulative from the beginning of the grading period. Students must be passing five credits in order to be eligible for the week. Eligibility will be from Sunday to Saturday." (Student Handbook, p.18)

With respect to citizenship, the Student Handbook imposes stringent requirements that must be met by students. Specifically, the Student Handbook provides:

"To be and remain eligible, a student must:

---

[9] The interpretive notes in the PIAA Bylaws expressly provide that the PIAA "standards are minimum standards (passing 'at least' four full-credit subjects), member schools may adopt higher or more stringent academic standards, but may not have lower academic standards." PIAA Bylaws, p.16.

\* \* \*

3.      carry a card if the citizenship falls below 3.0.  If the citizenship average falls below 2.2, the student is ineligible to participate.  If more than one teacher signs the card stating that citizenship is less than 3, the student is ineligible for that week. [Citizenship equals attitude plus initiative plus conduct.]"  (Student Handbook, p.18)

This requirement is the requirement referenced in condition number 5 above.  Simply stated, Megan does not and has not met each of these conditions for eligibility.  (for purposes of a preliminary injunction, of course, Megan must establish that she does meet these requirements; the school district need not prove that she does not.)

      With respect to attendance, as will be addressed more fully in the argument section of this Memorandum of Law, Megan fails to comply with a number of legal requirements.  First and foremost, participation in a cyber school is in violation of the compulsory attendance laws.  Section 1327 of the School Code, 24 P.S. §13-1327, requires students to "attend . . . a day school".  Simply stated, a cyber school is not a day school.  Moreover, the attendance regulations of the State Board of Education provide that "[n]o days may be counted as days taught on which the schools are closed . . .." 11 Pa.Code § 11.1.  In addition, time counted for attendance is limited to "instruction and instructional activities provided as an integral part of the school program *under the direction of certificated school employees*." (Italics added) 22 Pa.Code, §11.2.  Simply stated, the time that Megan spends on the Internet is not "under the direction of school employees."  It is self-directed or parent-directed, not school-employee-directed.

      In addition to these fundamental  attendance issues, the scheme that the Plaintiffs are offering to show attendance is unfair and has no accountability.  As will be established, the scheme proposed by Megan is that she will call the cyber school and tell the cyber school when she was in attendance. (Don't we all wish that we could meet attendance requirements of public schools by calling in and telling the school authorities that we were in school!)  In short, Megan

has not provided any verifiable or reliable data that she was participating in school activities, let alone meeting the legal requirements for attendance as set forth in Section 1327 of the School Code and Chapter 11 of the State Board regulations.

With respect to the actual grade that Megan claims to be in, the facts will show that Megan's chronological age would place her in the 9th grade. However, grade placement in the Midd-West School District is not determined solely by age. The evidence will show that when students transfer into Midd-West either from a homeschool program or from a private school, the student is evaluated to determine the student's grade placement. The evidence will establish that students who have not achieved a grade level commensurate with their chronological age are not placed in a grade with the age peers, but are placed in a lower level appropriate to their academic achievement. In this regard, Megan was not assessed to determine which grade level she has achieved for purposes of Midd-West. There is no evidence that has been presented to Midd-West that she has achieved 9th grade academically, despite her chronological age. The cyber school placed Megan in 9th grade, not because they have conducted any evaluation to determine placement, but because that's how old she is. Again, it is the Plaintiffs' burden to prove that Megan has achieved academically so as to properly be in the 9th grade. Failing this, Megan has not proven that she is in secondary school as is required by the PIAA bylaws.

With respect to citizenship, no reliable or verifiable evidence has been submitted that Megan has achieved the required grade for citizenship.

With respect to curriculum, not only has no evidence been provided to the school district that Megan is taking a 9th grade curriculum, but there is no evidence that has been presented to the school district that the curriculum is similar to or consistent with the curriculum of the school

district. As stated in the PIAA bylaws, the "curriculum [must] . . . conform to . . . any local policies established by the local school board." (PIAA Bylaws, Article IX, Section 1)

With respect to passing grades, again, no reliable or verifiable documentation has been supplied to Midd-West with respect to Megan. In short, the facts are clear that Megan has not satisfied the conditions necessary to enable her to participate.

Turning to the issue of the basketball schedule, Midd-West's junior varsity girl's basketball team has a 24 game schedule. The schedule began on Saturday, December 1, 2001 and concludes Monday, February 11, 2002. Megan played in the first game, but was excluded thereafter. In short, she has missed 19 games, and, effective February 4, 2002, there are only four (4) games remaining—February 4, 7, 9 and 11.

## Argument

I.    MEGAN IS NOT ENTITLED TO A PRELIMINARY INJUNCTION BECAUSE HER RIGHT TO RELIEF IS NOT CLEAR; THE INJUNCTION IS NOT NEEDED TO PREVENT IRREPARABLE INJURY; AND THE PLAINTIFF DELAYED ALMOST TWO MONTHS AND ALLOWED VIRTUALLY THE ENTIRE SEASON TO PASS WITHOUT SEEKING EITHER A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY INJUNCTION.

Megan is a fifteen year old girl who has been "home schooled" for the last five or six school years and who, as a home schooler, was not eligible to play interscholastic sports for Midd-West. Because she desires to play basketball for Midd-West, Megan's mother appealed to the school board of directors of Midd-West to change its policy and to allow Megan to play basketball this school year. The school board did not take any action to do so. Therefore, in order to circumvent the school board's policy that homeschoolers are not permitted to participate in interscholastic athletics, she enrolled with an entity known as the Western Pennsylvania Cyber Charter School. Enrolled in this entity, she now claims that under the Charter School Law, she is

entitled as a matter of law and her civil rights to play junior varsity girls basketball with Midd-West.  By letter dated October 1, 2001, Megan's mother announced to the school district that because Megan is enrolled in the cyber school, Megan "is entitled to participate in extracurricular activities in Midd-West School District, her district of residence.  She will be signing up for basketball for the 2001-2002 school year."  Midd-West disagrees and asserts: (1) that Megan has no legal entitlement to play basketball for Midd-West because her enrollment in the cyber school is not a lawful enrollment in a lawful public school; (2) that even if Megan's participation in the cyber school is lawful, Megan has failed to meet the conditions required for participation; (3) that because of these substantial issues of law and fact, Megan's right to relief is not clear and she cannot establish a substantial likelihood of success on the merits; and (4) that even if Megan were able to establish a substantial likelihood of success on the merits, she cannot establish that not being able to play four (4) basketball games this week constitutes "irreparable harm."  Megan missing these games is no more harmful than if she had the flu and was not able to pay basketball.  Midd-West, therefore, asks that the Motion for Preliminary Injunction be denied.

(A)  <u>Standards for the Issuance of a Preliminary Injunction.</u>

The standards for obtaining a preliminary injunction in federal court are high.  The Supreme Court has stated that the traditional standard for granting a preliminary injunction requires the plaintiff to show that, in the absence of its issuance, the plaintiff will suffer irreparable injury and, also, that the plaintiff is likely to prevail on the merits.  *Duran vs. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S.Ct. 2561 (1975).  Recently, in *Adams vs. Freedom Forge Corp.*, 204 F.3d 475, 487-489 (3rd Cir. 2000), the Court amplified these principles, stating:

"The law does not take judicial notice of matters of 'common sense,' and common sense is no substitute for evidence. A preliminary injunction may not be

based on facts not presented at a hearing, or not presented through affidavits, deposition testimony, or other documents, about the particular situations of the moving parties. The elasticity that the opposite conclusion would permit would essentially shift the burden to the defendant to disprove widely believed facts and would turn the preliminary injunction balancing process on its head.

In lieu of (or in addition to) 'common sense,' many of these cases pursue an additional approach, resting a preliminary injunction for many on the testimony of a few. This is not inappropriate so long as the plaintiffs lay an adequate foundation from which one could draw inferences that the testifying plaintiffs are similarly situated--in terms of irreparable harm--to all the other plaintiffs. When a court, such as the District Court, concludes that there is clear evidence that most, but not all, individuals will be harmed, it treats each individual only as part of an aggregate; in contrast, when a court infers a risk of harm to all individuals although only a few testify, it is reasoning inductively. The former mode of analysis is unacceptable; the latter is the daily work of fact-finders. In short, in the absence of a foundation from which one could infer that all (or virtually all) members of a group are irreparably harmed, we do not believe that a court can enter a mass preliminary injunction.

An important factor animating our holding is our respect for the extraordinary nature of the preliminary injunction power. We have repeatedly insisted that the *use of judicial power to arrange relationships prior to a full determination on the merits is a weighty matter*, and the preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm. See, e.g., Campbell Soup Co. v. ConAgra Inc., 977 F.2d 86, 91 (3d Cir.1992); *Frank's GMC Truck Center*, 847 F.2d at 102-03. The Supreme Court, moreover, has instructed that *the tool of the preliminary injunction should be reserved for 'extraordinary' situations*. Sampson, 415 U.S. at 88, 92, 94 S.Ct. 937. And as we have previously stated, "[t]he dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat." *Holiday Inns of America, Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir.1969) (emphasis added). [FN12]

FN12. *See also, e.g., Wyrough & Loser, Inc. v. Pelmor Labs., Inc.*, 376 F.2d 543, 547 (3d Cir.1967) ("[T]he black letter rule" is that "an injunction is an extraordinary remedy to be granted pendente lite only upon a showing of the likelihood of irreparable harm before the case is resolved on the merits."); *Warner Bros. Pictures v. Gittone*, 110 F.2d 292 (3d Cir.1940) ("We have pointed out frequently that the granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.").

In this vein, we have also insisted that *the risk of irreparable harm must not be speculative. See, e.g., Acierno v. New Castle Cty.*, 40 F.3d 645 (3d Cir.1994). [FN13] For many if not most of the plaintiffs in this case, the risk of irreparable harm seems speculative given the evidence presented to the District Court. The plaintiffs rely on the common sense approach of Textron to reason that most of these retirees probably cannot afford the premiums. This speculation

cannot support an injunction-- especially given the evidence of the relatively low premiums in the proposed plans.

FN13. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir.1989) (district court abused its discretion in granting a preliminary injunction when there was no hard evidence that could have led the court to believe that a broken contract would force one party to go out of business); Marxe v. Jackson, 833 F.2d 1121 (3d Cir.1987) (district court erred in finding irreparable harm when there was weakly alleged possibility that, in claim of retaliatory discharge, being kept out of the workplace threatened to discourage coworkers from testifying; such a charge could constitute irreparable harm, but more specific facts indicating the existence of such a threat needed to be presented); *United States v. Com. of Pennsylvania*, 533 F.2d 107 (3d Cir.1976) (threatened effect on ability to provide medical care too attenuated to constitute irreparable harm); *A.L.K. Corp. v. Columbia Pictures Indus., Inc.*, 440 F.2d 761 (3d Cir.1971) (threatened loss of "theatre momentum" not sufficiently concrete to require Columbia Pictures to deliver promised film before adjudication of meaning of contract).

Moreover, the plaintiffs all but concede that not all of them are threatened with irreparable harm. At the hearing, for example, counsel for the plaintiffs stated that "most," not all, of the plaintiffs retired under early retirement plans. He stated that Sieber met with "most" plaintiffs to discuss "most" claim programs and that "most of these people are on fixed income." The assertions of counsel were borne out by the testimony; some, but not all, plaintiffs testified that they were on fixed incomes. A few, but not most, testified that they would be forced to forego medical care. The District Court itself used qualified language in its decision ("many" of the plaintiffs live on fixed incomes; "several" of the testifying plaintiffs stated that their incomes were limited) (emphasis added).

Based on this record, we conclude there was insufficient evidence from which the District Court could infer that all the plaintiff-retirees and their spouses (in whose favor the injunction ran) were in such financial straits that they would be forced to choose between medical care and other necessities. In order to obtain a preliminary injunction that would apply to each one of them, the plaintiffs would have had to present affidavits or other evidence from which one could at least infer that each of them was so threatened. Instead, the plaintiffs only presented evidence from which a court could infer that some of them were threatened with harm. In holding that this is insufficient to support a preliminary injunction, we recognize that such orders are sought when an emergency threatens, and that the moving party may not be able to marshal extensive evidence. That does not mean, however, that proof by association in a law suit, or proof by "common sense," will suffice." (italics added) 204 F.3d 475, 487 to 489.

Not only are the standards for obtaining a preliminary injunction high, but not all "injury" is sufficient to justify the issuance of a preliminary injunction.    In *Shree Rama Enterprises vs. United States,* 982 F.Supp. 182 (C.I.T.1997), the court stated the following with respect to the concept of "irreparable injury":

Plaintiffs have not shown that they are threatened with *immediate* and *irreparable* injury. Irreparable harm is serious harm that cannot be undone. *Id.* (citing S.J. Stile Assoc. Ltd. v. Snyder, 68 C.C.P.A. 27, 646 F.2d 522, 525 (C.C.P.A.1981)). In evaluating that harm, the court must consider "the magnitude of the injury, the immediacy of the injury, and the inadequacy of future corrective relief." *Queen's Flowers,* 20 CIT at ___, 947 F.Supp. at 506. It is not enough to establish 'a mere possibility of injury, even where prospective injury is great. A presently existing, actual threat must be shown.' Zenith, 710 F.2d at 809." (italics added) 983 F.Supp. 192,194 to195.

Recognizing that not all harm is of the type to warrant the issuance of a preliminary injunction, courts have specifically held that sitting out of interscholastic events, even for entire seasons, is not the type of harm that is generally amenable to the issuance of a preliminary injunction. *See, e.g., Williams vs. Hamilton,* 497 F.Supp. 641 (D.N.H. 1980) ("For the reasons hereinabove set forth, the Court finds and rules that plaintiff lacks probability of success on the merits of the instant litigation and that such irreparable harm as he may perceive from being required to sit out this soccer season is outweighed by the balance between such harm and the injury that injunctive relief would inflict on the application of what the Court believes to be a perfectly reasonable rule by NAIA to its member institutions. Public interest accordingly requires that the Court deny the petition for preliminary injunction." 497 F.Supp. at 646); *Gonyo vs. Drake University,* 837 F.Supp. 989 (S.D.Iowa 1993); *Farver vs. Board of Education of Carroll County,* 40 F.Supp.2d 323 (D.Maryland 1999) ("First, the Due Process Clause, under authority from both the Fourth Circuit and other courts, has clearly been held not to protect the interest of a child in participating in extracurricular activities (including sports). Even recognizing that these days colleges are farm teams for the pros, and high schools are farm teams for colleges, and that, for champion athletes, certainly there could be economic consequences, the right to participate in extracurricular activities, as distinguished from the right to attend school, is not considered to be a protected interest under the Fourteenth Amendment. *See Denis*

*J. O'Connell High School v. Virginia High School*, 581 F.2d 81 (4th Cir.1978) (lack of protection under Equal Protection Clause as well as Due Process Clause). The more recent case authority has also failed to recognize a "constitutionally protected property interest in participating in [a] school's athletic program." *See Seamons v. Snow*, 84 F.3d 1226, 1235 (10th Cir.1996). This Court believes that that case is reflective of the general state of the law with regard to the reach of the Fourteenth Amendment." 40 F.Supp.2d at 324.); *contra, Cruz ex rel. Cruz v. Pennsylvania Interscholastic Athletic Ass'n, Inc.,* 157 F.Supp.2d 485, 156 Ed. Law Rep. 633, 21 NDLR P 97 (E.D. Pa. Jun 27, 2001) (ruling that a PIAA age requirement was in violation of the Americans with Disabilities Education Act.)

B. The Plaintiffs are Not Likely to Prevail on the Merits

Megan is asserting that she has the legal right to participate on Midd-West's girls junior varsity team because she is enrolled in the Western Pennsylvania Cyber Charter School and the Pennsylvania's Charter School Law permits students to participate in extracurricular programs of their resident school districts. In paragraph 13 of the Complaint, the Plaintiffs assert that the Western Pennsylvania Cyber Charter School is a lawful charter school and in paragraph 14 of their Complaint, the Plaintiffs partially quote a portion of the Charter School Law that ostensibly gives Megan the right to participate in Midd-West's basketball program. The portion of the Charter School Law that the Plaintiffs conveniently omit from their quotation is the provision that states students enrolled in lawful charter schools may participate in extracurricular activities of their resident school districts "Provided, That the student is able to fulfill all of the requirements of participation in such activity". 24 P.S. §17-1719-A(14). In this light, it is the position of Midd-West that the Western Pennsylvania Cyber Charter School is not a lawful

15

charter school and that Megan is not lawfully attending that school and that Megan does not meet the PIAA or the Midd-West conditions for participation in junior varsity girls basketball.

(1) *Cyber Schools are Not Lawful Charter Schools.*

The Western Pennsylvania Cyber Charter School claims to be chartered under Pennsylvania's Charter School Law. However, cyber schools are not authorized under the Charter School Law and are not, consequently, lawful. Moreover, Midd-West has not been provided with any documentation that, even if cyber schools are generally lawful, Western Pennsylvania Cyber Charter School is a valid charter school.

Judge Spiser of the Court of Common Pleas of Adams County has issued a preliminary injunction shutting down another cyber school, finding that the Charter School Law does not authorize cyber schools. Judge Spiser said that the Court is "of the opinion that the Charter School Law authorizes only brick and mortar institutions" (Slip opinion, p. 12)(Judge Spiser's decision is attached hereto as Exhibit "A". Because it incorporates by reference Proposed Findings made by the school districts in that case, the proposed findings are also being attached as part of Exhibit "A") Amplifying this proposition, Judge Spiser stated:

> "The General Assembly enacted the Charter School Law by adding a new article to the Public School Code on June 19, 1997.24 P,S. §17-1701-A et seq. At the time of the enactment, technology was not available for cyber schools and the legislation was geared toward traditional brick and mortar facilities. Although the act provides, that nothing in the act precludes the use of computer and satellite linkages delivering instruction for students, we can assume that legislators watched the same television depictions of satellite linkages the rest of us viewed. One with which this court is familiar depicted students assembled in a classroom while receiving instruction from a distant, especially gifted teacher. (Slip opinion, p. 10-11)

Judge Shaffer in Butler County, issuing a Preliminary Injunction to prevent a cyber school from opening in Butler County ruled:

The Charter School Law was enacted before the explosion of Internet technology. It is doubtful that the framers of the legislation contemplated the "cyber" or Internet learning school to be within the scope of charter schools. The Court found persuasive the testimony of Joseph F. Bard, executive director of the Pennsylvania Association of Rural and Small Schools, who testified that cyber schools in general, and Einstein, in particular are merely home schooling by another name and were not entitled to public money as charter schools." (Slip opinion, p.8)[10] (Judge Shaffer's decisions are attached hereto as Exhibit "B".)

Indeed, even the Education Committee of the General Assembly recognized that the Charter School Law provides no authority for the creation of cyber schools, such as the Western Pennsylvania Cyber Charter School. In setting forth its findings for House Bill 1733, the House Education Committee stated:

"The General Assemble finds and declares as follows:

---

[10] Litigation has been filed, as of February 1, 2002, in 17 different courts of common pleas seeking to enjoin cyber schools as being unlawful. The only cyber school that has been named in those suits is the Einstein Academy Charter School, but a ruling that cyber schools are not authorized by the Charter School Law would be equally applicable against all cyber schools. Those 17 common pleas cases are in different stages of the legal process. Eight (8) courts have issued preliminary injunctions against the Einstein Academy and the decisions and orders are attached hereto. Of those eight (8) preliminary injunctions, two (2) (i.e., in Butler and Adams counties) have been issued after full and complete evidentiary hearings. The other six (6) are in the nature of temporary restraining orders, having been issued pending the evidentiary hearings. (The Preliminary Injunction Orders in the nature of TRO's are attached hereto as Exhibit "C"In addition to the common pleas court decisions, the Pennsylvania School Boards Association has filed an action in the Commonwealth Court contesting the right of the Department of Education to withhold subsidy from school districts in order to pay cyber schools and contending that if there is a general right to do so, notice and an opportunity for a hearing under the Administrative Agency Law must be given before any funds are withheld. Senior Judge Morgan conducted a Preliminary Injunction hearing in May, 2001, and declined to enjoin the Department of Education from withholding subsidy. On the issue whether cyber schools were lawful, Senior Judge Morgan said: "Here, petitioners raise numerous issues of first impression relating to the validity of the "cyber" charter schools. *Despite the seriousness of the issues* and the potential effect on school districts across the state, we cannot say that petitioners' interpretations of the various statutes are sufficiently "clear" so as to justify preliminary injunctive relief." (Slip Opinion, p. 4) (Judge Morgan's decision is attached as Exhibit "D".) Judge Morgan declined to issue the Preliminary Injunction because the case involved only the payment of money. Judge Morgan said, in that respect: "Petitioners' request for preliminary injunctive relief essentially involves the payment of money. Our courts have held that harm which can be compensated by money damages does not qualify as "irreparable" for the purpose of preliminary injunctive relief. *Martians GP, Inc. v. Pepper, Hamilton & Schertz*, 529 Pa. 241, 602 A.2d 1277 (1992). Although petitioners' testimony established that deduction of the funds on June 1, 2000 would impact the budgets of the School Districts, there was no testimony to show a deduction would require the immediate reduction of essential services or place any of the petitioning School Districts in immediate financial jeopardy. As recognized by respondent, if petitioners should ultimately prevail in their claim that the "'cyber" charter schools are not authorized by Law, petitioners would have recourse to the Department of Education." (Slip opinion, p. 4)

(1) Since the enactment of the Charter School Law, applicants have sought charters to operate cyber schools as cyber charter schools.

(2) Because the technology involved readily enables cyber schools to draw students from throughout this Commonwealth, cyber schools can operate without significant involvement with individual school districts, including the district that granted the charter.

(3) Because the technology permits students enrolled in a cyber school to access instructional programming on an irregular schedule and without being physically present in an educational facility, *cyber schools do not fit the requirements of the Charter School Law to have a suitable physical facility and to provide a minimum number of days or hours of instruction.*

(4) *The Charter School Law does not provide an adequate framework for evaluating a cyber school application,* holding an approved cyber school accountable and funding the operation of the cyber school.

(5) The General Assembly in enacting this act intends to provide a framework that is more appropriate to the technological possibilities of cyber education, to facilitate the utilization of cyber technology to improve student learning and to hold cyber schools accountable for meeting measurable academic standards and demonstrating gains in student achievement." (Italics added) (A copy of House Bill 1733 is attached hereto as Exhibit "D".)

The Plaintiffs' claim is based upon their contention that Megan is lawfully enrolled in a cyber school. The only authority on point, both from the judiciary and from the General Assembly, clearly and without equivocation is the opposite—cyber schools are not authorized by the Charter School Law. With the foundation of their claims seriously flawed, the Plaintiffs cannot establish that they have a reasonable likelihood of success on the merits.

Moreover, even in the absence of the foregoing legal authority, it is as clear as crystal that cyber schools do not operate lawfully and that Megan's participation in a cyber school is in violation of her responsibilities to be lawfully enrolled in school. The compulsory attendance

law, the regulations of the State Board of Education, numerous provisions of the School Code,

and the Statutory Construction Act all lead to the inescapable conclusion that the General

Assembly had neither contemplated nor authorized the creation of virtual schools when it

enacted the Charter School Law.

Any analysis of legislative intent must begin with the plain words of applicable statutes

and the rules of construction contained in the Statutory Construction Act. Act of 1972, Dec. 6,

P.L. 1339, §1 et seq., 1 Pa.C.S.A. §1501 *et seq.*[11] The Statutory Construction Act provides:

> "a) Words and phrases *shall be* construed according to rules of grammar and according to their *common and approved usage*; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa.C.S.A. §1903 (emphasis added).

Against this backdrop, there are a number of words and phrases in the Charter School

Law, applicable provisions of the School Code, and applicable regulations, whose common

usage leaves no doubt that cyber schools are not legally authorized and have no claim to public

funds. Among the words and phrases that are relevant to the present inquiry are "day school,"

"compulsory attendance" and "located".

The starting point of the inquiry is the compulsory school attendance law. Students must

attend a day school, unless there is an exception that applies. 24 P.S. §13-1327, provides, in

pertinent part, as follows:

> "Except as hereinafter provided, every child of compulsory school age having a legal residence in this Commonwealth, as provided in this article, and every migratory child of compulsory school age, *is required to attend a day school* in which the subjects and activities prescribed by the standards of the State Board of

---

[11] The Statutory Construction Act provides: "[i]n the construction of the statutes of this Commonwealth, the rules set forth in this chapter *shall be* observed, unless the application of such rules would result in a construction inconsistent with the manifest intent of the General Assembly." 1 Pa.C.S.A. §1901 (Emphasis added). The Statutory Construction Act further provides that: "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. 1 Pa.C.S.A.§1921.

Education are taught in the English language. In lieu of such school attendance, any child fifteen years of age with the approval of the district superintendent and the approval of the Secretary of Education, and any child sixteen years of age with the approval of the district superintendent of schools, may enroll as a day student in a private trade school or in a private business school licensed by the Department of Education, or in a trade or business school, or department operated by a local school district or districts. Such modified program offered in a public school must meet the standards prescribed by the State Board of Education or the State Board for Vocational Education. Except as hereinafter provided, every parent, guardian, or other person having control or charge of any child or children of compulsory school age *is required to send* such child or children *to a day school* in which the subjects and activities prescribed by the standards of the State Board of Education are taught in the English language." 24   P.S.  §13-1327 (Emphasis added).

As the foregoing provisions clearly indicate, children are required "to attend" a "day school." Parents are required "to send" children "to a day school." The day school to which students are to be sent are schools "in which" the subjects and activities prescribed by the State Board are taught. It is hard to imagine how the General Assembly could have been clearer in its intent. Indeed, Judge Rogers, interpreting Section 1327 of the School Code in *School District of Pittsburgh vs. Ross,* 17 Pa.Cmwlth. 105, 330 A.2d 290 (1975), said simply: "Section 1327 requires attendance at school . ..." *Id.* at 292.

Importantly, the compulsory attendance law applies to charter schools, as well, under the Charter School Law. The Charter School Law expressly mandates that Charter schools, and, by extension, cyber schools, are subject to the compulsory school law. Section 1372-A of the School Code provides that "Charter schools shall be subject to the following: ". . . [§]1327."[12] 24 P.S.§17-1732-A. It is thus plain that students enrolled in a charter school must, by virtue of Section 1327 of the School Code, attend a day school, be sent to a day school, and be in a school

---

[12]   Section 1327, of course, is the compulsory attendance law in Pennsylvania.

in which the required subjects and activities take place.[13]   Section 1327 of the School Code, which is incorporated into the Charter School Law, does not permit students to simply "link up" to a computer-generated educational program.

Consistent with the proposition that students are required to "attend" a "day school" and that children must be sent to such schools by their parents, home schooling programs are expressly *prohibited* from being charter schools and public funds under the Charter School Law may not be used for home school programs.   Section 1717-A of the Charter School Law provides that "[n]o funds allocated or disbursed under this article shall be used to directly support instruction pursuant to section 1327.1."  24 P.S. §17-1717-A.  Section 1327.1 pertains to home education programs.   That section contains detailed and comprehensive provisions governing how home education programs will be operated.[14]   Charter schools are not permitted to run, operate or approve home schooling programs.  The home schooling law is conspicuously absent from the list of School Code provisions that apply to Charter Schools.[15]

_____

[13] As a reflection of the fact that such words as "attend", "attendance" and "school" have well understood meanings, there is little in the case law defining such simple and commonly understood words.  The only judicial discussion of the word "attend" that counsel were able to find was in *Gettysburg School District vs. Cumberland Township School District*, 50 Pa. Super. 97 (1912), in which the court said:  "There can be no doubt that the word 'attend' means to be present at as pupils . . .." 1912 WL 4591 at 2.

[14]   The importance the Commonwealth attaches to compulsory attendance can be found in the penalties which may be imposed for failure to comply with same, absent a valid home-school program.  *See* 24 P.S.§ 13-1333 which imposes possible fines, community service and/or imprisonment.

[15] The complete list of School Code provisions that apply to charter schools is set forth in Section 1717 of the Charter School Law, as follows: "a) Charter schools shall be subject to the following: Sections 108, 110, 111, 321, 325, 326, 327, 431, 436, 443, 510, 518, 527, 708, 736, 737, 738, 739, 740, 741, 752, 753, 755, 771, 776, 777, 808, 809, 810, 1109, 1111, 1112(a), 1310, 1317, 1317.1, 1317.2, 1318, 1327, 1330, 1332, 1303- A, 1513, 1517, 1518, 1521, 1523, 1547, 2014-A, Article XIII-A and Article XIV. Act of July 17, 1961 (P.L. 776, No. 341), known as the "Pennsylvania Fair Educational Opportunities Act." Act of July 19, 1965 (P.L. 215, No. 116), entitled "An act providing for the use of eye protective devices by persons engaged in hazardous activities or exposed to known dangers in schools, colleges and universities." Section 4 of the act of January 25, 1966 (1965 P.L. 1546, No. 541), entitled "An act providing scholarships and providing funds to secure Federal funds for qualified students of the Commonwealth of Pennsylvania who need financial assistance to attend postsecondary institutions of higher learning, making an appropriation, and providing for the administration of this act." Act of July 12, 1972 (P.L. 765, No. 181), entitled "An act relating to drugs and alcohol and their abuse, providing for projects and programs and grants to educational agencies, other public or private agencies, institutions or organizations." Act of December 15,

Suffice it to say, cyber schools are nothing more than home schooling programs that the General Assembly clearly prohibited from being charter schools under the Charter School Law. Indeed, many of the students enrolling in the cyber schools are former home schoolers, as is Megan in this case, lured by the promise that they will be provided with free computers, printers, internet access and the like.   The fact that these cyber schools are home schooling programs is made clear in the promotional campaigns of the cyber schools.   Einstein Academy's web site states:

> "Most students will work in their home where their parent will be responsible for their daily supervision.* * * [T]he parent determines the scope, sequence and method of self-paced instruction.* * * At Einstein Academy, unlike government run charter schools, the parent always controls the education of their children.  * * * The Einstein Academy believes that parents are the child's first and foremost teacher.  * * * Parents provide the day to day supervision of their child's work and coordinates with the Einstein teachers. * * * Parents or guardians play an important role as Base Facilitators.  BFs (sic) provide a suitable workplace, quiet environment and 'creature comforts' such as snacks and meals.   They answer simple questions and are the 'frontline' source to monitor student discipline and attendance. * * * The Einstein Academy believes that parents are the child's first and foremost teacher." *www.teachcharterschool.org/whatwedo.htm; www.teachcharterschool.org/parentsrole.htm; www.teachcharterschool.org/ourteachers.htm.*

Einstein is even more explicit in its pronouncement, virtually admitting that it is a home schooling program.   Einstein Academy promotes on its website that its "Family Schooling program also serves students who are attracted to the values of Homeschooling." *www.teachcharterschool.org/whoweserve.htm.*

Consistent with the proposition that students must attend a day school in order to comply with the compulsory attendance laws, the Charter School Law contains several provisions

---

1986 (P.L. 1595, No. 175), known as the "Ant hazing Law." (b) Charter schools shall be subject to the following provisions of 22 Pa. Code: Section 5.216 (relating to ESOL), Section 5.4 (relating to general policies),  Chapter 11 (relating to pupil attendance), Chapter 12 (relating to students), Section 32.3 (relating to assurances), Section 121.3 (relating to discrimination prohibited), Section 235.4 (relating to practices), Section 235.8 (relating to civil rights). 24 P.S. §17-1732-A(a) and (b).

reflecting that the General Assembly had "real" schools in mind when it enacted the Charter School Law.  For example, there are no less than three provisions speaking to the "location" of the school.  The Charter School Law prohibits school board directors from serving on a board of trustees of a charter school "*located* in the member's district."  24 P.S. §17-1716-A(b)(Emphasis added).  The application for approval as a charter school must be sent to the local board of school directors of the "school district in which the charter school will be *located*."  24 P.S. §17-1718-A(b)(emphasis added).   The application must identify the address of the "*physical facility* in which the charter school will be *located*."  24 P.S. §17-1719-A(11)(emphasis added).

The limited case law that currently exists recognizes that there is legal significance to the physical "location" of the school. In *West Chester Area School District vs. Collegium Charter School*, 760 A.2d 452 (Pa.Cmwlth. 2000), the court considered a number of issues pertaining to the Charter School Law, including whether a charter school was a "regional" charter school if it drew students from more than one school district, even though physically located in only one district.  The court, in concluding that such a school would not be considered a "regional" charter school, stated:

> "[U]nless the charter school will be *located* in more than one school district, which is not the case here, the CSL does not set forth any particular set of circumstances that would require a charter school applicant to apply as a multi-district regional charter school rather than a single district charter school."  760 A.2d 452, at 463.

Cyber schools have no location, in violation of the Charter School Law.  Cyber schools are the Internet.  Cyber schools are the children's homes.  Cyber schools are the computer servers, the Internet links and the websites all over the world from which children, hopefully, will learn. The General Assembly enacted several provisions based upon the location of a school in a particular district or region.  It did not and could not have intended a school that is housed in

a computer processor; that finds its resources in memory chips rather than the ability and skill of a teacher; that replaces bricks and mortar with wires, cables and/or electronic emissions criss-crossing the globe.

Consistent with the concept that the General Assembly contemplated genuine schools being operated under the Charter School Law, there are several provisions addressing the matter of school facilities.  The only authorization in the Charter School Law for establishing a school is the following provision:

> "A charter school may be established by creating a new school or by converting an existing public school or a portion of an existing public school."  24 P.S. §17-1717-A(a).

The application for approval of a charter school must contain a "description of and address of the physical facility in which the charter school will be located . . .." 24 P.S. §17-1719-A(11).   Charter schools are permitted to acquire real estate for use as a charter school facility.   24 P.S. §17-1714-A(a)(3). The law permits charter schools to enroll nonresident students on a "space-available basis."  24 P.S. §17-1723-A(c).  Contemplating that there would be an actual school facility, and recognizing the central role of the local school districts chartering charter schools, the General Assembly mandated that the local school boards have

> "ongoing access to the records *and facilities* to ensure that the charter school is in compliance with its charter and this act and that requirements for testing, civil rights and student health and safety are being met."   24 P.S. §17-1728-A(a) (emphasis added).

In an effort to ensure that there would be no violation of the Establishment Clause, the Charter School Law prohibits charter schools from displaying religious objects and symbols "*on the premises* of the charter school."   24 P.S. §17-1715-A(5)(Emphasis added).   However, as indicated previously, there are no facilities in a cyber school.  There are no premises of a cyber

school.  There is no way that a local school board can ensure that student health and safety is being met.

Other indicia of the legislature's intent that there be a real school where real children are taught by real teachers are the several minimum requirements that must be met by charter schools with respect to such things as attendance and curriculum.  The law requires that charter schools offer a minimum of 180 days of instruction or 900/990 hours of instruction each school year.  The Charter School Law provides:

> "[A] charter school shall provide a minimum of one hundred eighty (180) days of instruction or nine hundred (900) hours per year of instruction at the elementary level, or nine hundred ninety  (990) hours per year of instruction at the secondary level." 24 P.S. §17-1715(9).

No evidence exists that Western Pennsylvania Cyber Charter School will have any particular days or hours of instruction, minimal or otherwise.  On the contrary, the idea behind cyber schools is based on the proposition that students will learn at their own pace whenever and wherever they want.  The hallmark of Western Pennsylvania Cyber Charter School, and all other cyber schools, is the ability of the student to learn at the student's own pace, going to school when it suits the student and for the length of time that it suits the student.  Those concepts are totally at odds with the requirement that there be actual days or hours that school is in session.

Conspicuously absent from the Charter School Law is any provision that charter schools may be nothing more than educational programs offered over the Internet.  If the General Assembly wanted to authorize such cyber schools, it could have easily done so.[16]  There is

---

[16] Counsel's research has revealed that Colorado and Michigan have both dealt with cyber schools and have exempted  from  the  compulsory  attendance  laws  students  properly  enrolled  in  such  cyber  schools.  *See,* Col.Rev.Stat.  §22-33-104-7;  2000 Mich.Pub.Act 230.   Moreover, Pennsylvania had previously given some legitimacy to distance learning programs in its former "Educational Resource Sharing Through Distance Learning Act" which has since been repealed.  In that act, it was expressly stated that "[t]he State Board of Education shall

already a model in place with respect to postsecondary schools.  Postsecondary degree-granting institutions have been authorized to offer cyber schools by the State Board of Education.  Such postsecondary schools can offer education courses for credit via an "alternate instructional delivery system", which means the offering of courses whose "primary mode of delivery [is] television, videocassette or disc, film, radio, computer or other supportive devices . . .."  22 Pa.Code §31.2.  However, these institutions must still offer more than fifty per cent (50%) of their degree programs via "resident based instruction"—i.e., courses taught by faculty at physical locations where students physically attend programs.  22 Pa.Code §31.1(e).  There is not even a hint of such authorization in the Charter School Law.

The General Assembly has recognized so-called distance or computer learning only in one provision; that provision, however, being a general establishment of physical attendance for minimal days and hours of instruction.  It provides:

> "(9) A charter school shall provide a minimum of one hundred eighty (180) days of instruction or nine hundred (900) hours per year of instruction at the elementary level, or nine hundred ninety (990) hours per year of instruction at the secondary level.  Nothing in this *clause* shall preclude the use of computer and satellite linkages for delivering instruction to students."  24 P.S. §1715-A(9)(Emphasis added).

Thus, students who are in attendance at the day school, as required under both the compulsory attendance law and the Charter School Law, may receive some of their instruction via computer.  This provision does not, and cannot, it is submitted, overrule the compulsory attendance law.  It does not dispense with the need for students to attend school.  The fact that the General Assembly placed the provision in the clause dealing with the minimum number of

---

promulgate rules and regulations relating to academic credit that may be granted to students in courses offered through distance learning programs under the provisions of this Act."  24 P.S. §7005(repealed).

days or hours a school must be in session shows that it wanted to make clear that the minimum instruction time did not prohibit schools from augmenting their programs with computer or satellite linked resources.

Each and every of the foregoing provisions make it clear that cyber schools have not been authorized by law to enable students to comply with the compulsory attendance laws.  Other provisions of the School Code and the regulations of the State Board of Education with which charter schools must comply make it clear, as well, that the General Assembly was contemplating real, not cyber, schools when it enacted the Charter School Law.  Section 110 of the School Code is incorporated into the Charter School Law.  It provides that "[a]n official visitor shall have access to and may not be denied access to any public school in the Commonwealth at any time." 24 P.S. §1-110.  Naturally, charter schools are public schools. There is no place in a cyber school for officials to have access.  Section 1-111(a) requires that all employees, except for those few who never come into contact with students, must procure a criminal history record within 30 days of employment. Thus, the Charter School Law anticipates the close contact between staff, professional and nonprofessional, and students, in a real school setting, which requires the assurance of such a background check. Section 771 of the School Code is incorporated into the Charter School Law.  It requires that the United States Flag, flagstaff and necessary appliances, be displayed "upon or near each public school building in clement weather, during school hours, and at such other times as the board may determine." 24 P.S. §7-771.  With respect to real or genuine charter schools as contemplated by the General Assembly, we know where the flagstaff will be erected and the flag proudly displayed.  With respect to cyber schools, are we going to have a cyber flagpole from which a cyber flag will be wafting in gusts of digital wind?

Contemplating that charter schools would be real schools, with real buildings and real teachers, the General Assembly incorporated Section 1112(a) of the School Code into the Charter School Law.  That provision provides:

> "(a) That no teacher in any public school shall wear in said school or while engaged in the performance of his duty as such teacher any dress, mark, emblem or insignia indicating the fact that such teacher is a member or adherent of any religious order, sect or denomination."  24 P.S. §11-1112(a).

Section 1310 of the School Code is also incorporated into the Charter School Law and applicable to charter schools.  Among the provisions of Section 1310 of the School Code are the following:

> (a) "All of the pupils . . . shall be assigned to, and reasonably *accommodated in*, one of    the public schools . . .."  24 P.S. § 13-1310(a)(emphasis added).

> (b) "Before the board of school directors purchases educational services from the agency for a specific child, it must document that the child cannot receive appropriate educational services in a regular classroom setting because of behavioral or psychological reasons."  24 P.S. §13-1310(b).

Section 1317 of the School Code is also incorporated into the Charter School Law.  That section grants to school authorities the right to discipline students, not only when they are "in attendance" but also "during the time they are going to and from their homes . . ." 24 P.S. §13-1317.  If one were cynical, one would suppose that Western Pennsylvania Cyber Charter School would interpret this provision as giving it authority to discipline once the student makes a conscious decision to walk toward his or her computer, or perhaps only when the computer power button is activated.

Genuine charter schools are also required to comply with Section 1518 of the School Code.  That section requires emergency training so students may "in sudden emergencies be able

to leave the school buildings in the shortest possible time without confusion or panic." 24 P.S. §15-1518(b).

All of Article XIV of the School Code is incorporated into the Charter School Law. That Article permits exemption from the compulsory attendance laws only if the student is "prevented from attending school on account of the health or sanitation laws of this Commonwealth, or by the sanitary regulations of the local board of health or the board of school directors . . ." 24 P.S. §14-1417. Charter schools must employ physicians for certain purposes. 24 P.S. §14-1410. The school physician and school dentist shall conduct medical, dental, and other examinations, subject to certain exceptions. 24 P.S. §14-1404.

Pursuant to Article XIII-A of the School Code, which is also incorporated into the Charter School Law, among other requirements, charter school laws must "develop a memorandum of understanding with local law enforcement." 24 P.S. §13-1303-A(c). The cynic would expect a cyber agreement.

It is submitted that each and every one of these provisions makes it clear that the General Assembly had one thing in mind when it enacted the Charter School Law—that charter schools would be real schools, with real teachers, real facilities, and real students, present in a physical facility in which learning and social interaction would occur and be fostered. As its name implies, a cyber school is none of these things.

The regulatory provisions that have been incorporated into the Charter School Law evidence the same intention -- that charter schools be real schools -- exhibited by the General Assembly when it incorporated the School Code into the Charter School Law. Chapter 11, governing pupil attendance, is incorporated into the Charter School Law and makes it crystal

clear that what is being contemplated are real schools with real teachers interacting face-to-face with students. Chapter 11 requires that "schools shall be kept open each school year" for the requisite number of days or hours. 22 Pa.Code §11.1. To attend school, children must be immunized. 22 Pa.Code §11.20. These provisions could only make any sense when dealing with real schools.

Perhaps the regulatory provision that best constitutes an outright prohibition of cyber schools is 22 Pa.Code §11.2. That provision requires that instruction not be under the direction and supervision of parents or guardians, as is the model for cyber schools, but under the direction of certificated personnel. That provision provides as follows:

> "Instruction time for pupils shall be time in the school day devoted to instruction and instructional activities provided as an integral part of the school program under the direction of certificated school employees." 22 Pa.Code §11.2.

The instructional time for cyber students is not under the direction of certificated school employees. It is under the direction of parents and guardians with minimal involvement of certificated school employees, if any such involvement, in fact, takes place. To quote from the website of Einstein Academy: "The Einstein Academy believes that parents are the child's first and foremost teacher."

As the foregoing provisions make clear, not only is it unlikely that the Plaintiffs will succeed on the merits, the overwhelming authority establishes that cyber schools, such as the one in which Megan is enrolled, are not lawful and that Megan's participation in that school is in violation of Pennsylvania's compulsory attendance laws.

(2)   *The Plaintiff Has Not Met the Conditions for Her Proper Participation in Extracurricular Spots.*

In the event that the Court concludes that cyber schools, including the Western Pennsylvania Cyber Charter School, are lawful, and that Megan's participation in that school does not constitute home schooling, it is submitted that Megan has not fulfilled all of the requirements of participation as is required by the Charter School Law. 24 P.S. §17-1719-A(14).

1.      There is no evidence that Megan is a secondary school student. PIAA requirements, to which Midd-West is bound, mandate that a student be in secondary school—i.e., 9th through 12th grade. Megan admittedly is of an age that would place her in the 9th grade. However, age is not enough. Megan has to have achieved status as a 9th grader academically! Midd-West evaluates all students coming from a home school program or from private school to assess the grade level which the student has achieved. Regardless of age, if a student has not achieved academically at such a pace to keep the student with his or her age peers, the student is placed in a lower grade. In this case, Megan may be at a 9th grade level, but it is equally clear that she may not be. If she is not at a 9th grade level, then she would not qualify for secondary school status. As quoted previously, while common sense may suggest that Megan should be at the 9th grade level, common sense is not a substitute for evidence. To repeat what the Third Circuit said in *Adams vs. Freedom Forge Corporation*:

> "The law does not take judicial notice of matters of 'common sense,' and common sense is no substitute for evidence. A preliminary injunction may not be based on facts not presented at a hearing, or not presented through affidavits, deposition testimony, or other documents, about the particular situations of the moving parties. The elasticity that the opposite conclusion would permit would essentially shift the burden to the defendant to disprove widely believed facts and would turn the preliminary injunction balancing process on its head."

Simply stated, no evidence has been presented that Megan is met the requirements of being a ninth grade student.

2.      Verifiable Attendance.  Midd-West insists upon and implements a verifiable attendance requirement.  The PIAA requires "full-time attendance."  The regulations of the State Board of Education provide that attendance is that time spent under the direct supervision of a certified teacher.  Simply stated, the Plaintiffs can offer no verified data, and have offered no verified data that Megan is in lawful attendance, attendance under Chapter 11 of the State Board regulations.  What the Plaintiffs have proposed is that Megan call the cyber school and tell the officials there when she has been in attendance. That is hardly sufficient, nor reasonable.  If the cyber school does not have the means or ability to be able to verify attendance, the attendance rules of the school district and of the PIAA should not be cast aside.

3.      Curriculum and Physical Education.  The PIAA rules are very clear that "[t]o be eligible for interscholastic athletic competition, a pupil must pursue a curriculum defined and approved by the principal as a full-time curriculum. * * *  This curriculum . . . must be approved by, and confirm to, the regulations of the State Board of Education *and the Pennsylvania School Code,* as well as any local policies established by the local school board." (italics added)(PIAA bylaws, p.16)  Simply stated, the Plaintiffs have failed to demonstrate that Megan's curriculum meets the requirements of state law and the requirements of Midd-West.  Indeed, no physical education as required by Midd-West has been shown to be occurring.

4.      On going passing grade.  The Student Handbook establishes clear rules to ensure that student athletes are passing their courses in order to participate in sports.  "A student must be passing at least five full-credit subjects, or the equivalent, in order to be eligible to participate in extracurricular activities."  Borderline student-athletes must carry cards signed by teachers certifying whether the student is passing. (Student Handbook, p. 18)  Simply stated, in the cyber

void of accountability, no reliable or verifiable information has been provided that Megan is passing all subjects.

5.    Citizenship.  Midd-West imposes a minimum citizenship requirement on its students. Western Pennsylvania Cyber Charter School does not grade for citizenship.  Indeed, any attempt to grade for citizenship would be a sham where students are not in contact with one another and are not (and cannot be) observed by teachers.  Megan's parents, before enrolling Megan in an experimental program of cyber school and one that fails to grade for citizenship, should have inquired to make sure that the cyber school met all of the standards of Midd-West.  The General Assembly gives the local school district the full power and authority to establish its local requirements for participation on its sports teams.  The Plaintiffs are asking that the court subvert the locally established requirements and to have them succumb to the limitations inherent in a cyber school.  This is not what the General Assembly contemplated when it said, so clearly, that a charter school student must "fulfill all of the requirements" of the local school district.  24 P.S. §17-1719-A(14).

In light of the foregoing, the Plaintiffs have failed to prove that they "fulfill all of the requirements" of Midd-West.  Failing to prove that they meet the conditions for participation, the Plaintiffs are not entitled to a Preliminary Injunction.

(3)    *There is no Federal Jurisdiction in this Matter.*

As the Court is certainly aware, there must be a federal claim or diversity of citizenship in order for the Court to have jurisdiction.  The Plaintiffs allege federal claims under Section 1983.  Specifically, the Complaint seems to allege (it is not at all clear) a procedural due process property claim and an Equal Protection claim because, it is alleged, the rules being imposed upon Megan are arbitrary and capricious.  The Complaint concludes with a state law claim under the

Charter School Law.  No citation needs to be provided for the proposition that if the federal claims are dismissed, the state law claim should be similarly dismissed for lack of federal jurisdiction over the claim.  At bar, the federal claims are devoid of merit both factually and legally.  The lack of merit as a matter of law will be addressed in a Motion to Dismiss that will be filed subsequently.  However, factually, the underpinnings of the Plaintiffs' federal claims are that the Midd-West's requirements are arbitrary and capricious.  Succinctly stated, far from being arbitrary and capricious, the rules are traditional and widely accepted rules that have stood the test of time.  What is arbitrary is the Plaintiffs' efforts to obtain a waiver of the rules because the educational placement chosen by the Plaintiffs has insufficient capacity to meet the rules that everyone else has met.

(4)  *The Plaintiffs Cannot Prove Irreparable Harm will Result from Not Allowing Megan to Play the Last Four Basketball Games of the Season.*

After allowing approximately eighty percent (80%)% of the season and almost two months to pass by, the Plaintiffs have come into court seeking a temporary restraining order, and now a preliminary injunction, to compel the school district to allow Megan to play the final four (4) basketball games of the season.  Simply stated, keeping a fifteen year old girl from playing the last four games of a junior varsity season, after having missed nineteen (19) games, hardly constitutes irreparable harm that needs federal court protection.

Conclusion

In light of the foregoing, the Midd-West School District respectfully requests that the Court deny the Plaintiffs' Motion for Preliminary Injunction and adopt both the Proposed Findings of Fact and Conclusions of Law attached hereto.

Respectfully submitted,

LEVIN LEGAL GROUP, P.C.

2-3-02

Michael I. Levin, Esquire
(Counsel for Defendant)
1402 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley,  PA  19006
(215) 938-6378

Michael I. Levin, Esquire
**LEVIN LEGAL GROUP, P.C.**
**1402 Masons Mill Business Park**
**1800 Byberry Road**
**Huntingdon Valley, PA 19006**
**215-938-6378**
**(Counsel for Defendant)**

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID ANGSTADT, et al., | : | |
| *Plaintiffs* | : | |
| | : | 4:CV-02-0145 |
| vs. | : | |
| | : | |
| MIDD-WEST SCHOOL DISTRICT, | : | |
| *Defendant* | : | |
| | : | |
| | : | |

### Defendants' Proposed Findings of Fact

1.   Megan is fifteen (15) years old, having been born on January 31, 1987.

2.   Megan is a resident of Midd-West School District.

3.   Megan has continuously been "home schooled" between third and eighth grades, inclusive, and was approved for home schooling for the current school year (*i.e.*, 2001-2002).

4.   The board of directors of Midd West has had a home schooling policy that has consistently provided that homeschoolers would not be permitted to participate in school district activities.  The policy was originally adopted on December 16, 1985 and revised on February 20, 1995.  The relevant language of the policy provides that: "[s]tudents approved for home education programs shall not be eligible to participate in extra-curricular and athletic activities offered in the Midd-West School District." (Policy137, p.4)

5.     When Megan was at the chronological age for seventh grade, her mother, knowing the policy prohibiting homeschoolers from participation in extracurricular activities, appealed to the school board that the policy be changed. At the school board's public meeting on August 16, 1999, the Midd-West's board of directors debated whether to revise its home school policy or grant an exception to the policy.  After debate, a motion to change the policy was defeated by a vote of 4 to 4.  The board then voted at that meeting to grant to Megan an exception to the policy and to allow her to play basketball for that year with the 7th and 8th grade girls basketball team.

6.     A letter dated August 17, 1999 was sent to Megan's mother advising her of the exception to the policy. In relevant part, Megan's mother was advised as follows:  "[b]y Board action on Monday, August 16, 1999, an exception to Policy Guide 137 was granted for the 1999-2000 school year that will allow your daughter, Megan, the opportunity to participate in the junior high girls basketball program at Middleburg High School."  The letter then set forth a number of conditions with which Megan was required to comply, such as being transported to games, providing weekly documentation of academic progress and the like.  Megan played on the 7th and 8th grade team during the 1999-2000 school year.

7.     Megan also played in the 7th and 8th grade team during the 2000-2001 school year, although that was in violation of the policy.  The school district administrators responsible for implementing school district policy made an error and allowed Megan to play, even though it was in violation of policy and no exception was granted by the school board for the 2000-2001 school year.

8.     In accordance with Pennsylvania's home schooling statute, Megan applied for and was granted permission to be a homeschooler for the 2001-2002 school year.  However, knowing that Megan would not be permitted to play basketball because of the Midd-West's policy, Megan's

mother appealed to the school board again. At a public school board meeting on September 17, 2001, Megan's mother expressed her concerns about the policy prohibiting her daughter from participation on the junior varsity basketball team and she proposed that the school board institute a trial period for the 2001-2002 school year to allow home schoolers to participate in extra curricular activities. The school board did not act on that request.

9.     Although Megan began the current school year as a "home schooler", confronting the fact that she had no right to participate in basketball as a home school, she enrolled in a so-called cyber charter school and, by letter dated October 1, 2001, to the Assistant Superintendent, Megan's mother wrote:

> "This is to inform you that as of September 28, 2001, Megan Angstadt is no longer a homeschooled student but is enrolled as a public school student in Western Pennsylvania Cyber Charter School.   As such she is entitled to participate in extracurricular activities in Midd-West School District, her district of residence.   She will be signing up for basketball for the 2001-2002 school year."

10.     The Western Pennsylvania Cyber Charter School is a creation of the Midland School District in Western Pennsylvania.   It purports to operate pursuant to the Charter School Law. *See*, 24 P.S. §17-1701-A, *et seq.*

11.     Cyber schools are not authorized under the Charter School Law.

12.     With respect to cyber schools, there is no school building.   There is no classroom. Megan has no face-to-face contact with her teachers.   Megan stays at home and interacts with the cyber entity over the Internet.   The cyber school is nothing more than an Internet portal offering educational materials.

13.     Such basic legal requirements as the attendance regulations of the State Board of Education are being violated as a result of how cyber schools operate.   In these cyber programs, the parents are the teachers and are required for supervising the students.

14.    Notwithstanding the fact that cyber schools are not lawful entities, Midd-West made a determination to allow Megan to participate in its junior varsity girls basketball program provided that she met the same conditions for participation as are required to be met by students enrolled in Midd-West.

15.    The conditions are contained in two letters that have been to the Western Pennsylvania Cyber School—one dated October 23, 2001, and the other dated November 30, 2001. Although the conditions are set forth in twenty-nine (29) separate numbered paragraphs in the two letters, upon a careful reading of the letters, there are actually only (5) general categories of requirements that have been set forth by Midd-West. The twenty-nine (29) numbered paragraphs merely provides detail about each of the five (5) conditions.   The five (5) conditions are as follows:

a.   Megan must have achieved at least the 9th grade level academically;

b.   Megan's curriculum must be similar to the curriculum, including the physical education course, for the students enrolled in Midd-West;

c.   Verifiable attendance documentation must be provided;

d.   On-going passing grades must be documented;

e.   An average or above citizenship grade must be maintained by Megan.

16.    With respect to children enrolled in Charter Schools, local school boards have the right to require that the Charter School student meet the same requirements or conditions for participation is required of its own students.   The Charter School Law expressly provides that participation in extracurricular activities of a school district is permitted only if "the student is able to fulfill all of the requirements of participation in such activity . . .." 24 P.S.§17-1719-A(14).

17.     Each of the five (5) conditions described above, and as detailed in the letters to Western Pennsylvania Cyber Charter School on October 23 and November 30, 2001, are requirements that are applicable to students enrolled in Midd-West.   Some of these requirements are established by the Pennsylvania Interscholastic Athletic Association (hereafter "PIAA") and some by the school district.

18.     With respect to grade level and attendance requirements, the PIAA bylaws provide that "[i]n order to be eligible to participate in any interscholastic athletic contest, a pupil must have been regularly enrolled in a secondary school and in full-time attendance."   PIAA Bylaws, Article III, Section 1.   These two requirements that are applicable at bar—that the student be enrolled in a "secondary school" and that the student be in "full-time attendance."

19.     The school district Student Handbook contains the following attendance requirements: "[s]tudents have the responsibility to comply with all attendance laws, regulations and policies." (Student Handbook, p.12)   More specifically, the student handbook provides that "[s]tudents must be in attendance at school ALL DAY in order to participate in games, practices, rehearsals, activities, etc." (emphasis in the original)( Student Handbook, p. 18)

20.     With respect to curriculum, the PIAA requirements state:

> "To be eligible for interscholastic athletic competition, a pupil must pursue a curriculum defined and approved by the principal as a full-time curriculum. Where required, this curriculum or its equivalent must be approved by, and conform to, the regulations of the State Board of Education and the Pennsylvania School Code, *as well as any local policies established by the local school board.*" (italics added) PIAA Bylaws, Article IX, Section 1.

21.     With respect to passing grades, the PIAA requirements provide that "[t]he pupil must be passing at least four full-credit subjects, or the equivalent.   Eligibility shall be cumulative from the beginning of a grading period, shall be reported on a weekly basis, and shall be filed in the principal's office."   PIAA Bylaws, Article IX, Section 1.   Midd-West, however, has imposed a

higher standard for its students.  Rather than four credits, students must take five credits.  (Midd-West Student Handbook, p. 18)

22.    The Student Handbook sets forth the additional eligibility requirements for Midd-West's student athletes:

"To be and remain eligible, a student must:

1    be passing five credits.

2    carry a card if the academic average is below 74%.  The card shall be signed by each teacher and presented to the office every Friday.  Teachers shall sign 'yes' if the student's grade is passing or 'no' if the student's grade is failing.  The teacher's statement shall indicate the student's grade cumulative from the beginning of the grading period.  Students must be passing five credits in order to be eligible for the week.  Eligibility will be from Sunday to Saturday." (Student Handbook, p.18)

23.    With respect to citizenship, the Student Handbook imposes stringent requirements that must be met by students.  Specifically, the Student Handbook provides:

"To be and remain eligible, a student must:

* * *
3.    carry a card if the citizenship falls below 3.0.  If the citizenship average falls below 2.2, the student is ineligible to participate.  If more than one teacher signs the card stating that citizenship is less than 3, the student is ineligible for that week. [Citizenship equals attitude plus initiative plus conduct.]"  (Student Handbook, p.18)

23.    Megan does not and has not met each of these conditions for eligibility.

24.    With respect to attendance, Megan fails to comply with a number of legal requirements.  First and foremost, participation in a cyber school is in violation of the compulsory attendance laws.  Section 1327 of the School Code, 24 P.S. §13-1327 requires students to "attend . . . a day school".  Simply stated, a cyber school is not a day school.  Moreover, the attendance regulations of the State Board of Education provide that "[n]o days may be counted as days taught on which

the schools are closed . . .." 11 Pa.Code § 11.1.  In addition, time counted for attendance is limited to "instruction and instructional activities provided as an integral part of the school program *under the direction of certificated school employees*." (Italics added) 22 Pa.Code, §11.2. Simply stated, the time that Megan spends on the Internet is not "under the direction of school employees."  It is self-directed or parent directed, not school employee directed.

25.    In addition to these fundamental attendance issues, the scheme that the Plaintiffs are offering to show attendance is unfair and has no accountability.  The scheme proposed by Megan is that she will call the cyber school and tell the cyber school when she was in attendance.

26.    Megan has not provided any verifiable or reliable data that she was participating in school activities, let alone meeting the legal requirements for attendance as set forth in Section 1327 of the School Code and Chapter 11 of the State Board regulations.

27.    With respect to the actual grade that Megan claims to be in, the facts will show that Megan's chronological age would place her in the 9th grade.  However, grade placement in the Midd-West School District is not determined solely by age.

28.    When students transfer into Midd-West either from a homeschool program or from a private school, the student is evaluated to determine the student's grade placement.  Students who have not achieved a grade level commensurate with their chronological age are not placed in a grade with the age peers, but are placed in a lower level with commensurate with their academic achievement.

29.    Megan was not assessed to determine which grade level she had achieved for purposes of Midd-West.  There is no evidence that has been presented to Midd-West that she has achieved 9th grade academically, despite her chronological age.  The cyber school placed Megan in 9th grade,

not because they have conducted any evaluation to determine placement, but because that's how old she is.

30.     Megan has not proven that she is in secondary school as is required by the PIAA bylaws.

31.     With respect to citizenship, no reliable or verifiable evidence has been submitted that Megan has achieved the required grade for citizenship.

32.     With respect to curriculum, there is no evidence that has been presented to the school district that the curriculum is similar to or consistent with the curriculum of the school district. As stated in the PIAA bylaws, the "curriculum [must] . . . conform to . . . any local policies established by the local school board." (PIAA Bylaws, Article IX, Section 1)

33.     With respect to passing grades, no reliable or verifiable documentation has been supplied to Midd-West with respect to Megan.

34.     The facts are clear that Megan has not satisfied the conditions necessary to enable her to participate.

35.     Midd-West's junior varsity girls basketball team has a 24 game schedule.  The schedule began on Saturday, December 1, 2001 and concludes Monday, February 11, 2002.  Megan played in the first game, but was excluded thereafter.  Megan has missed 19 games, and, effective February 4, 2002, there are only four (4) games remaining—February 4, 7, 9 and 11.

36.     Megan will not suffer irreparable injury if she is not permitted to play in the final four (4) games of the girls junior varsity basketball schedule.

37.     Midd-West did not approve the Charter for the Western Pennsylvania Cyber Charter School.

### Defendant's Proposed Conclusions of Law

1.     Cyber schools are not authorized by the Charter School Law.

2.      Megan's participation in a cyber school does not entitle her to participation in Midd-West School District's extracurricular activities.

3.      Among other legal requirements, the following legal requirements, apply to charter schools:

     a.   Chapter 11 of the State Board of Education, which is expressly made applicable to Charter Schools. P.S. §17-1732-A(b);

     b.   Section 1502 of the Public School Code, which is also expressly incorporated into the Charter School Law. 24 P.S. §17-1719-A(12); and

     c.   The compulsory attendance law set forth in Section 1327 of the School Code.  24 P.S. §17-1732-A(a)

4.      Megan's participation in Western Pennsylvania Cyber Charter School is not in accordance with the compulsory attendance requirements of the School Code.

5.      The Western Pennsylvania Cyber Charter School allows students to receive credit for attendance on days on which school is not scheduled in violation of 22 Pa. Code §11.1.

6.      The Western Pennsylvania Cyber Charter School allows students to receive credit for attendance at hours of the day during which the school is not in session and when there is no supervision by any school employee in violation of 22 Pa. Code §11.2.

7.      The Western Pennsylvania Cyber Charter School allows students to receive credit for attendance during Saturdays and Sundays in violation of Section 1502 of the School Code.

8.      The Western Pennsylvania Cyber Charter School allows students to receive credit for attendance during evening and night hours in violation of the requirement for children of compulsory school age that they attend a "day school." 24 P.S. §13-1327.

9.      Children are required "to attend" a "day school." Parents are required "to send" children "to a day school." The day school to which students are to be sent are schools "in which" the subjects and activities prescribed by the State Board are taught. A cyber school is not a "day school" to which students are enrolled or "in which" subjects and activities prescribed by the State Board are taught.

10.     The educational program provided by the Western Pennsylvania Cyber Charter School is a home schooling program as envisioned by the home schooling law found at Section 1327.1 of the School Law. 24 P.S. §13-1327.1.

11.     Cyber schools were not authorized by the General Assembly to become cyber schools in light of the following:

    a.  There are no less than three provisions speaking to the "location" of the school. The Charter School Law prohibits school board directors from serving on a board of trustees of a charter school "*located* in the member's district." 24 P.S. §17-1716-A(b)(emphasis added). The application for approval as a charter school must be sent to the local board of school directors of the "school district in which the charter school will be *located*." 24 P.S. §17-1718-A(b)(emphasis added). The application must identify the address of the "*physical facility* in which the charter school will be *located*." 24 P.S. §17-1719-A(11)(emphasis added).

b. The limited case law that currently exists recognizes that there is legal significance to the physical "location" of the school. In *West Chester Area School District vs. Collegium Charter School*, 760 A.2d 452 (Pa.Cmwlth. 2000), the court considered a number of issues pertaining to the Charter School Law. One of the issues related to whether a charter school was a "regional" charter school because it drew students from more than one school district, even though the physical brick and mortar school facility in that case was located in only one school district.   Concluding that a charter school was not a "regional" charter school if the school was located in only one school district, the court said:

"unless the charter school will be *located* in more than one school district, which is not the case here, the CSL does not set forth any particular set of circumstances that would require a charter school applicant to apply as a multi-district regional charter school rather than a single district charter school." 760 A.2d 452, at 463.

c. In violation of the Charter School Law, cyber schools have no location. Cyber schools are the Internet.  Cyber schools are the children's homes. Cyber schools are the computer servers, the Internet links, and the websites all over the world from which children hopefully will learn. The General Assembly did not and could not have intended a school that is housed in a computer processor, that finds its resources in memory chips, and that replaces bricks and mortar with wires criss-crossing the globe when it enacted several provisions based upon the concept of a school's location being in a particular school district or in a particular region.

d.  In keeping with the concept that the General Assembly contemplated genuine schools being operated under the Charter School Law, there are several provisions addressing the issue of the facilities for the schools. The only authorization in the Charter School Law for establishing a school is the following statement:

> "A charter school may be established by creating a new school or by converting an existing public school or a portion of an existing public school." 24 P.S. §17-1717-A(a).

e.  The application for approval of a charter school must contain a "description of and address of the physical facility in which the charter school will be located . . .." 24 P.S. §17-1719-A(11). Charter schools are permitted to acquire real estate for use as a charter school facility. 24 P.S. §17-1714-A(a)(3). The law permits charter schools to enroll nonresident students on a "space-available basis."   24 P.S. §17-1723-A(c). Contemplating that there would be an actual school facility, and recognizing the central role of the local school districts chartering charter schools, the General Assembly mandated that the local school boards have:

> "ongoing access to the records *and facilities* to ensure that the charter school is in compliance with its charter and this act and that requirements for testing, civil rights and student health and safety are being met." 24 P.S. §17-1728-A(a) (emphasis added).

f.  In an effort to insure that there would be no violation of the Establishment Clause, the Charter School Law prohibits charter schools from displaying

religious object and symbols "*on the premises* of the charter school." 24

P.S. §17-1715-A(5)(emphasis added).

g.    Currently being considered by the General Assembly is House Bill 1733.

In that bill, the House Education Committee expressly stated what is clear

from the Charter School Law—i.e., that cyber schools were not

contemplated by the Charter School Law and that cyber schools do not

meet the requirements of the Charter School Law.   Specifically, House

Bill 1733 provides, in pertinent part:

"The General Assemble finds and declares as follows:

(1)  Since the enactment of the Charter School Law, applicants
have sought charters to operate cyber schools as cyber charter
schools.

(2)  Because the technology involved readily enables cyber
schools to draw students from throughout this Commonwealth,
cyber schools can operate without significant involvement with
individual school districts, including the district that granted the
charter.

(3)  Because the technology permits students enrolled in a
cyber school to access instructional programming on an irregular
schedule and without being physically present in an educational
facility, cyber schools do not fit the requirements of the Charter
School Law to have a suitable physical facility and to provide a
minimum number of days or hours of instruction.

(4)  The Charter School Law does not provide an adequate
framework for evaluating a cyber school application, holding an
approved cyber school accountable and funding the operation of
the cyber school."

h.  The only recognition by the General Assembly of so-called distance

learning or computer learning options is in the provision establishing the

minimum number of days or hours that a charter school must be in session. That provision states fully as follows:

> "(9) A charter school shall provide a minimum of one hundred eighty (180) days of instruction or nine hundred (900) hours per year of instruction at the elementary level, or nine hundred ninety (990) hours per year of instruction at the secondary level. Nothing in this *clause* shall preclude the use of computer and satellite linkages for delivering instruction to students." 24 P.S. §1715-A(9)(emphasis added).

i.   The foregoing provision simply means that when students are in attendance at the day school as they are required to be under both the compulsory attendance law and the Charter School Law, that some of the instruction and some of the time can be devoted to using distance learning. It does not overrule the compulsory attendance law. It does not dispense with the need for students "to attend" a "day school". The fact that the General Assembly placed the provision in the clause dealing with the minimum number of days or hours a school must be in session shows that it wanted to make clear that the minimum instruction time did not prohibit schools from augmenting their programs with computer or satellite linked resources.

j.   Section 110 of the School Code is incorporated into the Charter School Law. It provides that "[a]n official visitor shall have access to and may not be denied access to any public school in the Commonwealth at any time." 24 P.S. §1-110. Naturally, charter schools are public schools. There is no place in a cyber school for officials to have access. Section 771 of the School Code is incorporated into the Charter School Law. It

49

requires that the United States Flag, flagstaff and necessary appliances, be displayed "upon or near each public school building in clement weather, during school hours, and at such other times as the board may determine." 24 P.S. §7-771. :

k.   Section 1310 of the School Code is also incorporated into the Charter School Law and applicable to charter schools.  Among the provisions of Section 1310 of the School Code are the following:

   i.      "all of the pupils . . . shall be assigned to, and reasonably *accommodated in*, one of the public schools . . .."  24 P.S. § 13-1310(a)(emphasis added).

   ii.      "Before the board of school directors purchases educational services from the agency for a specific child, it must document that the child cannot receive appropriate educational services in a regular classroom setting because of behavioral or psychological reasons."  24 P.S. §13-1310(b).

l.   Section 1317 of the School Code is also incorporated into the Charter School Law.   That section grants to school authorities the right to discipline students, not only when they are "in attendance" but also "during the time they are going to and from their homes . . .." 24 P.S. §13-1317.

m.   Brick and mortar charter schools are also required to comply with Section 1518 of the School Code.  That section requires emergency training so students may "in sudden emergencies be able to leave the school buildings

in the shortest possible time without confusion or panic." 24 P.S. §15-1518(b).

n.      All of Article XIV of the School Code is incorporated into the Charter School Law.  That Article permits excusal from the compulsory attendance laws only if the student is "prevented from attending school on account of the health or sanitation laws of this Commonwealth, or by the sanitary regulations of the local board of health or the board of school directors . . .."  24 P.S. §14-1417.  Charter schools must employ physicians for certain purposes.  24 P.S. §14-1410.  The school physician and school dentist shall conduct medical, dental, and other examinations, subject to certain exceptions.  24 P.S. §14-1404.

o.      Pursuant to Article XIII-A of the School Code, which is also incorporated into the Charter School Law, among other requirements, charter school laws must "develop a memorandum of understanding with local law enforcement." 24 P.S. §13-1303-A(c).

p.      The Court finds that each and every one of these provisions makes it clear that the General Assembly had one thing in mind when it enacted the Charter School Law—the charter schools would be real schools, with real teachers, real facilities, and real students.  As its name implies, a cyber school is none of these things.

q.      Not only do the School Code provisions which the General Assembly incorporated into the Charter School Law reflect the intent that charter

schools be real schools, but the regulatory provisions that have been incorporated into the Charter School Law evidence a similar intent.

    i.  Chapter 11, governing pupil attendance, is incorporated into the Charter School Law and makes it as clear as crystal that what is being contemplated are real schools with real teachers interacting face to face with students.

   ii.  Chapter 11 requires that "schools shall be kept open each school year" for the requisite number of days or hours. 22 Pa.Code §11.1. To attend school, children must be immunized. 22 Pa.Code §11.20. These provisions could only make any sense when dealing with real schools.

  r.  Perhaps the regulatory provision that best constitutes an outright prohibition of cyber schools is 22 Pa.Code §11.2. That provision requires that instruction not be under the direction and supervision of parents or guardians, as is the model for cyber schools, but under the direction of certified personnel.

12.    Western Pennsylvania Cyber Charter School is operating a home schooling program in light of the following:

  a.  There is no physical school building;

  b.  The students stay at home;

  c.  The students and their education are supervised by parents or by some other caregiver;

  d.  Parents are the director(s) and supervisors of their child's education;

   e. Parents are responsible for their students' daily supervision;

   f. Parents determine the scope, sequence and method of self-paced instruction; and

   g. Parents provide a suitable workplace, quiet environment and creature comforts such as snacks and meals; answer simple questions; are the frontline source to monitor student discipline and attendance; monitor the program of instruction; and monitor physical education and extracurricular activities.

13.    The Western Pennsylvania Cyber Charter School is operating as a regional charter school, but failed to obtain approval from the school districts in which it is operating as required by the Charter School Law. 24 P.S. §17-1718-A.

14.    The Court concludes that for all of the reasons set forth above, the Plaintiffs do not have a reasonable likelihood of success on the merits.

15.    The Court concludes that Megan will not suffer irreparable harm.


Respectfully submitted,


LEVIN LEGAL GROUP, P.C.

_Michael I. Levin_  2-3-02

Michael I. Levin, Esquire
(Counsel for Defendant)
1402 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, PA 19006
(215) 938-6378

Exhibit   A

DEC-11 01 15:22 FROM:RYCOLRIDE ATTY   7173371364   TO:215 938 6375   PAGE:02

IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA

CIVIL

FAIRFIELD AREA SCHOOL DISTRICT, UPPER ADAMS   :
SCHOOL DISTRICT, GETTYSBURG AREA SCHOOL   :
DISTRICT and LITTLESTOWN AREA SCHOOL   :
DISTRICT,   :

    Plaintiffs   :

    vs.   :   No. 01-S-1008

THE NATIONAL ORGANIZATION FOR   :
CHILDREN, INC.; a/k/a EINSTEIN ACADEMY, a/k/a   :
T.E.A.C.H. CHARTER SCHOOL, a/k/a, TEACH-THE   :
EINSTEIN ACADEMY CHARTER SCHOOL, a/k/a   :
the E- ACADEMY CHARTER SCHOOL; and a/k/a   :
T.E.A.C.H. THE E-ACADEMY CHARTER SCHOOL, and   :
one or more JOHN AND/OR JANE DOES   :
    Defendants   :

PROTHONOTARY

Dec 11 2  21 PM '01

FILED

## RULING ON PRELIMINARY OBJECTIONS
## AND ADJUDICATION OF REQUEST FOR PRELIMINARY INJUNCTION

### I

### PRELIMINARY OBJECTIONS

This action was instituted on August 30, 2001 when Fairfield Area School District (FASD) filed its complaint against defendants. Thereafter, on October 3, 2001, the court conducted a conference with counsel concerning FASD's request for a preliminary injunction. Without vigorous objection by defendants, the court issued an injunction that froze the status quo as it existed at that time. Defendants were not enjoined from presenting an educational service or curriculum but were precluded from enrolling additional students.

This court summarily granted petitions by three other school districts requesting leave to intervene in the action. We saw no prejudice to defendants and acted to avoid lengthy preliminary proceedings. For purposes of simplicity,

---

DEC-11 01 15:22 FROM:RYCOLRIDE ATTY   7173371364   TO:215 938 6375   PAGE:03

we will refer to the parties collectively as plaintiffs and defendants, without specifying any particular party.

The court quickly learned that Adams County was not the only place where litigation was occurring. After being informed that the action concerned a charter issued by Morrisville Borough (Bucks County) School District, the court expressed some concerns about venue and was informed that defendants intended to file preliminary objections. During a telephone conference on October 5, 2001, we were told that preliminary objections had been filed. Nonetheless, with the agreement of counsel a hearing was scheduled on the preliminary injunction for October 25, 2001. Later, oral argument was scheduled on preliminary objections for November 16, 2001 and the hearing was continued until November 1, 2001.

We conducted a fairly lengthy hearing that spanned two days. The process would have been much longer, but counsel agreed to and did introduce proceedings from Butler County by reference. Numerous exhibits were received into evidence.

At the conclusion of the hearing, a decision was postponed pending filing of requests for findings and oral argument. We heard argument on both preliminary objections and the request for an injunction.[1]

Defendants advance the following reasons for their preliminary objections:

1. The action should be dismissed, or in the alternate, stayed pending resolution of a Commonwealth Court case entered to No. 213 M.D. 2001, Pennsylvania School Boards, Inc. et al v. Charles B. Zogby, Secretary of Education Designate, et al.

It is clear that none of the plaintiff school districts in our case was specifically named as a party in the Commonwealth Court action. Defendants base their

---

[1] This judge will retire from the bench at the stroke of midnight which will be either December 31, 2001 or January 1, 2002, depending upon one's perspective. For guidance of whoever inherits this case, we had the argument transcribed.

DEC-11 01 15:22  FROM:ROLLINGE ATTY                7173371364               TO:215 938 6375          PAGE:05

plea of abatement? on the fact that the complaint pending before Commonwealth Court includes a request for class certification that would include all school districts similarly situated to those involved in the action. However, plaintiffs point out that no certification has occurred. They have not directly participated in that action and are presently not parties to it.

Defendants point out that the same counsel represents school districts in each action and contend that the present action is "an attempt to circumvent the unfavorable May 11, 2001 ruling in the Commonwealth Court Action, which denied the school districts' petition for an injunction." Brief, page 6. As we point out in footnote 2, we may not consider the motives of plaintiffs in ruling on the objection. The parties have stipulated that we are not bound by Judge Morgan's decision in the Commonwealth Court action.

The court concludes that defendants are not entitled to abate this action. We have already expended considerable judicial resources and see no justification for a stay in this action.

2. **The action should be dismissed under Pa.R.C.P. 1028(a)(4) because it constitutes an impermissible collateral attack on the grant of a charter by Morrisville School District and because plaintiffs have not exhausted all administrative remedies.**

Defendants have provided a copy of Commonwealth Court's slip memorandum opinion in *Mosaica Academy Charter School, et al. v. Commonwealth of Pennsylvania, Department of Education, et al.,* No. 803 M.D. 1998 in which that court stated:

Additionally, the General Assembly has created and vested the Charter School Appeal Board with the exclusive authority to review an appeal by a charter school applicant or by the board of trustees of an existing charter school of a decision made by the local board of directors not to grant a charter, 24 P.S. §17-1717-A(i)(1). The Charter School Law is silent regarding whether there can be an appeal from a local school board's decision to grant a charter school application. Concomitantly, the Charter School Law does not detail the prerequisite steps necessary to appeal the grant of a charter school application. Id page 8.

The Commonwealth Court went on to suggest that (a) sole discretion as to granting, denying or revocation of a charter rests with the school district defined as the local district acting upon the charter; (b) other school districts may not interfere in that decision (c), the sole remedy is to attend meetings of the chartering school districts and request relief.[3]

Although a memorandum opinion is not binding precedent, it certainly gives us pause concerning plaintiffs' request that we declare the charter invalid. We may and do disagree with suggestions that the legislature has denied access to the courts by failing to provide for judicial review. Frankly, we cannot believe the legislature intended what we consider an absurd result, that is to empower each and every one of the 501 school districts in this Commonwealth to establish itself as the exclusive board of appeals from its own decision to grant a charter. This would mean that even when the grant of a charter clearly contravenes the law, the other 500 districts would be forced to journey to that local Mecca and present their grievances.

It is also interesting that the act provides for no consequence when an applicant fails to appeal a rejection of a charter application. Although defendants' applications for a charter in Philadelphia and elsewhere were

[1] One of the more interesting discussions that we have read about lis pendens appears in *David Cockle Co., Inc v. Waxley,* 389 Pa. Super.112 , 566 A.2d 870 (1989). We read that the plea is based upon an ancient maxim "nemo debet bis vexari pro una et eadem causa," (no man shall be vexed twice for the same cause of action). 566 A.2d at 873. The full name of the plea is lis alibi pendens. That decision makes it clear that an action may be dismissed because of an earlier proceeding unless both suits involved the same parties (acting in the same legal capacity), the same cause of action (with due regard to common law distinctions between contract, trespass and equity actions), the same relief asserted and the same relief requested. Unlike federal law, Pennsylvania cannot consider judicial economy and motivations of the parties unless all required common law utilities are present.

[2] Interestingly, the Charter School Law, in §17-1720-A provides that "(t)he written charter shall be legally binding on both the local board of school directors of a school district and the charter school's board of directors." The law does not expressly make the charter binding on other school districts that did not participate in the chartering process. Arguably, this statutory enables plaintiffs to challenge the charter as it applies to Adams County students.

DEC-11 01 15:23  FROM:SECHLER ATTY  7173371364  TO:215 938 6375  PAGE:07

denied, defendants have nonetheless enrolled students from those school districts.

Members of the Morrisville Borough School Board are doubtlessly fine people, but can hardly be considered motivated to police defendants' performance. Under terms of the charter, that district's children receive defendants' services without costs and the district stands to receive some $500,000.00 per year from defendants, presumably for administrative expenses incurred in overseeing defendants. We also mention without comment that defendants have rented a building from the district and that plaintiffs have argued that the terms are very favorable to the district.

Nonetheless, our analysis of this case does not require us to declare the Morrisville charter invalid. Although we believe that the Charter School Law applies only to brick and mortar institutions, we take care to limit our consideration to students residing in the four plaintiff districts.

The Charter School Law does not make defendants an instrumentality of the Commonwealth. The clear import of the law is to free some educational services from requirements that bind school districts. Individuals and other entities outside the government sector form the charter school and a privately selected board of directors administers its business. Thus, venue in Adams County is proper under Pa.R.C.P. 1006.

The court dismisses preliminary objections.

## II
## ADJUDICATION

Each counsel has filed extensive requests for findings of fact. Although facts can be succinctly stated, courtesy demands that we rule on the requests. We will consider them in the categories presented. Adoption of the

requests merely means that the facts have been established by credible evidence. Relevance to the decision in this case does not necessarily follow.

Plaintiffs' requests:

One through nine are adopted, except that "principle" is changed to "principal" throughout. Seven, which states that the court has not yet rendered a decision on the intervention request of Upper Adams School District is rejected. The order granting intervention was signed September 24, 2001.

Ten through twenty three are adopted.

Twenty four and twenty five are adopted.

Twenty six is adopted except that b.vii.7 is modified by substituting "testified" for "misrepresented," and the last sentence is changed to read, "She later corrected this statement by admitting that they were applying with other school districts." Thus we reject implications that the witness willfully lied.

Twenty seven through twenty nine are adopted.

Thirty through thirty three are adopted

Thirty four through forty are adopted.

Forty one is rejected. Testimony established that Borough School District considers that either all requirements of the Charter School Agreement have been satisfied or are currently being satisfied.

Forty two through forty four are adopted.

Forty five through fifty six are adopted except 54 is modified to read as follows:

54. Joseph Baird, who was employed by the Department of Education at the time that the Home Schooling Statute was enacted, was involved in the implementation of the home schooling statute. He testified that defendants' program was essentially a home school program. However, defendants provided resources and materials not normally available to home schooled children.

Fifty seven through seventy one are adopted.

Seventy two and seventy three are adopted. Seventy four is rejected.

Seventy five through seventy eight are adopted.

Seventy nine through ninety three are adopted, except footnote 12 is not. That footnote states that Mr. Mandel apparently perjured himself in the Butler County proceedings. We are in no position to make such an assumption.

Ninety four through one hundred and five, except ninety eight are adopted. As to 98, our record does not establish whether Judge Morgan heard or did not hear evidence prior to his ruling. Presumably, he did not due to the nature of his ruling, but we do not have the entire record in that case before us.

We decline to either accept or reject plaintiffs' submitted conclusions of law. Although we agree with most if not all, our decision in this case does not require that we find the Morrisville Borough charter invalid or the Charter School Law unconstitutional.

**Defendants' requests:**

However, we rule as follows:

Many of these requests are really matters of statutory interpretation.

One through six are adopted. Seven is rejected. Eight is adopted. Defendants ask us to find, in submission 7, legislative approval for cyber schools. The mere fact that a bill is pending does not imply such approval. Furthermore, the House Bill 1733 recites that "cyber schools do not fit the requirements of the Charter School Law to have a suitable physical facility and to provide a minimum number of days or hours of instruction."

Nine through fifteen are adopted, except 11 and 13 are modified to state that the Department of Education sent an email memorandum, Defendants' Exhibit 50, to various school districts. The memorandum stated that until court held a specific cyber school to be illegal and that decision was affirmed on appeal "the department believes that school districts should refrain from advising parents that they will violate compulsory attendance laws if they enroll their children in a cyber charter school." Requests 11 and 13 are also clarified to indicate that the Department of Education has neither the power nor the responsibility, except in disbursement of funds and involvement in the Charter School Appeal Board, to determine the validity of a particular charter school.

7

Sixteen through twenty are adopted. Twenty one, which states that a charter school may enroll students from outside the district that grants the charter is rejected, as not completely stating applicable law. Twenty two is rejected as submitted for the same reason. Twenty three is adopted but changed to read that Einstein, in submitting and pursuing its application for a charter, presumably followed the procedure set forth in 24 P.S. §17-1723-A(e). Twenty four, twenty five and twenty six are adopted. Although twenty seven accurately recites statutory language, that submission is modified to make it clear that no procedure exists in the statute for enforcing accountability, except to the chartering school district. Twenty eight and twenty nine are adopted.

Thirty through thirty four are adopted. Thirty five is rejected. As to 35, it is true that Mr. Severs testified that 21 of 28 teachers were certified, cross examination brought out that several teachers had stale certificates, and the witness could not say when or if they had been renewed. Although it may be true, as the submission suggests, that staleness is not an issue, this question was not raised in testimony or settled by evidence. Thirty six and thirty seven are adopted. As to thirty eight, it is true that defendants utilize programs in an attempt to ensure that younger students comprehend lessons and requirements, a great deal of responsibility falls to parents or facilitators. Thirty nine is adopted. All but the first line in forty is adopted. We reject the finding that it is impossible to know in any learning environment whether a child is paying close attention to what is being taught. Although a teacher may not know all the time whether a student is paying close attention, teachers in classroom settings are usually on top of such problems.

Forty one through sixty two are adopted.

Forty three through sixty seven are adopted. Sixty eight is adopted to the extent that the charter agreement requires Morrisville Borough School District to monitor defendants and Einstein's board of directors are responsible for monitoring school activities. Sixty nine through eighty are adopted. We see no need to either reject or adopt eighty one in light of prior findings including plaintiffs' number 54. We find there are similarities between defendant's

8

DEC-11 01 15:24 FROM:RHOADRIDE ATTY       7173371364       TO:215 538 6375       PAGE:10

services and home schooling, but that defendants provide services and materials not normally available to home schooled children.

The court does not find that Dr. Blust's comment concerning possible violation of mandatory attendance laws violated a PDE directive. There was no directive, merely an email communication that contained suggestions and stated PDE's position with respect to cyber schools. There was no violation.

Eighty five is rejected as submitted. However, the court finds that students are not in danger of irreparable harm. However, plaintiffs are attempting to enjoin illegal activity.

Generally, the court adopts eighty six through ninety four. However, we emphasize that we are not passing judgment on the legality of the Morrisville charter, nor on defendants' course, presentation, methods of determining attendance and tracking students progress. Additionally, the record makes it clear that defendants began enrolling students before they were capable of providing educational services and before they had met all requirements of the Charter School Law.

<u>Defendants' Supplemental Requests:</u>

Much of the supplemental requests is argument. One and two are adopted, except we reject the sentence that "In any event, the funding sought by Einstein is provided by the CSL, endorsed by PDE, and serves to educate children of taxpayers not being educated by plaintiffs." It is true, however, that the sum of $80,000.00 claimed from Upper Adams School District is based upon students not currently being educated by that school district. Three, involving the definition of unreserved operating fund is irrelevant to this court's decision. Four relates to the number of certified teachers. Certificates may be on file, but are not in evidence. At any rate, this finding is irrelevant for the purposes of this court's order. The same comment applies five and six.

Seven is adopted. Eight is rejected. Although it is only natural to suspect that Ms. Rothschild hoped to reap a large financial benefit from the endeavor, that fact is immaterial if defendants are otherwise entitled to payment. As to

DEC-11 01 15:24 FROM:RHOADRIDE ATTY       7173371364       TO:215 538 6375       PAGE:11

nine, we do not know enough about Ms. Rothschild or her literary contributions to state that she has significant experience in online education. In fact, the industry would appear to be in a formative stage and it is far from clear what "significant experience" means. Ten is rejected as submitted. It is clear that defendants scrambled to organize and prepare a curriculum. We have no idea how closely the Morrisville Borough School District or the Commonwealth will supervise defendants.

Eleven and twelve are adopted. Thirteen and fourteen are rejected. Fifteen is adopted to the extent that Tutorbots and Einstein are separate legal entities. Evidence indicates, however, that each is actually controlled by Ms. Rothschild and her family. For example, a teacher, Andrew Goldman testified that he was hired by Howard Mandel (Trial page 98). Otherwise the submission is rejected. Sixteen through eighteen are rejected.

Nineteen is technically accurate and is adopted. Twenty is adopted. Twenty one is adopted except for the comment that evidence adduced in this case establishes that defendants rushed to obtain a charter and later enrolled students when they were not adequately staffed or prepared to provide necessary educational services. As of the date of the last hearing, a majority of deficiencies had been remedied. Twenty two through twenty six are adopted. Twenty seven represents a legal argument and is neither adopted nor rejected. Twenty eight is adopted.

<u>Discussion and narration of additional facts pertaining to Injunction:</u>

The General Assembly enacted the Charter School Law by adding a new article to the Public School Code on June 19, 1997. 24 P.S. §17-1701-A et seq. At the time of the enactment, technology was not available for cyber schools and the legislation was geared toward traditional brick and mortar facilities. Although the act provides, that nothing in the act precludes the use of computer and satellite linkages delivering instruction for students, we can

DEC-11 01 15:28 FROM-EXCLUSIVE ATTY          7173371364          TO:815 938 6375          PAGE:13

assume that legislators watched the same television depictions of satellite linkages the rest of us viewed. One with this court is familiar depicted students assembled in a classroom while receiving instruction from a distant, especially gifted teacher. The act authorized local boards of school directors to issue charters. Although the act specifically prohibited the grant of charters to entities for profit, it is silent concerning management contracts. Charter schools must be nonsectarian and may not provide religious instruction.

Charters are to be issued for initial terms of not less than three years or more than five years and may be renewed for five year periods.

Charter schools are not required to obtain authorization from plaintiff-school districts to enroll students. Although local school are required to pay tuition and provide transportation for charter school students, charter schools are not obligated to notify school districts in advance of expected expenses. In our case, plaintiffs had no idea that they would be obligated to pay tuition when budgets and taxes were established.

While it is true that tuition requests concern students that plaintiffs are not teaching, there is no indication that costs for providing public education for non-charter students has been reduced.

Defendants were not completely organized and were not in a position to provide educational services when they sought and obtained a charter from Morrisville Borough School District. They intended to fund their program through a Department of Education grant, which was not obtained. Although the Secretary of Education has opined that cyber schools are legal until proven otherwise, he has withheld payments for tuition apparently until litigational dust settles.

Tuition costs payable to a charter school are uniformly set and bear no relationship to the cost of providing education.

It is true that the $80,000.00 bill submitted to Upper Adams School District can probably be paid without diminishing educational programs or requiring a tax increase. It is also true that defendants stand to earn millions in tuition fees. The court is reminded of a statement made by the late senator

11

from Illinois, Everett Dirksen, which we paraphrase, "a million here and a million there, and the first thing you know, we're talking about real money."

We hasten to clarify that we make no finding that defendants have done anything improper or illegal. Sometimes profit incentives can be powerful motivators. Nonetheless, should the legislature consider amending the Charter School Law and specifically address cyber schools, it may want to provide for a method of establishing tuition fees based upon expenses of providing tuition. It also may want to consider vesting the Department of Education with the power to charter and supervise cyber schools. The arrangement that defendants have made with Morrisville unfortunately engenders suspicion and doubts that Morrisville has real incentive to properly regulate defendants.

Although we are of the opinion that the Charter School Law authorizes only brick and mortar institutions, we refrain from passing judgment on Morrisville's decision to issue a charter. We make no findings of propriety or impropriety in the chartering process. Instead we consider only what has occurred in Adams County in light of relevant statutory provisions.

Defendants are, pursuant to the Charter School Law, authorized to enroll nonresident students on a space available basis "if available classroom space permits." §17-1723-A.

There is no indication that this wording involves technical words and phrases, or has acquired a peculiar and appropriate meaning as defined by statute. 1 Pa. C.S.A. §1903. Accordingly, the statutory language must be construed according to its common and approved usage. We therefore interpret "classroom space" as meaning space within a physical classroom setting." To construe it to mean cyber space, or computer space within the confines of a student's home, would make "classroom" meaningless. Although the Charter School Law has broad policy objectives, we cannot disregard clear words that are free from ambiguity under the pretext of pursuing the Charter School's spirit. Id. §1921(b).

12

DEC-11 01 15:26 FROM:BYCDAHLE ATTY   7173371364   TO:215 938 6375   PAGE:14

The evidence clearly establishes that defendants have no classrooms.

The inescapable conclusion that we draw from all this is that defendants lack authority to enroll students who reside in plaintiff districts. Without authority, such enrollment is illegal.

Although we deal with a request for a preliminary injunction, we also have produced an extensive record. It is difficult to believe that a trial would result in substantially additional evidence. Nonetheless, we consider the necessary elements for the grant of a preliminary injunction: 1) Plaintiff right to relief is clear; 2) the injunction is necessary to prevent immediate and irreparable harm not compensable by damages; 3) greater injury would result by refusing the injunction than by granting it; 4) the injunction restores the parties to the status quo that existed prior to wrongful acts; 5) the activity sought to be restrained is actionable and the injunction is reasonably suited to abate such action. *Singzon et al. v. Commonwealth of Pennsylvania, Department of Public Welfare*, 496 Pa. 8, 436 A.2d 125 (1981).[5] A preliminary injunction may issue upon finding that an organization is acting contrary to statutory requirements or its own regulations. 15 Standard Pennsylvania Practice *Injunctions* §83.20.

We therefore conclude that 1), plaintiffs' right to relief is clear; 2) an injunction is necessary to prevent a continuing violation of the law and therefore immediate and irreparable harm; 3) as between the parties, allowing defendants to operate in violation of law will result in greater harm than prohibiting them from doing so. We will fashion our decree to accommodate students who have enrolled in good faith; 4) a prohibitory injunction would restore the status quo as it existed before defendants wrongfully enrolled the students; 5) activities sought to be enjoined are actionable and the injunction is reasonably designed to abate such activities.

---

[4] The American Dictionary of the English Language (Houghton Mifflin Company) defines classroom "A room in which classes are conducted in a school or college".

[5] A more simplified version reciting four requirements is described in 15 Standard Pennsylvania Practice *Injunctions* §83.18.

Although it is clear that plaintiffs have the right to enjoin defendants' activities, we must consider the effect the injunction will have on the students who are enrolled. Time will be needed to either return those students to a classroom setting, or to make arrangements for home schooling. Ordinarily, we would give the parties an opportunity to present a schedule, but do not want to deprive defendants of their right to an immediate appeal. Our decree, therefore, will direct that defendants cease their activity at the end of the present marking period. However, the court will consider any reasonable request to extend the period.

## Conclusions of law:

1. This court has jurisdiction.

2. The parties are properly before the court.

3. Plaintiffs have proven their right to a temporary prohibitory injunction.

## ORDER

And Now, this 11th day of December, 2001, defendants' preliminary objections are overruled. Defendants shall have the right to plead over in accordance with Pa. R.C.P. 1028(d).

Defendants are enjoined from enrolling or presenting educational services to students residing in plaintiff-school districts. This injunction shall take effect at the end of the present marking period.

BY THE COURT,

OSCAR F. SPICER
President Judge

Michael I. Levin, Esquire
Attorney ID: 21232
Levin Legal Group, P.C.
1402 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, PA 19006
(215) 938-6378
(Co-counsel for Plaintiffs)

Robert McQuaide, Esquire
Attorney ID: 21606
Law Offices of Robert McQuaide
18 Carlisle Street
Suite 204
Gettysburg, PA 17325
(717) 337-1360
(Co-counsel for Plaintiffs)

IN THE COURT OF COMMON PLEAS OF
ADAMS COUNTY, PENNSYLVANIA
Civil Action—Law and Equity

FAIRFIELD AREA SCHOOL DISTRICT, et al.,
          Plaintiffs

vs.                                             No: 01-S-1008

THE NATIONAL ORGANIZATION FOR
CHILDREN, INC., a/k/a EINSTEIN
ACADEMY, a/k/a, T.E.A.C.H. CHARTER
SCHOOL, a/k/a, TEACH—THE EINSTEIN
ACADEMY CHARTER SCHOOL, a/k/a,
the E-ACADEMY CHARTER SCHOOL,
and a/k/a T.E.A.C.H. THE E-ACADEMY
CHARTER SCHOOL, and one or more
JOHN AND/OR JANE DOES,
          Defendants

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW

Proposed Findings of Fact

Preliminary Matters

1. The Fairfield Area School District (hereinafter "Fairfield") is a public school district of the Commonwealth of Pennsylvania located in Adams County with its principal offices located at 4840 Fairfield Road, Fairfield, PA 17320.

9. Evidentiary hearings were conducted by the Court with respect to the Petition for Special Relief on October 25, 2001, and November 1, 2001. Included in the record created at said hearings was the record created before the Court of Common Pleas of Butler County at hearings conducted on September 7 and 8, 2001. At the conclusion of the evidentiary hearings before this Court, the parties were ordered to file Proposed Findings of Fact and Conclusions of Law by November 9, 2001, and to present argument on November 16, 2001.

The National Organization for Children, Inc.

10. The Defendant school is owned and operated by a non-profit corporation named the National Organization for Children, Inc.

11. The National Organization for Children, Inc., filed Articles of Incorporation for a Domestic Nonprofit Corporation on November 11, 1998. (BP 854-855)[1] Murray W. Popkave was identified as the only "incorporator" of the corporation. It was represented that the corporation was incorporated "exclusively for charitable purposes under Sec. 501(c)(3) of Internal Revenue Code." The address of the corporation was represented to be "1225 East Montgomery Avenue, Wynnewood, PA 19096, Montgomery" County. The original name of the corporation was the Andrew Foundation, Inc. (BP 854)

12. Although it was represented that Murray Popkave was the only "incorporator" of the corporation, it was established that it was Mimi Rothschild who approached Murray Popkave to create a nonprofit corporation to use the Internet in various educational settings. (BP 2217)

---

[1] References to the exhibits will be to the "Bates Page Number" — i.e., "BP" set forth on each page of the exhibits. References to the transcripts of the hearings before the Court in Adams County will be to the Notes of Testimony—i.e., "NT".

3

2. The Upper Adams School District (hereinafter "Upper Adams") is a public school district of the Commonwealth of Pennsylvania located in Adams County with its principle mailing address of 161 North Main Street, Biglerville, PA 17307-0847.

3. The Gettysburg Area School District (hereinafter "Gettysburg") is a public school district of the Commonwealth of Pennsylvania located in Adams County with its principle mailing address of 900 Biglerville Road, Gettysburg, PA 17325-8007.

4. The Littlestown Area School District (hereinafter "Littlestown") is a public school district of the Commonwealth of Pennsylvania located in Adams County with its principle mailing address of Maple Avenue, Littlestown, Pennsylvania 17340-1343.

5. Each of the School Districts before the Court in this matter received invoices from the Defendant purporting to bill those School Districts for students who are allegedly enrolled in a so-called cyber charter school operated by the Defendant school.

6. In response to their receipt of invoices from the Defendant school, Fairfield initiated this action by filing a Complaint and a Petition for Special Relief, and Upper Adams, Gettysburg and Littlestown filed Petitions to Intervene. By Orders dated October 3, 2001, and October 22, 2001, Gettysburg and Littlestown were granted leave to intervene in this matter.

7. An Order regarding Upper Adams' Petition to Intervene has not been rendered to date by this Court, although the Court stated at the October 3, 2001, conference that it would be granting Upper Adams' Petition to Intervene.

8. By Order dated October 3, 2001, a preliminary injunction was granted enjoining the Defendants from enrolling any more students who were residents of either Fairfield or Upper Adams.

13. The name of the corporation was changed on June 29, 2000, from the Andrew Foundation to the National Organization for Children, Inc. (BP 207-208)

14. The corporate address of 1225 East Montgomery Avenue in Wynnewood is the residence of Howard Mandell and his wife Miriam Mandell, a/k/a, Mimi Rothschild. (BP 2081, 3424)

15. The corporate address remained at the residence of Howard Mandell and Mimi Rothschild from the inception of the corporation until a "Statement of Change of Registered Office" was filed with the Department of State on August 27, 2001. (BP 893-894)

16. An organizational meeting of the corporation took place on October 4, 1998. (BP 819-820) An "agenda" for that meeting exists, but no minutes have been produced for that meeting. The agenda states that an introduction was to be made by Michell Roth. (Michell Roth is Mimi Rothschild's father.) According to the agenda for that meeting, certain actions were taken by the Board of Directors, including the adoption of bylaws, the election of officers and the following action items:

a. "Entertain motion to authorize chairman on behalf of the board to sign assurance statement required with application for charter;"

b. "Entertain motion to authorize chairman to sign charter agreement if approved by the school district of Philadelphia;"

c. "Entertain motion to contract with Educare, Inc. for the daily operation of the Discovery Charter school at the rate of $4,400 per pupil;" and

d. "Entertain motion to lease the school property at 6765-6767 Germantown Avenue for the Discovery Charter School for $5,000 per month." (BP 819-820).

17. Educare, Inc., is a for-profit corporation owned by the parents of Mimi Rothschild. (NT 19).

18. Educare, Inc., provided funding for the National Organization for Children, Inc., to become incorporated. (BP 853, NT 24).

19. Mimi Rothschild has worked on-and-off for a period of 22 years for her parent's schools, including the school operated by her parents at 6765-6767 Germantown Avenue. (BP 3424).

20. From the first moments of its corporate life, the National Organization for Children, Inc., was being used as a means to secure a public school charter so that lucrative contracts could be entered into with for-profit corporations owned by Mimi Rothschild or her family.

21. The Board of Directors of the National Organization for Children, Inc., had meetings between the time of the initial organizational meeting on October 4, 1998, and March 20, 2001. (BP 2220, 3412). Despite being required by a Notice to Attend served in this case to produce corporate minutes and the corporate minute book, the Defendant school did not produce any corporate minutes for any meeting prior to notes for its meeting of May 29, 2001, and did not produce any corporate minute book. (NT 68-71).[2] It is, consequently, found as a fact that no such minutes or minute book exist.

22. Through sworn testimony and in applications filed with government agencies over the years, the Defendant National Organization for Children, Inc., has misrepresented the number of members of its Board of Directors and the identity of the members of its Board

of Directors. Inconsistent representations as to the number and identity of Board members is reflected in the following:

a. In sworn testimony before the Court of Common Pleas of Butler County, Murray Popkave testified that at the time of incorporation, there were initially three board members—i.e., Murray Popkave, Agnes Smith and Paul Cruz. (BP 2216). Mr. Popkave further testified that Anna Friedrich and Lillian Kuretu later became members of the Board of Directors. (BP 2216). However, Mr. Popkave testified in Butler County that from 1998 to 2000, there were only three members of the Board of Directors—i.e., Murray Popkave, Agnes Smith and Paul Cruz. (BP 2217). Indeed, contrary to what Mr. Popkave testified before this Court, he testified in Butler County that there were no new members of the board from its inception until the time of the charter school applications being filed in mid-2000. (BP 2218). In addition, Mr. Popkave represented that a sixth person was added to the Board—i.e., Neobeth Lane. (BP 2218). As Mr. Popkave testified in Butler County, by the Spring or Summer of 2000, "so there were six of us at that point." (BP 2218).

b. In contrast, in sworn testimony before this Court, Mr. Popkave testified that Paul Cruz had replaced Linda Cruz in 1998. (NT 17), something that was not mentioned in his testimony in Butler County. Moreover, by Mr. Popkave's sworn testimony before this Court, there were five (5) board members by 1999. (NT 13-17). Mr. Popkave identified those five (5) members of the board as being himself, Lillian Kuretu, Anna Friedrich, Agnes Smith and Linda Cruz. (NT 13-17).

---

[2] When testifying before the Court of Common Pleas of Butler County, Mr. Popkave testified that he "believed" that they had minutes of meetings prior to May 29, 2001. (BP 2231).

c. Despite there being at least five (5) board members by 1999 and up to six board members in the Spring or Summer of 2000, in an application for exempt status filed on behalf of the Defendant National Organization for Children, Inc., with the Internal Revenue Service (hereafter "IRS"), it was represented that there were only three (3) members of the Board of Directors—i.e., Murray Popkave, Agnes Smith and Paul Cruz. (BP 675). This representation was made to the IRS in the summer of 2000, at roughly the same time that the Defendant school was filing applications with school districts and representing that there were nine (9) members on the Board of Directors.

d. On applications filed with the Department of Education and with school districts, including the Morrisville Borough School District, it was represented that there were nine (9) members of the Board of Directors—i.e., Murray Popkave, Agnes Smith, Anna Friedrich, Paul Cruz, Katie Roth (Mimi Rothschild's mother), Nesbeth Lane, Lillian Kuzein, Linda Cruz and Mitchell Roth (Mimi Rothschild's father). (BP 62).

e. At the hearing before the Butler County Court of Common Pleas, Murray Popkave testified that contrary to the representations made in the application, Mimi Rothschild's parents, Katie Roth and Mitchell Roth, were never on the Board of Directors. (BP 3412). According to the testimony of Mr. Popkave: "They have no, no connection whatsoever with the National Organization of (sic) Children" and they never had any such connection.[3] (BP 3412). However, Mr. Popkave testified that all of the other people identified on the Application as

members of the board "are all correct." (BP 3412). Contrary to this testimony, Mr. Popkave testified before this Court that Paul Cruz was not on the Board of Directors when the applications were filed. (NT 17).

f. Contrary to the testimony of Mr. Popkave that the Roth's were never on the Board of the National Organization for Children, Inc., Mimi Rothschild told the Philadelphia School Board, during a hearing on T.E.A.C.H.'s charter application to the School District of Philadelphia, that T.E.A.C.H. has been donated the use of a facility by "one of the board members", (BP3494), referring to her mother, Carly (sic) Roth. (NT 24).

g. Contrary to Mr. Popkave's testimony that the Roth's never had any connection whatsoever with the National Organization for Children, Inc., in a resume for Mitchell Roth that was presented as part of an application to governmental agencies, it was represented that Mr. Roth was "Executive Director, The National Organization for Children." (BP 1005).

h. Although according to the testimony of Murray Popkave in this Court that after August 1, 2001, there were only five (5) members of the Board of Directors, (NT 13-20), Howard Mandell testified in Butler County that he was present at the Board meeting on August 26, 2001, when six (6) board members voted to enter into a contract with Tutorbots, Inc. (BP 2146).

23. Based upon the inconsistent representations and testimony as identified above, the Court cannot make a factual finding at this point in time as to how many people were actually on the board of directors of the National Organization for Children, Inc., at any of the relevant periods of time. Notwithstanding the most recent testimony that there were only

---

[3] As stated above, not only has Katie Roth and Mitchell Roth had involvement in the National Organization for Children, Inc., but that for-profit corporation, Educare, Inc., provided the funding to incorporate the National Organization for Children, Inc. (BP 853, NT 24).

a maximum of five members of the board at any one time, it is possible that all nine of the individuals identified as board members on the many applications filed with school districts were actually members of the board and that they are now trying to deny it based on possible conflict of interest implications, particularly Mimi Rothschild and her parents.

### Meetings of the National Organization for Children, Inc.

24. After the National Organization for Children, Inc. entered into the Charter School Agreement with the Morrisville Borough School District on March 20, 2001, the board of directors of the National Organization for Children, Inc., had at least the following four meetings, advertised in the following manner:

a. May 29, 2001, (BP 2219), advertised on May 29, 2001, the day of the meeting, in the Philadelphia Daily New and stating: "Meeting of the Board of Directors of T.E.A.C.H. Charter School will be held Tues, May 29, 2001 at 1:00 PM at T.E.A.C.H. Charter School, 79 Spring Avenue, Broomall, PA." (BP 204),⁴

b. August 19, 2001, (BP 2219), advertised in the Philadelphia Daily News in August and stating: "A special board of directors meeting will be held on Sunday, August 19, 2001 at 1 p.m. at 111 Crawford Avenue, West Conshohocken 19067." (BP 2223).

c. August 26, 2001, (BP 2219), advertised on August 22, 2001, in the Philadelphia Inquirer and the Philadelphia Daily New and stated: "In compliance with the Pennsylvania Sunshine Act, a Special Meeting of the Board of Directors of the National Organization for Children/Teach will be held on Sunday, August 26,

---

⁴ The residence located on Bridge Avenue in Broomall, Pennsylvania, is the home of Mimi Rothschild's parents, Mitchell and Karlie Roth. (BP 2221).

9

2001 at 12 P.M. at 111 Crawford Avenue, West Conshohocken, 19067, to be followed by an Executive Session to discuss litigation and employment contracts." (BP 890).

25. The May 29, 2001, meeting was advertised on the day of the meeting, did not disclose the true identity of the National Organization for Children, Inc, and falsely claimed that the school was located at 79 Spring Avenue in Broomall, when, in fact, that is the address of a Montessori school owned by Mimi Rothschild's parents. The advertisement of the meeting on August 19, 2001, did not disclose the identity of who was meeting. The advertisement of the meeting on August 26, 2001, did not correctly identify who was meeting and did not disclose that it was a meeting of a charter school board of directors. In light of the foregoing, it is found as a fact that each of these advertisements was misleading.

### The Activities of the National Organization for Children, Inc, between October 4, 1998 and November 15, 2000

26. Although Murray Popkave testified that the National Organization for Children, Inc., was not operational between the time of its organizational meeting on October 4, 1998, and the filing of the application with Morrisville Borough School District on November 15, 2001, (NT 17), it is found as a fact that the corporation was operational and was engaged in an ongoing pattern of attempting to obtain from public school districts a charter to operate a charter school so that a contract could be entered into with companies owned either by Mimi Rothschild or her family. This factual finding is based on the following:

a. Mr. Popkave testified that "The Andrew Foundation [i.e., the prior name of the National Organization for Children, Inc.] during the period between 1998 and 2000, was basically inactive, as no projects had yet been identified to pursue, so

10

there was no ongoing business at that point." (BP 2218). Mr. Popkave testified similarly before this Court. (NT 17).

b. Notwithstanding the foregoing testimony, during cross-examination of Mr. Popkave, it was later brought out that the National Organization for Children, Inc. was actively pursuing many projects and began pursuing those projects from the time of its organizational meeting on October 4, 1998. Those projects included the following:

i. Authorization on October 4, 1998, for application for a charter with the Philadelphia School District for a charter school named Discovery Charter School, (BP 819-820, NT 22);

ii. Authorization for entry into a management contract with Mimi Rothschild's parents' company by the name of Educare, Inc., (BP 819-820, NT 21);

iii. Authorization for entry into a lease agreement for property owned by Mimi Rothschild's parents or by a company owned by her parents on Germantown Avenue in Philadelphia, (BP-819-820, NT 21);

iv. Board members were "polled" during this period of time by Murray Popkave on numerous occasions, (BP 2219);

v. There were "several meetings that [they] held at the – at the City Line Adams Mark Hotel, where all the members of board (sic) met and the proposal to submit charter applications was approved at that time." (BP 2231);

11

vi. Mr. Popkave testified that Mimi Rothschild "was properly authorized to file the applications on behalf of National Organization for Children", (BP 2231-2232);

vii. Mimi Rothschild and her husband, Howard Mandell, filed at least 12 and perhaps as many as 62 applications for charter schools during the time that Mr. Popkave testified the National Organization was not operational and had not identified any projects to pursue, (BP 2218), all as established by the following:

1. Mr. Popkave testified in Butler County that "over the years"; "Mrs. Mandell [i.e., Mimi Rothschild] made applications to numerous school districts. I'm not sure how many. Possibly a couple of dozen in the State of Pennsylvania. Maybe more." (BP 3416);

2. Mimi Rothschild has been working on the charter school and applications for 3 to 4 years. (BP 877, NT 42-43);

3. Exhibit P-153 (BP 2873) is a charter school application that Howard Mandell filed with the Philadelphia School District on November 16, 1998, proposing a charter school to be known as "Roots and Wings." Exhibit P-149 (BP 2847) is a transcript of a meeting conducted by the Philadelphia School District on December 17, 1998, in which Howard Mandell spoke on behalf of a charter application for a charter school to be known as "Roots and Wings". (See, BP 2847). According to Mr. Mandell's representations to the Philadelphia School District, this project was

12

initiated by him, his wife, Mimi Rothschild, and a Mr. Bergson. (BP 2851);

4. Exhibit P-155 (BP 2908) is a transcript of a meeting before the Philadelphia School District where Mimi Rothschild spoke on behalf of the Roots and Wings Charter School Application. At that meeting, Mimi Rothschild testified that the charter school could accomplish its missions "because of the unique partnership that we have with Educare, Incorporated [i.e., the for-profit company owned by Mimi Rothschild's parents]. For the past 20 year (sic) Educare, Incorporated has successfully operated schools and summer programs in Philadelphia that target at risk populations and encompass these very philosophies. They have been true change agents in their community led capably by Director Carlie Roth [i.e., Mimi Rothschild's mother] a seasoned educated (sic) steeped in the Montessori philosophy, Mitchell Roth [i.e., Mimi Rothschild's father] a board member who is the ex-director of the Comprehensive Health Planning Agency." (BP 2909A-2909B)[3]

5. Exhibit P-145 (BP 2422) are documents relating to the review and rejection of the charter school application filed for the E-Academy Charter School (T.E.A.C.H.) that was filed with the Philadelphia School District. Exhibit P-146 (BP 2424) is a transcript of a

[3] When preparing these proposed findings, we saw that the pagination process did not number page 164 through 167 of the hearing transcript of the Philadelphia School District transcript that was marked P-155. For reference purposes, we will refer to them as follows: transcript page 164 will be BP 2909A, 165 will be BP 2909B, 166 will be 2909C, and 167 will be 2909D.

13

meeting before the Philadelphia School District during which Mimi Rothschild made a presentation to the school board of the Philadelphia School District. Mimi Rothschild identified herself as "the coordinator of the founding coalition of the proposed Teach Charter School" and "a principal at Tutor Bots (sic), Incorporated." (BP 2430). Instead of identifying her husband as her husband, Mimi Rothschild identified her husband to the Philadelphia School Board as: "our technology and Internet guru." (BP 2431). She identified Mr. Popkave as the "acting" chairman of the Board, even though he had been the actual chairman since 1998. (BP 2431).

6. Exhibit P-53 (BP 688) is a copy of a transcript of a meeting at the New Hope-Solebury School District during which Mimi Rothschild represented the National Organization for Children, Inc. in its application for a charter with that school.

7. In response to the direct question asked of her at the Philadelphia School Board meeting, "are you applying to multiple school districts," Mimi Rothschild misrepresented the facts by answering "No." (BP 2432-2433). She was later caught in that misrepresentation and admitted that they were applying with other school districts. (BP 2434).

8. At a meeting before the New Hope-Solebury School District, Mimi Rothschild testified that "Sixty-two [school districts] got a full

14

draft of our application." (BP 748). When asked to identify the specific school districts to which applications were submitted, Mimi Rothschild testified that: "I would have to refer that to our attorney." (BP 753). She would not even confirm whether they had applied to the Morrisville Borough School District. When asked why she refused to answer the question, she testified: "We don't want there to be any sense of competition to this charter school or any other kind of activity along those lines. So we have been advised not to talk about the other districts at this point." (BP 753). Mimi Rothschild did admit, however, that: "There is no difference in the applications, as far as I know." (BP 753).

9. Contrary to this testimony before the Board of Directors of the New Hope-Solebury School District, at the hearing before the Court of Common Pleas of Butler County, Mimi Rothschild testified that they filed an application with only twelve (12) to fourteen (14) school districts. (BP 3428).

10. The School District of Philadelphia denied T.E.A.C.H.'s charter application on February 26, 2001. (BP 2423). Mimi Rothschild resubmitted an application to the School District of Philadelphia in March, 2001. (BP 2447), which was also later denied.

11. T.E.A.C.H. did not appeal the denial of a charter by the School District of Philadelphia or by the New Hope-Solebury School

viii. Mr. Popkave represented in June or July, 2000, in an application for tax exemption that was filed with the IRS that the National Organization for Children, Inc.: "At this time, grant proposals have been submitted to several of the organizations listed in the Attachment." (BP 656).

ix. At its meeting on May 29, 2001, Howard Mandell reported to the Board of Directors that the "cyber school project" had a history of "3 yrs work by Mrs. Mandell." (BP 877).

**The Tax Status of the National Organization for Children, Inc.**

27. In either June or July 2000, on behalf of the National Organization for Children, Inc., Mr. Popkave filed an "Application for Recognition of Exemption" with the IRS. (BP 655) That application misrepresented a number of facts to the IRS, including the following:

a. That the only members of the board of directors were Mr. Popkave, Agnes Smith and Paul Cruz. (BP 657). In fact, there were either five, six or nine members of the board of directors at that time.

b. That the National Organization for Children, Inc., does not have a special relationship with another organization "by reason of interlocking directorates or other factors." (BP 657). In fact, the National Organization for Children, Inc., is one and the same as Tutorbots, Inc.

c. That the organization's facilities or operations will not be managed by another organization under a contractual agreement. (BP 658). In fact, it was known that the National Organization for Children, Inc., would be managed by Tutorbots, Inc.

d. That the organization does not limit its services to specific individuals or classes of individuals. (BP 658). In fact, it limits its services to students who are eligible for public school enrollment and whose parents sign an agreement.

e. That the organization will not attempt to influence legislation. (BP 658). In fact, The National Organization for Children, Inc., is attempting and is and has attempted to influence legislation. For example, posted on its web page was an announcement by Mimi Rothschild asking reader to "contact your local reps and senators TODAY reiterating our request for $1 million in emergency funding . . ." (BP 3796). In its notes for its May 29, 2001, meeting, the board of directors of the National Organization for Children, Inc., discussed that it "need[s] lobbyists." (BP 877).

f. That neither the organization nor any part of it is a school. (BP 661). In fact, the National Organization for Children, Inc., claims to operate a charter school.

g. That neither the organization nor any part of it provides or administers any scholarship benefits. (BP 661). In fact, the agreement with the Morrisville Borough School District provides for scholarships for residents of the Morrisville Borough School District. (BP 17).

h. The National Organization for Children agreed to amend its Articles of Incorporation with the Commonwealth of Pennsylvania. (BP 666). In fact, no action was taken by the National Organization for Children, Inc., between the July 2000, filing date and September 21, 2001, to amend the charter. (See, FD-53)[6].

[6] The Defendants submitted a number of documents into the record which were given "FD" exhibit numbers and that were handed to Plaintiffs' counsel at the conclusion of the hearing on November 1, 2001. Despite some of the Defendants' exhibits containing a large number of documents and pages, such diverse documents and pages were not individually numbered. Therefore, it is impossible to give a more specific page reference.

17

28. Based on the application that was filed with the IRS and the misrepresentations that were made by the National Organization for Children, Inc., a conditional tax exempt determination was made. By letter dated August 10, 2000, to the National Organization for Children, Inc., from the IRS, the National Organization for Children, Inc., was told: "If you change your sources of support, your purposes, character, or method of operation, please let us know so we can consider the effect of the change on your exempt status and foundation status. If you amend your organizational document or bylaws, please send us a copy of the amended document or bylaws. Also, let us know all changes in your name or address." (BP 649).

29. It is found as a fact that the exempt status was granted by the IRS based upon misrepresentation of fact and that the National Organization for Children, Inc. is not operating in accordance with the application that was filed with the IRS.

The Charter School Application

30. The National Organization for Children, Inc., filed a charter school application with the Morrisville Borough School District on November 15, 2000. (Exhibit P-2, BP 24).

31. At the time that the National Organization for Children, Inc. filed its application with the Morrisville Borough School District, it had no facilities of any nature in the Morrisville Borough School District. Nor did it have any facilities in the Morrisville Borough School District at any time when the application was being considered or when the Charter School Agreement was entered into with the Morrisville Borough School District.

32. The application that the National Organization for Children, Inc., filed with the Morrisville Borough School District contained a number of misrepresentations. Among the misrepresentations were the following:

18

a. That the applicant was "T.E.A.C.H.," some unidentified parents and some unidentified teachers. (Application Fact Sheet, BP 577). In fact, the applicant was the National Organization for Children, Inc.—a fact not disclosed anywhere on the application or at the school board meetings conducted by the Morrisville Borough School District on January 17, 2001, and March 20, 2001. Moreover, T.E.A.C.H. was never an applicant. T.E.A.C.H. is a fictitious name registered by the Reverend Lawrence Brown and stands for "Thee Ecumenical Accreditation Christian Habitat" (BP 521-522).

b. That the applicant had a "suite" at 93 Old York Road in Jenkintown, PA. (BP 24). In fact, there was no suite at that location, only a Mail Boxes Etc. store. (BP 584).

c. That the school will "become a non-profit entity" (BP 126). In fact, the applicant was already a nonprofit corporation and had been a nonprofit corporation since 1998. (BP 205).

d. That the school will apply for tax-exempt status. (BP 126). In fact, the applicant had already applied and been granted conditional tax-exempt status by the IRS. (BP 645-667).

e. That the Board of Directors consisted of nine (9) individuals, (BP 62). In fact, three or four of those individuals were never on the Board or were, in actuality on the Board and are now denying their involvement out of concerns for conflict of interest implications.

f. That "all T.E.A.C.H. students will be issued a new laptop." (BP 30, 39) In fact, the students were not issued laptops, only desktops. (NT 44, 168).

19

g. That "T.E.A.C.H. will implement policies that ensure that all students with disabilities receive a Free Appropriate Public Education (FAPE)," (BP 43). In fact, the defendant school admitted that it is not providing related services (a component of FAPE), (NT 178), and it did not provide any evidence of how it was actually delivering specially designed instruction, another component of FAPE.

h. That there will be only 1,000 students the first year of operation and 76 in each grade, (BP 44, NT 33-34). In fact, the defendant school accepted as many as 3,000 for enrollment, (BP 1505), and at the time of the hearing before this Court, two different enrollment numbers, 2,694 and 2,731, were presented to this Court. (NT 165, 166).

i. That "students will be selected based on the staff's assessment of their ability to work independently and meet the admission criteria stated above," (BP 46). In fact, no student was assessed prior to being admitted to the school. (NT 164).

j. That the form and substance of the parent agreement was as set forth in Appendix T of the application, (BP 47, 67). In fact, the school has been using a different form. (BP 3429-3430).

k. That "T.E.A.C.H.'s calendar will be the same [as] Philadelphia' School District's calendar" and as reflected in Appendix W of the application, (BP 49). In fact, the calendar that has actually been adopted is different. (BP 804, 805).

l. That "[a]ll expenditures over $1000.00 will be submitted to several vendors to ensure competitive bids," (BP 75). Although the management contract with

20

Tutorbots was not incorporated at the time that the applications to school districts, including the Morrisville Borough School District, were filed. Tutorbots did not become incorporated until June, 2001. (BP 2102)[7].

n. That Tutorbots consisted of a "skilled team of web developers, technology specialists, educators, curriculum developers, [and] management consultants." (BP 69). At another point in the application, it was represented that Tutorbot's team "includes educators, curriculum developers, software designers, graphics, e-commerce pioneers and start-up experts." (BP 63). In fact, at the time that the application was filed with the Morrisville Borough School District, the only individuals who were identified anywhere in the record either before the Court of Common Pleas of Butler County and in the record before this Court were Mimi Rothschild and Howard Mandell. Mr. Mandell then testified that Tutorbots had only four (4) employees, himself as "executive director", Mr. Tim Allen, Tim Bender and a new employee whose name Mr. Mandell did not even know. (BP 2082).

o. That "Tutorbots, Inc. has been selected because overall is mission, partners, vendors and short and long range goals satisfy the mission and vision of T.E.A.C.H." (BP 70). It is found as a fact that Tutorbots, Inc., was selected

---

[7] The underhype that Tutorbots, Inc. was somehow a legitimate company engaged in arms-length dealing with the applicant was taken to the extent of including a "Letter of Intent" dated October 1, 2000, over Howard Mandell's name that "Tutorbots, Inc. will be pleased to manage the operation of the e-school." (BP 167).

21

Tutorbots was not incorporated at the time that the applications to school districts, including the Morrisville Borough School District, were filed. Tutorbots did not become incorporated until June, 2001. (BP 2102)[7].

n. That Tutorbots consisted of a "skilled team of web developers, technology specialists, educators, curriculum developers, [and] management consultants." (BP 69). At another point in the application, it was represented that Tutorbot's team "includes educators, curriculum developers, software designers, graphics, e-commerce pioneers and start-up experts." (BP 63). In fact, at the time that the application was filed with the Morrisville Borough School District, the only individuals who were identified anywhere in the record either before the Court of Common Pleas of Butler County and in the record before this Court were Mimi Rothschild and Howard Mandell. Mr. Mandell then testified that Tutorbots had only four (4) employees, himself as "executive director", Mr. Tim Allen, Tim Bender and a new employee whose name Mr. Mandell did not even know. (BP 2082).

o. That "Tutorbots, Inc. has been selected because overall is mission, partners, vendors and short and long range goals satisfy the mission and vision of T.E.A.C.H." (BP 70). It is found as a fact that Tutorbots, Inc., was selected

21

because Tutorbots and the defendant school are "one and the same"," (NT 66), and Mimi Rothschild and/or Howard Mandell created the National Organization for Children, Inc., as a means of funneling taxpayer dollars into their for-profit company.

33. Consistent with the misrepresentation made in the application filed with the Morrisville Borough School District, at the New Hope-Solebury School District meeting on December 18, 2000, in connection with the application filed there, Mimi Rothschild expressly stated that they were not yet incorporated as a non-profit corporation and she went on to say: "We can't be." (BP 754). In fact, they were incorporated since 1998.

## The Application Process and Charter School Agreement

34. The application that was filed by the National Organization for Children, Inc., was filed with the Morrisville Borough School District on November 15, 2000. (BP 2266).

35. No hearing was held within the required forty-five (45) day period. (BP 2267). Instead, the Morrisville Borough School District conducted a hearing on January 17, 2001. (Exhibit P-8, BP 211).

36. Based upon the application that had been submitted and the information considered at the January 17, 2001, school board meeting, The National Organization for Children, Inc., did not have any chance of obtaining a charter from the Morrisville Borough School District. The testimony from William Thompson, the solicitor for the Morrisville Borough School District and the individual who chaired the January 17, 2001, school board meeting was that the applicant did not have a "prayer of getting the charter." (BP 2259).

22

37. Following the January 17, 2001 meeting, private and behind closed door meetings, negotiations, and demonstrations took place between representatives of The National Organization for Children, Inc., and representatives of the Morrisville Borough School District. In addition, changes and modifications were made to the application. More specifically, these activities included the following:

a. Dr. Gould, the Superintendent of the Morrisville Borough School District, did a lot of "networking" with the school board to lobby for granting the charter. (BP 2259). According to the school district solicitor, Dr. Gould "talked to the board members individually and kind of campaigned in favor of T.E.A.C.H." (BP 2259). Dr. Gould contacted school board members "one-on-one" and "in private." (BP 2270).

b. Although there was never authorization for Dr. Gould or William Thompson to negotiate a contract or draft a contract (BP 2271-2272), Dr. Gould told Mr. Thompson to prepare such a contract. (BP 2272).

c. Dr. Gould (while campaigning in favor of The National Organization for Children, Inc., and contacting school board members one-on-one) was a consultant for another cyber school applicant in Lancaster County.[8] He was helping that cyber school develop curriculum; he was asked to be on the board of that cyber school; and he was a paid consultant for a commercial company for whom he has worked for approximately four (4) years known as Classroom

---

[8] Dr. Gould initially misrepresented to the Court of Common Pleas of Butler County that he was a consultant for the Lancaster City School District. (BP 2330). During cross-examination, he corrected that testimony to indicate that he was a consultant for a cyber school that was being considered by the Lancaster City School District, not for the Lancaster City School District itself.

23

Connect. (BP 2330-2341) Dr. Gould admitted that Einstein Academy could buy material from Classroom Connect. (BP 2342).

d. No evidence was presented on the record that the school board in Morrisville Borough knew that Dr. Gould was a consultant for another cyber school in Lancaster County, that he was developing curriculum for the other cyber school, or that he was a paid consultant for Classroom Connect, a company that could sell services to the Einstein Academy.

e. There were "constant negotiations" between representatives of the school district, their attorney and Mimi Rothschild for a contract. (BP 2261).

f. On March 8, 2001, Mimi Rothschild submitted 25 Addendums to the application to the School Board. (BP 856).

g. By letter dated March 9, 2001, Mimi Rothschild provided the school board with a listing of where the different material in the application could be found. (See, BP 857-866). By the time of the submission of the March 9, 2001, letter from Mimi Rothschild, the application to the Morrisville Borough School District had grown to more than "460 pages." (BP 856).

h. By letter dated March 11, 2001, Mimi Rothschild provided additional information to the school district to supplement the application. (BP 867-868).

i. By letter dated March 20, 2000, Murray Popkave provided additional information to the school district to supplement the application. (BP 870-871).

j. The contract that was negotiated by a representative of the school district and representatives of the National Organization for Children, Inc., was not finalized until within an hour or so of the start of the March 20, 2001, meeting of the board

24

of directors of the Morrisville Borough School District (BP 2269) and was not handed to the school board until March 20, 2001.

k. The agreement that was negotiated was the document that became the Charter School Agreement that was entered into between the school district and National Organization for Children, Inc., on March 20, 2001. That agreement called for money to be paid to the Morrisville Borough School District. The school district solicitor admitted that "if T.E.A.C.H. and the Einstein Academy did not agree to make . . . all the payments called for in this contract . . . , that this contract would not have been entered into and the charter would not have been issued." (BP 2276).

38. The Morrisville Borough School District did not wait the required forty-five (45) days after submission of the revised application material in March, 2001.

39. The Morrisville Borough School District conducted another meeting on the charter school application on March 20, 2001. (P-9, BP 424). Later that evening, the school board approved the application and entered into the Charter School Agreement. (P-35, BP 585).

40. No "charter" document was ever issued by the Morrisville Borough School District. On the contrary, the only document that was issued was the "Charter School Agreement".

**Lack of Compliance with the Charter School Agreement**

41. The Charter School Agreement between the Morrisville Borough School District and the National Organization for Children, Inc., required the National Organization for Children, Inc., to comply with a number of requirements. However, the evidence establishes that the National Organization for Children, Inc., did not comply with many provisions of the

25

agreement for a substantial amount of time and that parts of the agreement still have not been satisfied.

42. The Charter School Agreement requires the National Organization for Children, Inc., to operate in accordance with the Charter School Law and other applicable laws and regulations. (BP 588, ¶ 5.a.) It is found, as a fact, as confirmed in the Conclusions of Law set forth below, that the National Organization for Children, Inc., is and has been operating in violation of applicable laws and regulations as specifically set forth below:

a. One of the requirements of the Charter School Law is that "at least seventy-five per centum of the professional staff members of a charter school shall hold appropriate State Certification." 24 P.S. §17-1724-A(a). Another requirement is that teachers have criminal background statements and child abuse clearance statements. (See, 24 P.S. §17-1724-A(i) & (j)). Another legal requirement is that I-9 forms be filed to insure that the individual can be lawfully employed in the United States. (See, 24 P.S. §11-1109, 8 U.S.C. §1324a). However, it is found as a fact that fewer than one-half of the teachers are certified. Some of the teachers do not have criminal background checks and some do not have child abuse clearance statements. No I-9 forms were supplied and Mr. John Sever, defendant school's principal, testified that only "four or five teachers that had applied, have filled out that form." (NT 179). The Defendants entered into the record what were marked as Exhibits FD-65 and FD-66, which purport to set forth the credentials of the professional staff of the Einstein Academy. The following is a chart of what was disclosed in FD-65 and FD-66:

26

| Name | Certification Status | Certification Area | Criminal Background | Child Abuse | I-9 |
|---|---|---|---|---|---|
| 1. Badawi | Expired[9] | | Y | Y | Y |
| 2. Banski | Not provided[10] | | N | N | N |
| 3. Brazilian | Yes | English | Y | N | N |
| 4. Bohorad | Expired | | Y | N | N |
| 5. Clayton | Yes | Elementary | Y | N | N |
| 6. Fiama | Expired | | Y | N | N |
| 7. Fenger-Peterson | Yes | Social Studies | Y | Y | N |
| 8. Geis | Not provided | | Y | N | N |
| 9. Goldman | No | | Y | Y | N |
| 10. Jankowski | Yes | Elementary | Y | Y | N |
| 11. Kaniewski | No | | Y | N | N |
| 12. Kelly | Yes | Social Studies | Y | Y | N |
| 13. Liebert | No | | Y | N | N |
| 14. McKenny | Yes | Elementary | Y | Y | N |
| 15. Nesbit | Yes | Elementary | Y | Y | N |
| 16. Rudisill | Yes | Elementary | Y | N | N |
| 17. Sinclair | Not provided | | Y | N | N |
| 18. Snyder | Expired | | N | N | N |
| 19. Sweet | Expired | | Y | N | N |
| 20. Tracy | No | | N | N | N |
| 21. Wax | Not provided | | N | Y | N |
| 22. Wilbur | No | | Y | Y | N |
| 23. Williams | No | | Y | Y | N |
| 24. Wolf | Yes | Elementary | Y | N | N |
| 25. Smoker | Not provided | | Y | N | N |
| 26. Aida | Not provided | | Y | N | N |

b. A requirement of the Charter School Law is that a charter school must comply with the state statutes applicable to public schools as found in 24 P.S. §17-1732-A. See, 24 P.S. §17-1715-A.

[9] The Principal of the Einstein Academy Charter School, Dr. Sever, testified that an Instructional I certificate lasts only 6 years and that he had not seen any documentation that the certificates that the Instructional I certificate that had been presented in this case did not in fact lapse. Where it is stated in this chart that the certification lapsed, the face of the certification shows that it was issued more than 6 years ago. There were five (5) such lapsed certificates. Even if we were to count those five lapsed certificates, that would bring the total number of teachers with certificates at fourteen (14), still well below the 75% required.

[10] The phrase "not provided" as used in this chart means that the certificate was not included in the exhibits provided by the Defendants. Even if those certificates exist somewhere, the total number of certified teachers are 13, still well below the 75% requirement imposed in law.

27

c. The members of the Board of Directors are considered to be public officials by the Pennsylvania Ethics Act and, thus, required to file financial disclosure statements. 65 Pa.C.S. §1104. It was admitted that none of the Board of Directors has filed statements of financial interest. (NT 82)

d. All federal laws governing public schools apply to charter schools. See, 24 P.S. §17-1715-A(1). One of the applicable federal laws is the Individuals with Disabilities Education Act. See, 20 U.S.C.A. §1401 et seq. Under that law, public schools are required to provide "special education" and "related services" to students with disabilities. It was admitted that the National Organization for Children, Inc. was not providing related services. (NT 178).

e. Chapter 11 of the regulations of the State Board of Education apply to charter schools. See, 24 P.S. §17-1732-A(b); 22 Pa. Code §11.1 provides that "[n]o days may be counted as days taught on which the schools are closed . . ." 22 Pa. Code §11.2 provides that instructional time shall be "time in the school day" and time that is "devoted to instruction and instructional activities provided as an integral part of the school program under the direction of certificated school employees." Based upon the testimony of employees of the National Organization for Children, Inc., the defendant school counts time on days when the school is closed and time that is not under the direction of certificated school employees. (NT 55 173). Although section 1502 of the School Code applies to charter schools and prohibits schools from operating on Saturday and Sunday, the defendant school allows its students to be counted as being in school on Saturdays and Sundays. (NT 55).

28

43. In addition to being in breach of requirements that the school operate in compliance with law, there are other contractual requirements which still have not been met by the defendant school, including the following:

a. The Charter School Agreement requires that "copies of all contracts . . . governing personnel will be provided to the District." (BP 589, ¶ 5.d). However, no contracts of any teacher or other employee have been provided to Morrisville Borough School District. On the contrary, a "sample" copy of a blank contract form was supplied to the school district, (FD-53).[1] None of the employees of the National Organization for Children, Inc., including the principal and the two teachers, had contracts that were signed by or on behalf of the National Organization for Children, Inc. (NT 108, 174, 323).

b. Cash flow projections were required to be provided to the school district for the 2001-2002 school year no later than June 15, 2001. (BP 590, ¶ 6.b). No evidence has been provided that such cash flow projections have yet been provided.

c. A statement from a certified public account was required to be provided to the school district by June 1, 2001, concerning the status of the defendant school's management and financial controls. (BP 591, ¶ 6.d). No evidence was presented that such a statement has been filed with the school district.

d. The Charter School Agreement requires that no later than August 1, 2001, the District and TEACH will enter into an Accountability Agreement. (BP 593, ¶9.a). No evidence was presented that such an agreement was ever entered into.

[1] FD-53 leaves blank the date of the contract, the name of the employee, the number of months in the work year, and the salary of the employee.

29

44. It is found as a fact that the National Organization for Children, Inc., is in substantial and material breach of the Charter School Agreement.

### Facts Pertaining to Home Schooling

45. At a meeting before the Philadelphia School District, Mimi Rothschild testified that "we're counting the base facilitator [i.e., the parent or guardian] as a teacher who is providing the daily supervision, scope, and sequence directions." (BP 2436).

46. Because the National Organization for Children, Inc. is counting the parents/guardians as teachers in describing the teacher/student ratio, Mimi Rothschild testified in the Philadelphia School District that there will be "two to three students per one teacher." (BP 2436).

47. At a meeting on December 18, 2000, before the New Hope-Solebury School District, Mimi Rothschild testified that the base facilitator "is the individual who provides the child with daily, hourly instruction and supervision. And that person is a real live teacher person educator person responsible for the child." (BP 785).

48. The parent always controls the education of their children. (BP 3427).

49. The defendant school believes that "the parents are the child's first and foremost teacher." (BP 3427).

50. Mimi Rothschild testified that it is an accurate statement "for parents who choose the Family Schooling Program at Einstein, their role in their child's education is integral." (BP 3427).

51. Mimi Rothschild admitted that it is true that "parents select curriculum from a wide variety of programs." (BP 4327).

52. Mimi Rothschild admitted that it is true that "parents can provide additional curricula at any time that may reflect their own priorities and work view." (BP 3427).

53. In the notes of the Board of Directors of the National Organization for Children, Inc. of the May 29, 2001, meeting, it was stated that their market is to "home schoolers." (BP 877).

54. Joseph Bard, who was employed by the Department of Education at the time that the Home Schooling Statute was enacted, was involved in the implementation of the home schooling program. He testified credibly that the defendant school's program was a home schooling program. (BP 2376-2377). No witness was presented by the Defendant to rebut this testimony.

55. Parents who testified generally testified that they enrolled in the Einstein Academy because they were interested in a home schooling program. For example, parent Susan Karppala testified that she had planned to home school her son, David, until she discovered Einstein. (NT 327-328). Parent Kristin Coposky, as opposed to one of children's teachers, dictates which subject areas her young children will be learning each day. She testified: "At this point I think, because of their ages, I do need to help them type mostly but a typical day we would get on-line, and we would choose, we wouldn't try to do every subject everyday because we signed them up for seven courses...So we don't do every subject everyday. We choose math and social studies and language arts. The next day we might do science and language arts and math. Just depends on how much is involved each day." (NT 346). Parent Nickolina Jacoby's four children only attend Einstein Academy in the early morning and evening hours when she is at home to

supervise them. (NT 349). She testified: "[M]y children don't school during the day because they're not allowed to log into the school when I'm not present." (NT 349).

56. Some students, particularly at the earlier grades, are dependant upon their parents to teach them. (NT 329, 346).

**Facts Pertaining to the Relationship Between the National Organization for Children, Inc., and Mimi Rothchild, Howard Mandell and Tutorbots, Inc.**

57. The National Organization for Children, Inc., was formed in 1998 when Mimi Rothschild approached Murray Popkave to form a nonprofit corporation to use the Internet in various educational functions. (BP 2217).

58. The registered address of the National Organization for Children, Inc., was Mimi Rothchild's house from the time of the inception of the corporation in 1998 until September 2001. (BP 2213).

59. In addition to being the location for the National Organization for Children, Inc., Mimi Rothschild and Howard Mandell's home at 1225 Montgomery Avenue in Wynnewood, PA, was for an unspecified period of time the operational center for "certain employees", according to Howard Mandell, of Tutorbots, Inc. (BP 2212). Howard Mandell admitted that, for a period of time, Tutorbots had the same address as the Einstein Academy. (BP 2117).

60. In its application for tax exempt status filed with the IRS in June or July, 2000, the National Organization for Children, Inc., represented that: "The Chief Executive Officer will be Miriam Mandell, who will supervise all activities from the organization's address as stated on Page 1"—i.e., 1225 Montgomery Avenue in Wynnewood. (BP 656).

32

61. In a "Charter School Start-Up Grant" application, Mimi Rothschild represented to the Pennsylvania Department of Education that she was the "Head of [the] School." (BP 1007).

62. Mimi Rothschild has testified that she is the "Founder" of Einstein Academy. (BP 3425).

63. On many documents, Mimi Rothschild represented that she was the "founder of Einstein Academy. (See, e.g., BP 614, 1238, 1334, 1370, 3207, 3210, and 3797).

64. As part of the application filed by the National Organization for Children, Inc., with school districts and with the Pennsylvania Department of Education, Mimi Rothschild's father, Mitchell E. Roth, was represented to be the "Executive Director, The National Organization for Children." (BP 1005).

65. On her own resume that was included in the applications filed with school districts and the Pennsylvania Department of Education, Mimi Rothschild described her employment by the National Organization for Children, Inc. as follows: "2000 The National Organization for Children, Director, Special Projects." (BP 1004).

66. Although the National Organization for Children, Inc., operated out of Mimi Rothschild's house, in the applications filed by the National Organization for Children, Inc., with school districts and in letters and bills to school districts, the Einstein Academy represented that its address was "93 Old York Road, Suite 1-404, Jenkintown, PA 19046." (See, e.g., BP 2093). Rather than being a "suite" as represented, it was a box at Mail Boxes, Etc. The box was rented by Mimi Rothschild's husband, Howard Mandell. (BP 582, 2095).

67. The mail drop box at Mail Boxes Etc. was the address to which school districts across the state were initially told to send taxpayer money in payment of the bills being issued by

33

Howard Mandell. For example, in an invoice dated June 30, 2001, to Upper Adams, the school district was instructed by Howard Mandell (who personally prepared the invoices that were sent to school districts (BP 2155)) remit payments to: "Einstein Academy, 93 Old York Road, Suite 1-404, Jenkintown, PA 19045." (*See, e.g.,* BP 3262-3273).

68. Security deposits for the computers were sent by parents to Howard Mandell's mail drop at Mail Boxes Etc. (BP 2121).

69. The checks that were sent by school districts and parents to Mr. Mandell's mail drop were picked up at the mail drop by Mimi and Howard's eighteen (18) year old daughter, by their daughter's girl friend, by Howard and by Mimi. Various people picked up the mail there. (BP 2121-2124).

70. It does not appear that there is any board of directors of Tutorbots, Inc. Although Mr. Mandell claimed to be the highest-ranking employee of Tutorbots and its "executive director," (BP 2082), he was unable to name anyone on the Board of Directors of Tutorbots, (BP 2103), and does not even know if anyone is on the Board of Directors of Tutorbots, (BP 2104).

71. Murray Popkave testified to the following:

"Q. I ask you to look at Bates 63, third paragraph from the bottom. It says quote, TEACH will be contacting with Tutorbots, Inc., end of quote. Do you see that?
A. Yes.
Q. And Tutorbots is owned solely by Mimi Rothschild, right?
A. Yes.
Q. Now can you show me any minutes where it was decided prior to this application on November 15, 2000, to contract with Tutorbots?
A. The discussion of all of the people involved, all of the Directors, all of the people that are currently Directors, was that this charter school could not reach fruition without the creations developed by Tutorbots. It was part and parcel of the creation of this internet charter school. *Without Tutorbots, it wouldn't have existed in the first place. It was their technology and their creation that created the idea behind the school. It's*

*one and the same and it was basically in joint discussions.*" (NT 65-66)(Emphasis added).

## Facts Pertaining to Regional Nature of the Einstein Academy Charter School

72. The National Organization for Children, Inc., was approved as a charter school by only one school district—the Morrisville Borough School District.

73. The National Organization for Children, Inc., applied to somewhere between twelve (12) and sixty-two (62) school districts. Mimi Rothschild testified before the New Hope-Solebury School District that: "Sixty-two [school district] got a full draft of our application." (BP 748).

74. The fact that Mimi Rothschild, by her own admission, filed applications on behalf of the National Organization for Children, Inc., with sixty-two (62) school districts supports the conclusion that she knew and understood that the Einstein Academy was going to be a regional charter school.

75. The School District of Philadelphia denied the charter application that the National Organization for Children, Inc., filed with it. (BP 2423).

76. The Einstein Academy Charter School has enrolled a large number of students who are residents of hundreds of different school districts in Pennsylvania, including a number of resident children from the Fairfield, Upper Adams, Gettysburg and Littlestown School Districts.

77. The Einstein Academy Charter School has not obtained a charter from Fairfield, Upper Adams, Gettysburg or Littlestown School Districts.

78. The school for each of the resident students of the Fairfield, Upper Adams, Gettysburg and Littlestown School Districts is located in their homes in their respective school districts.

**Facts Pertaining to the Operation of the Einstein Academy Charter School**

79. By the time of the hearings in this matter on October 25 and November 1, 2001, many students have not yet been provided with computers. (NT 168).

80. By the time of the hearings in this matter on October 25 and November 1, 2001, many students have not yet been provided with any textbooks or with all of the textbooks necessary for their courses. (NT 45).

81. There is a significant pattern of the Defendants billing school districts for students who were actually not enrolled at the school. (See, BP 3221, 3775-3777, NT 165-166).

82. The National Organization for Children, Inc., was operating without any insurance of any type until on or about September 21, 2001. (FD-68). Among other things, this means that employees of the National Organization for Children, Inc., did not have workers' compensation insurance coverage for periods of time during their employment and if any were injured during those uninsured times, they would not be covered by the insurance that was later put in place.[12]

83. The initial bills to school districts fraudulently represented that they were for "June, 2001" (BP 3262-3273, 3309-3325) when, in fact, the Einstein Academy was not in existence in June, 2001, and was not authorized to begin operations under the Charter School Agreement until July 1, 2001.

[12] It must be noted that Mr. Mandel separately perjured himself at the hearing before the Butler County Court of Common Pleas on September 7, 2001, when he testified under oath that Einstein has insurance and that Einstein obtained the insurance during the several months prior to the hearing. (BP 2155-2156).

36

84. The Einstein Academy is operating in substantial breach of the Charter School Agreement as found above and those findings are incorporated herein by this reference.

85. The Einstein Academy failed or refused to provide state auditors with much of the material requested by the auditors. (P-228, BP 3896-3910). The report by the auditors to the Pennsylvania Department of Education issued on October 30, 2001, stated, in part: "Due to inadequate information received by TEACH Charter School, we were unable to conduct a thorough and comprehensive review of the school. TEACH was only available for an interview with one school representative. As a result, the information included is limited." (BP 3875).

86. From the documents submitted by the Defendants in this record, the National Organization for Children has certified teachers only in the following areas:

| Area of Certification | Number of Teachers |
| --- | --- |
| English | 1 |
| Elementary | 5 |
| Social Studies | 1 |

87. One of the teachers who testified stated that she has 1,259 students assigned to her and her "classes average about 410 students." (NT 321).

88. Mimi Rothschild testified that she believes that the school needs approximately sixty (60) teachers for the number of students enrolled. (BP 3433).

89. On the list of teachers that was provided to the Morrisville Borough School District this last month, (See, FD-53), the Einstein Academy Charter School claimed to have teachers only in the following subject areas:

a. English (2 teachers);

b. Spanish (1 teacher);

37

c. Math (1 teacher);

d. Elementary (10 teachers);

e. Socially and Emotionally Disturbed (1 teacher); and

f. Social Studies (5 teachers).

90. According to their own documents, the National Organization for Children, Inc., does not have any certified teachers or personnel in the following areas: Science; French; German; Russian (or any other language other than a Spanish teacher who is also certified in English); Guidance Counselors; School Nurse; Learning Disabled or any other special education area other than SED; School Psychology, Arts and Humanities, Shop; Reading; or Remedial Reading.

91. It is found as a fact that there is an insufficient number of teachers and an insufficient array of teachers to provide any meaningful education. Indeed, there are no teachers in many subject areas. This finding is made regardless of the number of Einstein teachers who are actually certified and assuming that all of the teachers listed by the Defendants in Exhibit FD-53 as being employed are actually employed.

92. Students are not required to attend class. (NT 112-113).

93. Students get credit for attendance by doing homework. (BP 173).

**Facts Pertaining to the Commonwealth Court Action**

94. On or about April 23, 2001, Petitioners, the Pennsylvania School Boards Association, Cameron County School District, Butler Area School District, Mars Area School District and Pocono Mountain School District (hereafter "PSBA"), commenced an action entitled *Pennsylvania School Boards Association, et al., vs. Zogby, et al.,* 213 M.D. 2001 (hereafter "Commonwealth Court action"), against the Pennsylvania Department of

Education and Secretary of Education Charles Zogby pursuant to the Commonwealth Court's original jurisdiction.

95. The action was commenced by way of a Petition for Review.

96. On May 11, 2001, the Honorable Warren G. Morgan denied Petitioners' request for preliminary injunctive relief and peremptory mandamus.

97. Einstein Academy Charter School was not a party to the PSBA case at the time of Judge Morgan's May 11, 2001, Order.

98. The Commonwealth Court did not hear any evidence pertaining to Einstein Academy Charter School.

99. On June 29, 2001, PSBA filed a Second Amended Petition for Review in the Commonwealth Court naming the following additional respondents: Commonwealth Cyber Charter School, T.E.A.C.H. a/k/a Einstein Academy, and the PA Virtual Charter School.

100. The individual cyber schools were named as Respondents after PDE argued they were indispensable parties to the Commonwealth Court action.

101. The Second Amended Petition for Review was brought under both original and appellate jurisdiction of the Commonwealth Court.

102. Fairfield, Upper Adams, Gettysburg and Littlestown are not parties to the Commonwealth Court action.

103. The John and Jane Doe Defendants named in this action have not been named as Respondents in the Commonwealth Court action.

104. The claims raised herein (save one) against the Einstein Academy Charter School have not been raised by PSBA in the Commonwealth Court action.

a. The Second Amended Petition for Review asks the Court to determine two questions: (1) the obligation of public school districts to make payments to cyber charter schools in general; and (2) the authority of PDE to withhold state subsidies or state payments that are due to the public school districts in order to pay cyber charter schools and whether such a decision is subject to the provisions of the Administrative Agency Law.

b. The only similar claim raised in this litigation and the Commonwealth Court action is an assertion by the Plaintiff School Districts herein and PSBA that the Charter School Law does not authorize the formation of cyber school programs.

105. The relief requested by PSBA is against PDE and Secretary Zogby.

## Plaintiffs' Proposed Conclusions of Law

1. Among other legal requirements, the following legal requirements, which are applicable to this matter, apply to charter schools:

   a. A charter school shall provide a minimum of one hundred eighty (180) days of instruction or nine hundred (900) hours per year of instruction at the elementary level, or nine hundred ninety (990) hours per year of instruction at the secondary level. 24 P.S. §17-1715-A(9). The minimum day and hour requirements of the Charter School Law are augmented and clarified by both: (a) Chapter 11 of the State Board of Education, which is expressly made applicable to Charter Schools, P.S. §17-1732-A(b); and (b) Section 1502 of the Public School Code, which is also expressly incorporated into the Charter School Law. 24 P.S. §17-1719-A(12);

40

b. The compulsory attendance law set forth in Section 1327 of the School Code. 24 P.S. §17-1732-A(a);

c. At least seventy-five per cent (75%) of the professional staff members of a charter school shall hold appropriate State certification. 24 P.S. §17-1724-A(a). Staff members shall provide criminal history clearances in compliance with 24 P.S. §1-111(b), as well as child injury or abuse clearances in compliance with 23 Pa.C.S. §6355. 24 P.S. §17-1719-A(15)(16). Employees shall provide I-9 forms to verify their employees' citizenship status. 24 P.S. §11-1109, 8 U.S.C. §1324a.

d. Other than certain provisions of the Public School Code, charter schools are not except from statutes applicable to public schools. 24 P.S §17-1715-A(1). Consequently, such laws as the Individuals with Disabilities Education Act, 20 U.S.C.A. §1401 et seq., and the Public Official and Employee Ethics Act, 65 P.S.§1101 et seq, apply to charter schools. Trustees of a charter school are public officials. 24 P.S. §17-1715-A(1);

e. Charter schools must also comply with the requirements contained in the Sunshine Act. 24 P.S. §17-1716-A(c).

2. The Defendants have and are acting in violation of the following laws in light of the following:

   a. The meetings conducted by the Defendants on May 29, 2001; August 19, 2001; and August 26, 2001 were not advertised as required by the Sunshine Act. 65 Pa.C.S.A. §709. In addition, the minutes of the meetings of May 29, 2001 and August 26, 2001, were not recorded as required by the Sunshine Act. 65 Pa.C.S.A. §706. All actions taken or purportedly taken at these meetings, including the authorization to enter into a contract with Tutorbots, Inc., are declared null and void in accordance with the Sunshine Act. 65

41

Pa.C.S.A. §713. In addition, it is determined that the Defendants willfully or with wanton disregard violated the notice provisions of the Sunshine Act with respect to these three meetings. If such a finding is made, reasonable attorneys fees and costs of litigation shall be awarded to the prevailing party. 65 Pa.C.S.A. §714.1.

b. The Defendants are in violation of the Individuals with Disabilities Education Act as a result of not providing related services to students with disabilities. 20 U.S.C. §1401(22); see generally, 20 U.S.C. §1400 et seq; *Cedar Rapids Community School District v. Garret F.*, 526 U.S. 66, 119 S.Ct. 992 (1999)(continuous nursing services is a related service that a school district is required to provide under the IDEA); *Morton Community Unit School District No. 709 v. J.M.*, 152 F.3d 583 (7th Cir. 1998)(health-related services required by handicapped child were "related services" which the school district had to supply at its own expense under IDEA); *Oberti v. Board of Education of Borough of Clementon School District*, 995 F.2d 1204 (3rd Cir.1993)(school district is prohibited from placing a child with disabilities outside a regular classroom when school district failed to provide evidence that child could not be educated appropriately in a regular classroom with supplementary aids and related services). Prevailing parties who have proven a violation of the IDEA are entitled to attorneys fees. 20 U.S.C.A. §1415(O)(3)(B).

c. Nominees for local office shall file a statement of financial interests for the preceding calendar year with the governing authority or body that is vested with power of confirmation at least ten days before the official or body shall approve or reject the nomination. 65 P.S. §1104(c). "No public official shall be allowed to take the oath of office or enter or continue upon his duties, nor shall he receive compensation from public

funds, unless he has filed a statement of financial interests as required by" the Ethic Act. 65 P.S. §1104(d). The Defendants are in violation of the Public Official and Employee Ethics Act as a result of the failure of the members of the Board of Trustees of the National Organization for Children, Inc. to file any financial disclosure statements as required.

d. The National Organization for Children, Inc. is operating in violation of the minimum day/hour and attendance requirements of the Charter School Law, Chapter 11 of the State Board regulations, and Section 1502 of the School Code in light of the following:

i. The National Organization for Children, Inc. allows students to receive credit for attendance on days on which school is not scheduled in violation of 22 Pa. Code §11.1.

ii. The National Organization for Children, Inc. allows students to receive credit for attendance at hours of the day during which the school is not in session and when there is no supervision by any school employee in violation of 22 Pa. Code §11.2.

iii. The National Organization for Children, Inc. allows students to receive credit for attendance during Saturdays and Sundays in violation of Section 1502 of the School Code.

iv. The National Organization for Children, Inc. allows students to receive credit for attendance during evening and night hours in violation of the requirement for children of compulsory school age that they attend a "day school." 24 P.S. §13-1327.

e.   Participation by students in the Einstein Academy Charter School does not satisfy the compulsory attendance law as set forth in Section 1327 of the School Code, 24 P.S. §13-1327.

i.   1327, provides, in pertinent part, as follows:

"Except as hereinafter provided, every child of compulsory school age having a legal residence in this Commonwealth, as provided in this article, and every migratory child of compulsory school age, *is required to attend a day school* in which the subjects and activities prescribed by the standards of the State Board of Education are taught in the English language. In lieu of such school attendance, any child fifteen years of age with the approval of the district superintendent and the approval of the Secretary of Education, and any child sixteen years of age with the approval of the district superintendent of schools, may enroll as a day student in a private trade school or in a private business school licensed by the Department of Education, or in a trade or business school, or department operated by a local school district or districts. Such modified program offered in a public school must meet the standards prescribed by the State Board of Education or the State Board for Vocational Education. Except as hereinafter provided, every parent, guardian, or other person having control or charge of any child or children of compulsory school age *is required to send* such child or children *to a day school* in which the subjects and activities prescribed by the standards of the State Board of Education are taught in the English language." 24 P.S.§13-1327 (emphasis added).

ii.   In light of the foregoing provisions, children are required "to attend" a "day school." Parents are required "to send" children "to a day school." The day school to which students are to be sent are schools "in which" the subjects and activities prescribed by the State Board are taught. Simply stated, a cyber school is not a "day school" to which students are enrolled

f.   The educational program provided by the National Organization for Children, Inc., is a home schooling program as envisioned by the home schooling law found at Section 1327.1 of the School Law, 24 P.S. §13-1327.1.

i.   The Charter School Law provides that: "No funds allocated or disbursed under this article shall be used to directly support instruction pursuant to section 1327.1." 24 P.S. §17-1717-A(a).

ii.   The invoices being sent by the National Organization for Children, Inc., to the school district plaintiffs in this case are being sent in violation of the prohibition that no funds be disbursed to support home schooling.

g.   The National Organization for Children, Inc., is operating in violation of the requirement that seventy-five per cent (75%) of its professional staff be certified as set forth in 24 P.S. §17-1724-A(a).

h.   The National Organization for Children, Inc., is operating in violation of the requirement that criminal history record reports for all individuals who shall have direct contact with students be submitted as part of the charter school application. 24 P.S. §17-1719-A(15).

i.   The National Organization for Children, Inc., is operating in violation of the requirement that official clearance statements regarding child injury or abuse from the Department of Public Welfare as required by 23 Pa.C.S. §6335 for all individuals who shall have direct contact with students be submitted as part of the charter school application. 24 P.S. §17-1719-A(16).

j.    The National Organization for Children, Inc., is operating in violation of 24 P.S. §11-1109 by failing to provide I-9 forms to verify their employees' citizenship status.

k.    The "Charter Agreement entered into between the National Organization for Children, Inc., and the Morrisville Borough School District is not in the form of a Charter described in 24 P.S. §17-1720-A.

l.    The National Organization for Children, Inc., failed to take the proper steps to appeal the School District of Philadelphia's denial of its charter application. Instead of appealing to the State Charter School Appeal Board, the National Organization for Children, Inc., chose to circumvent the appeal requirements of the Charter School Law, 24 P.S. §17-1717-A, by obtaining a charter from Morrisville.

3.    Cyber schools were not authorized by the General Assembly to become cyber schools in light of the following:

a.    There are no less than three provisions speaking to the "location" of the school. The Charter School Law prohibits school board directors from serving on a board of trustees of a charter school "*located* in the member's district." 24 P.S. §17-1716-A(6)(emphasis added). The application for approval as a charter school must be sent to the local board of school directors of the "school district in which the charter school will be *located*." 24 P.S. §17-1718-A(6)(emphasis added). The application must identify the address of the "*physical facility* in which the charter school will be *located*." 24 P.S. §17-1719-A(11)(emphasis added).

b.    The limited case law that currently exists recognizes that there is legal significance to the physical "location" of the school. In *West Chester Area School District vs. Collegium Charter School*, 760 A.2d 452 (Pa.Cmwlth. 2000), the court

46

considered a number of issues pertaining to the Charter School Law. One of the issues related to whether a charter school was a "regional" charter school because it drew students from more than one school district, even though the physical brick and mortar school facility in that case was located in only one school district. Concluding that a charter school was not a "regional" charter school if the school was located in only one school district, the court said:

"unless the charter school will be *located* in more than one school district, which is not the case here, the CSL does not set forth any particular set of circumstances that would require a charter school applicant to apply as a multi-district regional charter school rather than a single district charter school." 760 A.2d 452, at 463.

c.    In violation of the Charter School Law, cyber schools have no location. Cyber schools are on the Internet. Cyber schools are the children's homes. Cyber schools are the computer servers, the Internet links, and the websites all over the world from which children hopefully will learn. The General Assembly did not and could not have intended a school that is housed in a computer processor, that finds its resources in memory chips, and that replaces bricks and mortar with wires criss-crossing the globe when it enacted several provisions based upon the concept of a school's location being in a particular school district or in a particular region.

d.    In keeping with the concept that the General Assembly contemplated genuine schools being operated under the Charter School Law, there are several provisions addressing the issue of the facilities for the schools. The only authorization in the Charter School Law for establishing a school is the following statement:

"A charter school may be established by creating a new school or by converting an existing public school or a portion of an existing public school." 24 P.S. §17-1717-A(a).

47

e. The application for approval of a charter school must contain a "description of and address of the physical facility in which the charter school will be located . . .." 24 P.S. §17-1719-A(11). Charter schools are permitted to acquire real estate for use as a charter school facility. 24 P.S. §17-1714-A(a)(3). The law permits charter schools to enroll nonresident students on a "space-available basis." 24 P.S. §17-1723-A(c). Contemplating that there would be an actual school facility, and recognizing the central role of the local school districts chartering charter schools, the General Assembly mandated that the local school boards have:

"ongoing access to the records *and facilities* to ensure that the charter school is in compliance with its charter and that requirements for testing, civil rights and student health and safety are being met." 24 P.S. §17-1728-A(a) (emphasis added).

f. In an effort to insure that there would be no violation of the Establishment Clause, the Charter School Law prohibits charter schools from displaying religious object and symbols "*on the premises* of the charter school." 24 P.S. §17-1715-A(5)(emphasis added).

g. Currently being considered by the General Assembly is House Bill 1733. In that bill, the House Education Committee expressly stated what is clear from the Charter School Law—i.e., that cyber schools were not contemplated by the Charter School Law and that cyber schools do not meet the requirements of the Charter School Law. Specifically, House Bill 1733 provides, in pertinent part:

"The General Assembly finds and declares as follows:
(1) Since the enactment of the Charter School Law, applicants have sought charters to operate cyber schools as cyber charter schools.
(2) Because the technology involved readily enables cyber schools to draw students from throughout this Commonwealth, cyber schools can

48

operate without significant involvement with individual school districts, including the district that granted the charter.
(3) Because the technology permits students enrolled in a cyber school to access instructional programming on an irregular schedule and without being physically present in an educational facility, cyber schools do not fit the requirements of the Charter School Law to have a suitable physical facility and to provide a minimum number of days or hours of instruction.
(4) The Charter School Law does not provide an adequate framework for evaluating a cyber school application, holding an approved cyber school accountable and funding the operation of the cyber school.
(5) The General Assembly in enacting this act intends to provide a framework that is more appropriate to the technological possibilities of cyber education, to facilitate the utilization of cyber technology to improve student learning and to hold cyber schools accountable for meeting measurable academic standards and demonstrating gains in student achievement."

h. The only recognition by the General Assembly of so-called distance learning or computer learning options is in the provision establishing the minimum number of days or hours that a charter school must be in session. That provision states fully as follows:

"(9) A charter school shall provide a minimum of one hundred eighty (180) days of instruction or nine hundred (900) hours per year of instruction at the elementary level, or nine hundred ninety (990) hours per year of instruction at the secondary level. Nothing in this *clause* shall preclude the use of *computer* and satellite linkages for delivering instruction to students." 24 P.S. §17-1715-A(9)(emphasis added).

i. The foregoing provision simply means that when students are in attendance at the day school as they are required to be under both the compulsory attendance law and the Charter School Law, that some of the instruction and some of the time can be devoted to using distance learning. It does not overrule the compulsory attendance law. It does not dispense with the need for students "to attend" a "day school". The fact that the General Assembly placed the provision in the clause dealing with the minimum number of days or hours a school must be in session shows that it wanted to make clear that the minimum

49

instruction time did not prohibit schools from augmenting their programs with computer or satellite linked resources.

j.    Not only do each and every of the foregoing provisions make it clear that cyber schools have not been authorized by law to enable students to comply with the compulsory attendance laws or to drain resources away form public school districts, but the other provisions of the School Code and the regulations of the State Board of Education with which charter schools must comply make it clear that the General Assembly was contemplating real, not cyber, schools when it enacted the Charter School Law. Section 110 of the School Code is incorporated into the Charter School Law. It provides that "[a]n official visitor shall have access to and may not be denied access to any public school in the Commonwealth at any time." 24 P.S. §1-110. Naturally, charter schools are public schools. There is no place in a cyber school for officials to have access. Section 771 of the School Code is incorporated into the Charter School Law. It requires that the United States Flag, flagstaff and necessary appliances, be displayed "upon or near each public school building in clement weather, during school hours, and at such other times as the board may determine." 24 P.S. §7-771. With respect to real or genuine charter schools as contemplated by the General Assembly, we know where the flagstaff will be erected and the flag proudly displayed. With respect to cyber schools, are we going to have a cyber flagpole from which a cyber flag will be waiving in the gusts of digital wind?

k.    Contemplating that charter schools would be real schools, with real buildings and real teachers, the General Assembly incorporated Section 1112(a) of the School Code into the Charter School Law. That provision provides that:

50

"(e) That no teacher in any public school shall wear in said school or while engaged in the performance of his duty as such teacher any dress, mark, emblem or insignia indicating the fact that such teacher is a member or adherent of any religious order, sect or denomination." 24 P.S. §11-1112(a).

l.    Section 1310 of the School Code is also incorporated into the Charter School Law and applicable to charter schools. Among the provisions of Section 1310 of the School Code are the following:

i.    "all of the pupils . . . shall be assigned to, and reasonably *accommodated in*, one of the public schools . . . ." 24 P.S. § 13-1310(a)(emphasis added).

ii.    "Before the board of school directors purchases educational services from the agency for a specific child, it must document that the child cannot receive appropriate educational services in a regular classroom setting because of behavioral or psychological reasons." 24 P.S. §13-1310(b).

m.    Section 1317 of the School Code is also incorporated into the Charter School Law. That section grants to school authorizes the right to discipline students, not only when they are "in attendance" but also "during the time they are going to and from their homes . . . ." 24 P.S. §13-1317.

n.    Genuine charter schools are also required to comply with Section 1518 of the School Code. That section requires emergency training so students may "in sudden emergencies be able to leave the school buildings in the shortest possible time without confusion or panic." 24 P.S. §15-1518(b).

o.    All of Article XIV of the School Code is incorporated into the Charter School Law. That Article permits excusal from the compulsory attendance laws only if the student is "prevented from attending school on account of the health or sanitation laws of

51

this Commonwealth, or by the sanitary regulations of the local board of health or the board of school directors . . . ." 24 P.S. §14-1417. Charter schools must employ physicians for certain purposes. 24 P.S. §14-1410. The school physician and school dentist shall conduct medical, dental, and other examinations, subject to certain exceptions. 24 P.S. §14-1404.

p.      Pursuant to Article XIII-A of the School Code, which is also incorporated into the Charter School Law, among other requirements, charter school laws must "develop a memorandum of understanding with local law enforcement." 24 P.S. §13-1303-A(c).

q.      The Court finds that each and every one of these provisions makes it clear that the General Assembly had one thing in mind when it enacted the Charter School Law—the charter schools would be real schools, with real teachers, real facilities, and real students. As its name implies, a cyber school is none of these things.

r.      Not only do the School Code provisions which the General Assembly incorporated into the Charter School Law reflect the intent that charter schools be real schools, but the regulatory provisions that have been incorporated into the Charter School Law evidence a similar intent.

i.      Chapter 11, governing pupil attendance, is incorporated into the Charter School Law and makes it as clear as crystal that what is being contemplated are real schools with real teachers interacting face to face with students.

ii.     Chapter 11 requires that "schools shall be kept open each school year" for the requisite number of days or hours. 22 Pa.Code §11.1. To attend school, children must be immunized. 22 Pa.Code §11.20. These provisions could only make any sense when dealing with real schools.

52

s.      Perhaps the regulatory provision that best constitutes an outright prohibition of cyber schools is 22 Pa.Code §11.2. That provision requires that instruction not be under the direction and supervision of parents or guardians, as is the model for cyber schools, but under the direction of certified personnel.

4.      The National Organization for Children, Inc. procured the Charter School Agreement by fraud and misrepresentation and in violation of the Charter School Law. Among the erroneous statements made to the Board of School Directors of the Morrisville Borough School District was the identity of the applicant. The Charter School Law required that an application to establish a charter school shall include "[t]he identification of the charter applicant." 24 P.S. §17-1719-A(1).

5.      The Charter School Agreement was entered into by the National Organization for Children, Inc. and the Morrisville Borough School District in violation of the process required by the Charter School Law as exemplified by the following:

a.      The Morrisville Borough School District did not hold its first hearing on the application within forty-five (45) days of submission of the application as required by the Charter School Law. 24 P.S. §17-1717-A(d).

b.      The National Organization for Children, Inc. submitted supplements and revised its application during the period of time between January 17, 2001, and March 20, 2001. The last revisions to the application were submitted in the weeks, days and hours before the March 20, 2001, school board hearing.

c.      The approval of the Charter School Agreement on March 20, 2001, was in violation of the requirement that "When an application is revised and resubmitted to the local board of school directors, the board may schedule additional public hearings on the

53

revised application. The board shall consider the revised and resubmitted application at least forty-five (45) days *after* receipt of the revised application by the board." 24 P.S. §17-1717-A(f).

d. The time requirements for the application process are mandatory and not merely directory. *Philadelphia School District vs. Independence Charter School*, 774 A.2d 798 (Pa.Cmwlth.2001)).

6. The Einstein Academy Charter School is operating a home schooling program in light of the following:

a. There is no physical school building;

b. The students stay at home;

c. The students and their education are supervised by parent or by some other caregiver;

d. Parents are the director(s) and supervisors of their child's education;

e. Parent are responsible for their students' daily supervision;

f. Parents determine the scope, sequence and method of self-paced instruction;

g. Parents provide a suitable workplace, quiet environment and 'creature comforts' such as snacks and meals; answer simple questions; are "the 'frontline' source to monitor student discipline and attendance"; "monitor the program of instruction"; and "monitor physical education and extracurricular activities";

h. T.E.A.C.H. represents on the "parent's role" page of its website, that:

i. "unlike government run charter schools, the parent always controls the education of their children";

ii. "For parents who choose the *Family Schooling Program* at Einstein, their role in their child's education is integral" (emphasis in the original);

iii. "Parents provide day to day supervision of their child's work";

iv. "Parents can supplement the student's program with information that may not be included in the curriculum that they determine to be important or appropriate"; and

v. "Parents can provide additional curricula at any time that may reflect their own priorities and world view".

7. The National Organization for Children, Inc., is a subterfuge for a for-profit corporation owned by Mimi Rothschild and known as Tutorbot, Inc.

8. The bills being sent by the Einstein Academy Charter School to school districts, including to Fairfield, Upper Adams, Gettysburg and Littlestown, are being sent in violation of the prescription that no funds under the Charter School Law be used to directly support home schooling instruction pursuant to section 1327.1, 24 P.S. §17-1717-A(6).

9. The Charter School Agreement is not binding on Fairfield, Upper Adams, Gettysburg or Littlestown. The Charter School Law provides that the "written charter shall be legally binding on both the local board of school directors of a school district and the charter school's board of trustees." 24 P.S. §17-1720-A. The Charter School Law does not make any provision that the charter is binding on any school district other than the one that granted the charter.

10. The National Organization for Children, Inc., has failed to demonstrate any reason why this Court should dismiss this action on its Preliminary Objections.

a. *Pennsylvania School Boards Association, et al.,* vs. *Zogby, et al.,* 213 M.D. 2001, an action in the Commonwealth Court, does not involve the same parties, the

same causes of action, and does not request the same relief sought by the Plaintiffs herein. The pendency of a prior action is only a valid defense "when the parties, the causes of action *and the relief sought are the same in both actions*."

*Commonwealth, Department of Public Welfare vs. Blue Cross of Western Pennsylvania*, 130 Pa.Cmwlth. 507, 514, 568 A.2d 995, 998 (1990)(Emphasis added).

i. Fairfield, Upper Adams, Gettysburg and Littlestown are not parties to the Commonwealth Court action.

ii. The claims raised herein (save one) against the Einstein Academy Charter School have not been raised in the Commonwealth Court action. For example, the PSBA case in Commonwealth Court is for declaratory relief pursuant to 42 Pa.C.S.A. §7531 *et seq.*, for mandamus and injunctive relief, and is an appeal of the Pennsylvania Department of Education and the Secretary of Education's decision to withhold funds from school districts and transmit those funds to Pennsylvania cyber charter schools. The petition for review asks the Court to determine two questions: (1) the obligation of public school districts to make payments to cyber charter schools in general; and (2) the authority of PDE to withhold state subsidies or state payments that are due to the public school districts in order to pay cyber charter schools. The only similar claim raised in this litigation and the Commonwealth Court action is an assertion by the Plaintiff School Districts herein and PSBA that the Charter School Law does not authorize the formation of cyber school programs. One similar claim out of several

claims is not enough to satisfy the *Department of Public Welfare, supra,* requirement that all causes of action be the same to invoke the prior pending action provision of Rule 1028(a)(6).

iii. While Fairfield, Upper Adams, Gettysburg and Littlestown in this action and PSBA in Commonwealth Court both requested injunctive relief, the request for injunctive relief was made against completely different parties in the two cases and, in the Commonwealth Court action, the injunctive relief was requested and denied *prior to* Einstein Academy Charter School even being named as a Respondent. The other relief requested varies significantly between the two cases. For instance, in *PSBA vs. Zogby*, the only relief requested other than injunctive relief is directed towards PDE and Secretary Zogby, not the individually named Defendant cyber schools. PSBA seeks a declaratory ruling from the Commonwealth Court (a) mandating that PDE make all State subsidy payments to public school districts when due and without any deductions for payments to cyber schools, and (b) prohibiting PDE from deducting State subsidies to public school districts without first affording them proper notice and an opportunity to be heard in accordance with the Administrative Agency Law. As previously mentioned, PDE is not even a party to the case at hand, so Einstein has no grounds upon which to argue that the relief requested in *PSBA vs. Zogby* is the same relief requested against Einstein Academy Charter School.

b. The Pennsylvania Department of Education and Secretary of Education, Charles Zogby, are not indispensable parties to this action; therefore, none of the parties to this action fall under the jurisdiction of the Commonwealth Court.

   i. In order for the Commonwealth Court to have original jurisdiction over an action, a state agency must be an *indispensable party* to the action. *Pennsylvania School Boards Association, Inc. vs. Commonwealth Association of School Administrators, Teamsters Local 502, 696 A.2d 859* (Pa.Cmwlth.1997).

   ii. A state agency has not been named as a party in this matter. The Pennsylvania Department of Education does not have any appreciable interest in this litigation.

c. A stay should not be entered pending the resolution of the Commonwealth Court action. The actions are substantially different.

   i. Different issues (save one) have been raised in this litigation and the action in the Commonwealth Court. Indeed, the issues raised herein are serious issues as to whether Einstein Academy Charter School is providing any meaningful educational program. The children who may not be receiving any educational program demand that this case move forward. While Einstein Academy Charter School is a defendant in the Commonwealth Court action, it is one of many cyber schools named and allegations specific only to Einstein Academy, which have been raised in the action at hand, have not been raised in the Commonwealth Court action. At no time has PSBA raised the allegations made in this action

regarding Einstein Academy Charter School's particular Charter School Agreement or the circumstances surrounding Einstein Academy Charter School's issuance of its so-called "charter". Nor have the issues surrounding Einstein Academy's enrollment policies or lack thereof been raised in the Commonwealth Court action. Whereas the legality of cyber schools in general, or more particularly the legality of Einstein Academy Charter School, is not the main focus of the Commonwealth Court action, the legality of Einstein Academy Charter School and its right to collect funds from public school districts that have not granted Einstein Academy a charter is, in fact, the focus of the case at hand.

d. This action is not an impermissible collateral attack on the decision by Morrisville School District to enter into a Charter School Agreement with The National Organization for Children, Inc.

   i. The School Districts at bar are challenging Einstein Academy Charter School's legal existence under the Charter School Law as well as Einstein Academy's attempt to collect monies from the individual School Districts in Adams County that did not grant it a charter by improperly using the Charter School Agreement as an authorizing document for this conduct. It is true that Fairfield, Upper Adams, Gettysburg and Littlestown have set forth allegations against The National Organization for Children, Inc., with respect to the process by which Morrisville entered into the Charter School Agreement with that entity and whether the chartering process violated the dictates of the Charter School Law and the Sunshine Act.

However, Morrisville is not named as a defendant and none of Plaintiff School Districts' prayers for relief demand any relief from Morrisville Area.

c. Plaintiff School Districts did not have any administrative remedies, such as an appeal to the State Charter School Appeal Board, to exhaust before bringing this action. Jurisdiction and venue in the Adams County Court of Common Pleas are proper.

i. Fairfield, Upper Adams, Gettysburg and Littlestown are not "appealing" Morrisville Area School District's decision to issue a Charter School Agreement to The National Organization for Children, Inc. The Morrisville decision did not affect the rights of the Plaintiff School Districts. To the contrary, Einstein Academy Charter School affected our rights when it conducted illegal and fraudulent dealing to solicit and/or enroll students from Fairfield, Upper Adams, Gettysburg and Littlestown and then billed those School Districts for the allegedly enrolled students. Fairfield, Upper Adams, Gettysburg and Littlestown were not parties to the proceeding in Morrisville, never received notice of the charter school application and/or hearings on the application, and never received the opportunity to comment on those proceedings.[13]

ii. Einstein Academy Charter School is not a local agency.

iii. Fairfield, Upper Adams, Gettysburg and Littlestown also have not failed to exhaust their administrative remedies; in fact, they have no administrative remedies to exhaust. Under the exhaustion of administrative remedies doctrine, "where a party can obtain complete relief before an administrative agency, he must exhaust all of his remedies before the agency before seeking judicial relief." Ostrov vs. I.R.T., Inc., 402 Pa.Super. 87, 95, 586 A.2d 409, 413 (1991)(citations omitted). Even if the Plaintiff School Districts were attempting to do so (which they are not), the Charter School Law does not provide them with the right to appeal Morrisville's decision to enter into a CSA to the State Charter School Appeal Board (hereafter "CAB").

"The CSL itself clearly does not confer on Taxpayers the right to intervene in Collegium's proceeding before the CAB. Indeed, the CSL authorizes only a charter school applicant to appeal to the CAB from the denial of a charter by the local school board, 24 P.S. §17-1717-A. Other than the charter applicant and the local school school directors, the CSL does not authorize any other parties' involvement in the appeals process. As the CAB noted, an appeal taken pursuant to the CSL is by the applicant whose charter was rejected by the local school board; the CSL does not provide for appeal from the grant of a charter. Thus, if the School District had granted Collegium's charter, Taxpayers would have been statutory authority to appeal that decision. Obviously, the effect on Taxpayers to appeal that decision would be the same whether the grant of Collegium's charter came from the School District in the first instance or from the

---

[13] Section 504 of the Administrative Agency Law, as applied to Local Agencies, i.e. school districts, by way of Section 551, provides: "No adjudication of a Commonwealth agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard. All testimony shall be stenographically recorded and a full and complete record shall be kept of the proceeding." 2 Pa.C.S.A. §504.

[14] If the Local Agency Law was applicable to these proceedings, then the Defendant would be in violation of the LAL, because no notice and comment period were established for its charter school application.

CAB following an appeal. Logically, then, Taxpayers cannot intervene by statutory right in the appeal of Collegium's unsuccessful charter application. Instead, the School District must defend against its own decision, without participation from its own, or other districts' taxpayers." [Emphasis added]; *West Chester Area School District*, 760 A.2d at 464; allocatur granted, -- A.2d --, 2001 WL 824184 (Pa. July17, 2001).

Based upon the Charter School Law and *West Chester Area School District, supra,* Fairfield, Upper Adams, Gettysburg and Littlestown and any other school district in the Commonwealth who is aggrieved by Morrisville's decision to grant a charter have no right to appeal that decision to the State Charter School Appeals Board.

iv. Plaintiff School Districts are not mandated to file their action against Einstein Academy Charter School in the Bucks County Court of Common Pleas because the Local Agency Law does not apply to the facts at hand.

Pennsylvania Rule of Civil Procedure 2179 states:

"[A] personal action against a corporation or similar entity may be brought in and only in
(1) the county where its registered office or principal place of business is located;
(2) a county where it regularly conducts business;
(3) the county where the cause of action arose; or
(4) a county where a transaction or occurrence took place out of which the cause of action arose."

The causes of action arose in Adams County when Einstein Academy Charter School came here of its own accord and solicited Adams County students for enrollment in the cyber school. Einstein Academy Charter School regularly conducts business in Adams County by soliciting and/or enrolling Adams County students. Accordingly, the Adams County Court

of Common Pleas is the appropriate court for jurisdictional and venue purposes.

11. Plaintiff School Districts have satisfied the four factor test used to determine whether to grant an application for a preliminary injunction: (1) whether the injunction is necessary to prevent an immediate and irreparable harm not compensable by damages; (2) whether a greater injury will result by refusing such relief, (3) whether the injunction will restore the parties to the stats quo; and (4) whether Applicant has established a clear right to relief. *Gaston v. Reed,* 679 A.2d 285, 288 (Pa.Cmwlth. 1996).

12. Plaintiff School Districts have proven illegal activity has occurred. Where a statute proscribes certain activity, all that an applicant needs to demonstrate to prove entitlement to a preliminary injunction is that the illegal activity has occurred or will occur. *Commonwealth v. Coward,* 489 Pa. 327, 414 A.2d 91, 98 (1980). "Where the Legislature declares certain conduct to be unlawful it is tantamount in law to calling it injurious to the public. For one to continue such unlawful conduct constitutes irreparable injury." *Pa.P.U.C. v. Israel,* 356 Pa. 400, 406, 52 A.2d 317, 321 (1947).

a. Since there is no legal authority for cyber schools and Einstein Academy Charter School operates in violation of Pennsylvania substantive law as enumerated in paragraphs 1-9 and incorporated herein, there is no need for the Plaintiff School Districts to show irreparable harm.

b. As was found by the Court of Common Pleas of Butler County:

"The violation by Einstein of an express statutory provision, here the Charter School Law per se constitute irreparable harm. * * * Contrary to Einstein's arguments, this case is not about money damages. Obviously, BASD and Intervenors will not suffer irreparable financial harm if an injunction is not granted. Plaintiff's expert, Mr. Bard, testified that Einstein cannot deliver

the educational program it says it can. Testimony established that Einstein has only seven certified teachers. As noted above, Einstein is in serious breach of its Charter Agreement. * * * Irreparable harm would result of Einstein is permitted to begin classes as scheduled on September 11, 2001, because it cannot provide a viable educational program to students currently enrolled." (slip opinion, p.9)

c. While it is true that this case is not about money damages, the Plaintiff School Districts' loss of use of money can constitute irreparable injury. In *American Federation of State, County and Municipal Employees v. Commonwealth*, 465 A.2d 62 (Pa.Cmwlth.1983), the Commonwealth Court granted a preliminary injunction and, in so doing, noted:

". . . the loss of the *immediate use* of one's earnings is an egregious injury that could never be adequately remedied, at some indefinite future date, by the simple award of damages. The Commonwealth minimizes the gravity of a 1 1/4% reduction in net compensation. However, the impact of an ostensibly small minimum waits substantially, depending upon the particular fiscal obligations of the individual." *Id.* at pp. 65-66 (emphasis in original).

d. Unless a preliminary injunction is issued, Fairfield, Upper Adams, Gettysburg and Littlestown will lose the present use of the subsidies on which they depend. Even though those subsidies may amount to a very small percentage of each School District's overall budget, under AFSCME, the gravity of even a small percentage loss in revenue supports a finding of "irreparable harm."

13. There is no need to balance the potential harms on each side since cyber schools themselves are unlawful under Pennsylvania's Charter School Law and the home school provisions of the Public School Code, and the conduct of Einstein Academy Charter School in particular violates substantive provisions of Pennsylvania law as enumerated in paragraphs 1-9, where are incorporated herein.

a. In *Kanefsky v. Dratch Construction Company*, 376 Pa. 188, 101 A.2d 923 (1954), the Pennsylvania Supreme Court noted that "[e]ven though greater injury may result from granting than refusing an injunction, a plaintiff is entitled thereto if defendant's act is tortuous." *Cappiello v. Duca*, 449 Pa.Super. 100, 672 A.2d 1373, 1378 (Pa.Super. 1997).

b. It is inappropriate for a respondent to complain that it will suffer by being prohibited from committing a wrongful act against another. See, *Cappiello, supra; Weiss and Mann v. Greenberg*, 101 Pa.Super. 24 (1930).

c. Judge Schaffer, in his decision in the Butler County action, found that the balancing test clearly weighs in favor of issuing a preliminary injunction.

"The harm to Einstein by preventing it from providing an education to students of the BASD and Intervenors is outweighed by Einstein's violation of its Charter School Agreement and its apparent inability to provide education to the students of the school district of Butler County involved herein." (slip opinion, p.9).

14. Granting an injunction will restore the parties to the status quo before Einstein Academy Charter School began soliciting and enrolling students and attempting to collect money from the Plaintiff School Districts.

a. The rule is that the status quo which will be preserved by preliminary injunction is the last actual, peaceable status which preceded the pending controversy. *Commonwealth v. Coward*, 489 Pa. 327, 341, 414 A.2d 91 (1980).

b. Where the conduct of the responding party is unlawful, the question of maintaining the status quo is irrelevant. *Id.*

c. Where unlawful conduct is continuing, a preliminary injunction is proper to "...change the status of the parties while the result is pending in order to safeguard the public interest." *Id.*

15. Fairfield, Upper Adams, Gettysburg and Littlestown have established a clear right to relief.

   a. To establish a "clear right to relief," the parties seeking an injunction need not prove the merits of the underlying claim. *Chmura v. Deegan*, 398 Pa.Super. 532, 581 A.2d 592 (Pa.Super. 1990).

   b. Rather, a party seeking a preliminary injunction need only show substantial legal questions must be resolved to determine the rights of the respective parties. *Id.*, citing *Fischer v. Department of Public Welfare*, 497 Pa. 267, 271, 439 A.2d 1172, 1174 (1982).

   c. As enumerated in paragraphs 1-9 and incorporated herein, Einstein Academy Charter School is in violation of the Charter School Law, the Public School Code, and the Sunshine Act, as well as numerous other substantive laws of this Commonwealth.

Respectfully submitted:

Levin Legal Group, P.C.

Law Offices of Robert McQuaide

Michael I Levin, Esquire
Allison C. Snyder, Esquire
(Counsel for Plaintiffs)
1800 Byberry Road, Suite 1402
Huntingdon Valley, PA 19006
(215) 938-6378

Robert McQuaide, Esquire
(Counsel for Plaintiffs)
18 Carlisle Street, Suite 204
Gettysburg, PA 17325
(717) 337-1360

66

Exhibit B

IN THE COURT OF COMMON PLEAS
OF BUTLER COUNTY, PENNSYLVANIA

BUTLER AREA SCHOOL DISTRICT,
Plaintiff,

and

KARNS CITY AREA SCHOOL DISTRICT,
MARS AREA SCHOOL DISTRICT,
and SOUTH BUTLER SCHOOL DISTRICT,
Intervenors,

vs.

EINSTEIN ACADEMY, d/b/a T.E.A.C.H
CHARTER SCHOOL, a/k/a TEACH THE
EINSTEIN ACADEMY CHARTER SCHOOL,
a/k/a THE E-ACADEMY CHARTER SCHOOL,
and a/k/a T.E.A.C.H. THE E-ACADEMY
CHARTER SCHOOL,
Defendant.

: E.Q. No. 2001-50031

William R. Shaffer, Judge.
September 10, 2001

MEMORANDUM OPINION AND ORDER OF COURT

For Plaintiff: Michael I. Lewis
For Intervenors: Thomas W. King, III

For Defendant: Michael N. Onufrak
Paul Mooney
Alexander E. Lindsay

Procedural History

The present action was commenced by the Butler Area School District ("BASD") on July 24, 2001 when a Complaint in Equity was filed to prevent

1

PLAINTIFF EXHIBIT 150

---

Defendant, (hereinafter "Einstein") from operating a "Cyber" Charter School.

On August 9, 2001 a Petition for Special Relief was filed and presented in Motion Court. Einstein appeared through local counsel. On that date, a Preliminary Injunction was granted which enjoined Einstein from soliciting or enrolling students who would otherwise attend BASD and further enjoined Einstein from attempting to collect bills for instruction sent to BASD in early July 2001 and continuing. A hearing on the injunction was scheduled for August 15, 2001. At the request of new counsel for Einstein, a hearing on the injunction was continued to September 7, 2001. On August 24, 2001, the Karns City Area, Mars Area and South Butler School Districts of Butler County filed Petitions to Intervene in this legal action and the Petition for Special Relief. A hearing and argument on the issue of intervention was scheduled with the Injunction Hearing of September 7, 2001. A hearing on the injunction was held September 7, 2001 and September 8, 2001.

Background Facts

Einstein holds a charter pursuant to the Charter School Law, 24, P.S. §16-1701 et seq. as a result of an Agreement and Charter dated March 20, 2001 between the Morrisville Borough School District and the E-Academy Charter School ("TEACH)." Einstein's founders are Mimi Rothchild and her husband, Edward Mandel. Einstein purports to be a fictitious name for a corporation named The National Organization for Children, Inc. which prior to June of 2000 was called The Andrew Mandel, a/k/a Mimi Rothchild has been identified as the CEO of the National

2

Organization for Children, Inc.

In November of 2000, T.E.A.C.H., The B-Academy Charter School filed an application with the Morrisville School District to become a chartered "cyber school" delivering schooling through the Internet. It is undisputed that a hearing was not held on the application within the time frame contemplated by 24 P.S. 17-1717-A. It is also noted that the fictitious name for Einstein, filed March 30, 2001, did not exist at the time of the application for Charter status. The application does not reveal that the non-profit entity required by the Charter School Law is actually the National Organization for Children, Inc.

On January 17, 2001 at a special meeting of the Board of the Morrisville School District, Ms. Rothschild presented her application. William Thompson, Solicitor for the District testified that his recollection of that meeting lead him to believe that Einstein had very little chance of being granted a charter.

No decision on the application was made and a second Board meeting was scheduled for March 20, 2001. In the interim, the Superintendent of Morrisville, Dr. John Gould, communicated on several occasions with Ms. Rothschild to refine her application to insure approval. Test demonstrations of Einstein's software were arranged for the benefit of the Morrisville School Board members. These demonstrations were not done at public meetings.

Prior to the March 20, 2001 public meeting, Dr. Gould, without Board authorization, entered into negotiations with representatives from Einstein to draft a Charter School Agreement. Testimony established that the negotiations were only

3

---

completed and the Agreement finally drafted one hour before the meeting of March 20, 2001. Thus, no members of the Board of Directors could have reviewed the Agreement prior to the meeting of March 20, 2001. The Document executed on March 20, 2001 is styled "Charter School Agreement" rather than simply "Charter". That is presumably because, in addition to the requirements for Term and Form of Charter commanded in 24 P.S. 17-1720-A, the document also contains an agreement that Einstein will pay Morrisville, in return for "services", $200 for each student enrolled at Einstein. Using Einstein's figures for enrollment, Morrisville stands to receive $600,000 for the school year 2001-2002 from Einstein. Additionally, in the Charter Agreement, Einstein has agreed to lease space and custodial services from Morrisville for $15,000 per year. To guarantee this cash stream, Einstein agreed not to seek a charter from any other school district.

Following the grant of the Charter on March 20, 2001, Defendant finally registered its fictitious name with the Department of State (March 30, 2001). The actual fictitious name registered to the organization which was granted the charter is "T.E.A.C.H. (The B-Academy Charter School)"[1]. As previously stated, T.E.A.C.H. is the fictitious name for the National Organization for Children, Inc. Again, this fact was not disclosed in the Charter School Agreement. Further, the "Einstein Academy Charter School" is not a registered fictitious name for any existing entity, nor is it a registered

[1] "T.E.A.C.H." is also the fictitious name for an entirely different entity registered in 1987, Penn Ecumenical Accreditated Christian Habitat.

4

non-profit organization with the Department of State. As Einstein existed at this time period only as an idea of Howard Mandel and Mimi Rothchild, Einstein's address is noted on the Department of State Records as the Mandel residence.

Einstein is to be run by a corporation called Tutorbook, Inc. Incorporated in June of 2001, as a for profit corporation and having an address at Mailbox's, Etc, a maildrop in Jenkintown, Pa. According to the Department of State Records, Mimi Rothchild is the CEO, Secretary and Treasurer of Tutorbook. On August 24, 2001 Einstein and Tutorbook entered into a management contract for Tutorbook, Inc. to operate the charter school. Rothchild is the sole owner of Tutorbook and her husband, Howard Mandel is the executive director.

Einstein, as fictitious name for the National Organization for Children, Inc. and Tutorbook, Inc. are capitalized by personal loans for the Mandel's relatives. Einstein had approximately $31,000 on deposit on July 31, 2001. Einstein had apparently misfigured receiving $825,000 from the Education Department as seed money that was not forthcoming. To begin cash flow, Einstein charged an $87.00 registration fee to some students who have enrolled which may violate 24 P.S. 17-1725-A. Einstein has also billed school districts, including Plaintiff and intervenors herein, for June and July of 2001 even though Einstein has not provided any instruction. Approximately $20,000 has been received from school districts.

On August 24, 2001 Einstein ordered $2,407,692 in computer equipment from Compaq Computers. On August 31, 2001, Einstein received $506,000 from the Education Department. The record clearly establishes that Einstein is undercapitalized.

5

Einstein presently claims to have 3,000 students enrolled. Einstein also claims to have hired between 20-30 teachers, although signed contracts for only 13 were produced. Only seven teachers have been determined to be certified. The Charter School Law require 75% certification. Teachers are to receive salaries ranging from $31,000 to $35,000.

Einstein also appears to be in breach of its Charter Agreement with Morrisville. By letter dated September 6, 2001, the Solicitor for Morrisville was requesting the following from Einstein: a course study for every course; a copy of Einstein's Disciplinary Code; a copy of the school calendar; copies of employment contracts with personnel and any employment policies; the names, positions, social security numbers and certification (solicitor's emphasis) of employees; evidence of health care benefits of employees; Act 111 background checks of all employees; Einstein's business manager or administrator; financial documents showing budget and cash flow; an audit review from a CPA; insurance coverage documentation; an Accountability Agreement Covering Pupil Performance; fiscal management, 2001-2002 Budget; schedule of budget meetings for 2002-2003; financial audit requirements and financial documents showing pension payments, payroll tax payments, insurance coverage and loan payments and forms.

Apparently, based upon the above letter, Morrisville had not received copies of contracts entered into by Einstein, didn't know the Board of Directors, extracurricular activities, attendance taking procedures, special education audits or even Einstein's schedule of Board Meetings. Einstein is scheduled to start classes on

6

September 11, 2001.

It is with this factual background that this Court must consider the application for special relief.

**Legal Analysis:**

The following must be demonstrated for a preliminary injunction to issue: 1) Petitioner's right to relief is clear; 2) The injunction is necessary to prevent immediate and irreparable harm not compensable by damages; 3) Greater injury would result by refusing the injunction than by granting it; 4) The injunction restores the parties to the status quo; and 5) The activity sought to be restrained is actionable and the injunction is reasonably suited to abate such action. Sugarman et al. v. Commonwealth of Pennsylvania, Department of Welfare, 495 Pa. 8, 10, 436 A.2d 124, 126 (1981). The Plaintiff must establish each of these elements to prevail.

**1. Clear Right/Reasonable Likelihood**

In its Complaint, Plaintiff raises the following causes of action: Charter Schools/Cyber Schools are Unconstitutional; Cyber Schools are not authorized by the Charter School Law; Einstein was not properly chartered; Einstein is not in compliance with the Charter School Law.

This Court decides the issue of clear right only with respect to the preliminary injunction and, not as a disposition on the merits.

As noted by the Honorable Judge Morgan in the case of Pa. School Board Association v. Zogby, No. 213 M.D. 2001 (May 10, 2001) a trial court opinion of the Commonwealth Court, these issues raise numerous questions of first impression.

7

However, this Court is persuaded that some of Plaintiff's issues have a reasonable likelihood of success on the merits.

The Charter School Law was enacted before the explosion of Internet technology. It is doubtful that the framers of the legislation contemplated the "cyber" or Internet learning school to be within the scope of charter schools. The Court found persuasive the testimony of Joseph F. Bard, executive director of the Pennsylvania Association of Rural and Small Schools, who testified that cyber schools in general, and Einstein, in particular are merely home schooling by another name and are not entitled to public money as charter schools. This Court also believes that Plaintiff has established a clear right to relief on the issue of whether Einstein was validly chartered by Morrisville and/or whether it is in breach of the Charter Agreement. There is a serious question of the propriety of Morrisville essentially selling a charter in return for "head money" per student and an exclusivity clause in return for breach of its Charter Agreement. Also, Einstein is obviously in

**2. Immediate and Irreparable Harm**

The BASD must also show that denial of the injunction would result in immediate and irreparable harm not compensable by damages.

The violation by Einstein of an express statutory provision, here the Charter School Law, per se constitutes irreparable harm. Pa. Public Utility Commission v. Israel, 52 A.2d 317, 356 Pa. 400 (1947). Contrary to Einstein's arguments, this case is not about money damages. Obviously, BASD and Intervenors will not suffer irreparable financial harm if an injunction is not granted. Plaintiff's

8

502, 512 (1988).

The continuance of the injunction will abate, for the present, Einstein providing education to the students of BASD and Intervenors until such times as this Court decides the merits of the pending claims.

Accordingly, the special injunctive relief granted August 9, 2001 is continued and the following Order is entered:

expert, Mr. Berd, testified that Einstein cannot deliver the education program it says it can. Testimony established that Einstein has only seven certified teachers. As noted above, Einstein is in serious breach of its Charter Agreement. Only three of the students registered for Einstein in the BASD are home-schooled. The remaining students in the BASD enrolled in Einstein are regular students. Irreparable harm would result if Einstein is permitted to begin classes as scheduled on September 11, 2001, because it cannot provide a viable educational program to students currently enrolled.

3. Balancing of Harms

The harm to Einstein by prevailing it from providing an education to students of the BASD and Intervenors is outweighed by Einstein's violation of its Charter Agreement and its apparent inability to provide education to the students of the school district of Butler County involved herein.

4. Status Quo

The status quo is not disturbed by the continuance of the injunction. The status quo is that Einstein is presently not providing education to students in Butler County. Students presently home schooled will continue its that status. Other students enrolled at Einstein will attend their respective schools in Butler County.

5. Abatement of Actionable Activities

An equity court has broad powers of discretion in "shaping its decree and granting relief tailored to the particular circumstances of the case" pursuant to a party's prayer for general relief. Lower Frederick Twp. v. Clemmer, 518 Pa. 313, 543 A.2d

9

10

IN THE COURT OF COMMON PLEAS
OF BUTLER COUNTY, PENNSYLVANIA

BUTLER AREA SCHOOL DISTRICT,
Plaintiff,

and

KARNS CITY AREA SCHOOL DISTRICT,
MARS AREA SCHOOL DISTRICT,
and SOUTH BUTLER SCHOOL DISTRICT,
Intervenors,

vs.

EINSTEIN ACADEMY, h/k/a T.E.A.C.H.
CHARTER SCHOOL, n/k/a TEACH-THE
EINSTEIN ACADEMY CHARTER SCHOOL,
b/d/a THE E-ACADEMY CHARTER SCHOOL,
and a/k/a T.E.A.C.H. THE E-ACADEMY
CHARTER SCHOOL,
Defendant.

B.Q. No. 2001-50031

### ORDER OF COURT

AND NOW, this 10th day of September, 2001, after a hearing to
determine whether the special injunctive relief granted to Petitioner should be continued
or dissolved, and in accordance with the opinion contemporaneously filed,

It is Ordered that the Petition to Intervene filed on behalf of the Mars
Area School District, the South Butler School District and the Karns City Area School
District is granted.

It is further Ordered that, until further Order of Court, the Einstein
Academy Charter School is preliminarily enjoined from providing education to students
within the Butler Area School District, the Karns City Area School District, the Mars
Area School District and the South Butler School District; Einstein shall not bill for any
such educational services or attempt to collect any bills previously sent to the school
districts.

It is further Ordered that the Einstein Academy Charter School shall
return any registration deposits to the students of these school districts.

BY THE COURT,

WILLIAM R. SHAFFER
Judge

09/10/01 COPIES TO THOMAS KING III, MICHAEL LEVIN, MICHAEL ORINAGE-PETER MOORE,
ALEXANDER LINDSAY

IN THE COURT OF COMMON PLEAS OF BUTLER COUNTY, PENNSYLVANIA

BUTLER AREA SCHOOL DISTRICT,
   Plaintiff,

and

KARNS CITY AREA SCHOOL DISTRICT, MARS AREA SCHOOL DISTRICT, And SOUTH BUTLER SCHOOL DISTRICT,
   Intervenors

vs.

EINSTEIN ACADEMY, a/k/a T.E.A.C.H CHARTER SCHOOL, a/k/a T.E.A.C.H.-THE EINSTEIN ACADEMY CHARTER SCHOOL, a/k/a THE E-ACADEMY CHARTER SCHOOL, and a/k/a T.E.A.C.H. THE E-ACADEMY CHARTER SCHOOL,
   Defendant.

For Plaintiffs:   Michael I. Levin, Esquire
For Intervenors:   Thomas W. King, III, Esquire

For Defendant:   Michael N. Onufrak, Esquire
   Paul Mooney, Esquire
   Alexander H. Lindsay, Esquire

William R. Shaffer, Judge
October 22, 2001

### MEMORANDUM OPINION PURSUANT TO Pa.R.A.P. 1925(A)

And Now, this 22nd day of October, 2001, Defendant having filed a Concise Statement of Matters Complained of on Appeal, the Memorandum Opinion and Order of Court dated September 10, 2001 are incorporated herein, with regards to sections 3, 5, 6, 7, 10 – 14 of Appellant's Concise Statement of Matters Complained of on Appeal. Regarding sections 1, 2, 4, 8, and 9 of the Concise Statement, the Court has added additional comments.



PLAINTIFF EXHIBIT 197

BATES PAGE NUMBER 3458

---

In Section 1 of their Concise Statement, Appellants claim this Court erred by not considering or deciding Defendant's Preliminary Objections prior to conducting the Preliminary Injunction hearing. There is nothing that requires this Court to rule on Preliminary Objections before a hearing for a Preliminary Injunction, and this Court used its discretion in deciding to consider the Preliminary Objections after the hearing for special relief had occurred. The purpose of a Preliminary Injunction is to preserve the existing status of the subject of the controversy until the merits of the case can be decided upon. in re Appeal of Little Britain, 651 A.2d 606 (Pa.Cmwlth 1994).

In Section 2 of the Concise Statement, Appellants claim this Court erred in not granting Defendant's Preliminary Objections. Once again, this Court is not required to rule on Preliminary Objections before it grants a Preliminary Injunction. The Court may consider Preliminary Objections when deciding whether to grant a Preliminary Injunction Aitkenhead v. Borough of West View, 397 A.2d 878 (Pa.Cmwlth. 1979), but it is not required to rule on those Preliminary Objections at that time.

In Section 4 of the Concise Statement, Appellant claims that this Court erred by granting the Petition to Intervene after the hearing for relief was held and nonetheless making the Preliminary Injunction applicable to the intervening school districts.

Intervenors were Butler County school districts who voiced the same concerns about Appellant as the original Plaintiff school district, and were in almost the same relationship to Appellant as the original Plaintiff. It was not necessary to hold another hearing which would include Intervenors, in order to come to the conclusion that a Preliminary Injunction was necessary.

BATES PAGE NUMBER 3459

In Sections 8 and 9, Appellants claim this Court erred in not following the rulings of the Commonwealth Court in Pennsylvania School Boards Association v. Zogby, No. 23 M.D. 2001 (Commonwealth Court 2001). Appellants also claim that this Court erred in not applying the law of the case doctrine regarding Zogby. This Court believes that Zogby is not controlling authority as this case involves different issues.

By the Court,

William R. Shaffer, Judge

10-23-01 COPY TO MICHAEL LEVIN
THOMAS W. KING III
MICHAEL ONUFRAK
PAUL MOONEY
ALEXANDER H. LINDSAY

**BATES PAGE NUMBER 3460**

Exhibit C

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CIVIL ACTION

ABINGTON SCHOOL DISTRICT

VS

THE NATIONAL ORGANIZATION FOR CHILDREN, INC., a/k/a EINSTEIN ACADEMY, a/k/a T.E.A.C.H. CHARTER SCHOOL, a/k/a TEACH, THE EINSTEIN ACADEMY CHARTER SCHOOL, and a/k/a T.E.A.C.H., THE ACADEMY CHARTER SCHOOL, and one or more JOHN and/or JANE DOES

: NO. 01-17444

**O R D E R**

AND NOW, this 21st day of September, 2001, upon consideration of the Plaintiffs' Complaint, Petition for Special Relief, and supporting documents, it is hereby ORDERED and DECREED that a Preliminary Injunction is GRANTED and it is ORDERED as follows:

Pending said hearing, the Defendants are enjoined from soliciting or enrolling students who are residents of the Abington School District or the Upper Perkiomen School District. Defendant are further enjoined from attempting to collect or from collecting any amounts from either school district.

Further, the "status quo" is to be maintained in terms of the education of the students from the above school districts who enrolled in the Einstein Academy Charter School prior to September 17, 2001.

BY THE COURT:

[signature]

Copies sent 9/21/01 to:
Michael Levin, Esquire
Kenneth Roos, Esquire
Allison Snyder, Esquire
Michael Ornstein, Esquire

---

RECEIVED
NOV 17 2001
___ and ASSOCIATES

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW and EQUITY

EPHRATA AREA SCHOOL DISTRICT
Plaintiff

v.

THE NATIONAL ORGANIZATION FOR CHILDREN, INC., a/k/a EINSTEIN ACADEMY, a/k/a T.E.A.C.H. CHARTER SCHOOL, a/k/a TEACH, THE EINSTEIN ACADEMY CHARTER SCHOOL, a/k/a E-ACADEMY CHARTER SCHOOL, and a/k/a T.E.A.C.H. THE E-ACADEMY CHARTER SCHOOL, and one or more JOHN AND/OR JANE DOES,
Defendants.

No. CI-01-10315

**O R D E R**

AND NOW, this ___ day of ___ November ___, 2001, upon consideration of the Plaintiff's Complaint, Petition for Special Relief and supporting documents, and after conferring with counsel for the parties, a Preliminary Injunction is GRANTED and it is Ordered as follows:

1. The parties shall file a stipulation of facts on or before November 29, 2001;

2. The parties shall file proposed findings of fact and conclusions of law on or before December 13, 2001;

3. Oral argument shall be held on Thursday, January 17, 2002 at 10:00 a.m. in

ENTERED AND FILED
01 NOV 14 PM 4:41
PROTHONOTARY'S OFFICE
LANCASTER, PA.

IN THE COURT OF COMMON PLEAS OF
JEFFERSON COUNTY, PENNSYLVANIA

BROOKVILLE AREA SCHOOL DISTRICT
And PUNXSUTAWNEY AREA SCHOOL
DISTRICT,                                    :
                                             :
                    Plaintiffs               :
                                             :    No. 726-2001 CD
          vs.                                :
                                             :
EINSTEIN ACADEMY, a/k/a T.E.A.C.H.           :
CHARTER SCHOOL, a/k/a TEACH-THE              :
EINSTEIN ACADEMY CHARTER SCHOOL;             :
a/k/a, the E-ACADEMY CHARTER SCHOOL;         :
and a/k/a T.E.A.C.H. THE E-ACADEMY           :
CHARTER SCHOOL,                              :
                                             :
                    Defendants.              :

For Plaintiff:      David L. Young, Esq.
                    Michael I. Levin, Esq.
                    Thomas W. King, III, Esq.

For Defendant:      Michael Onufrak, Esq.

Judge:              William L. Henry

## ORDER OF COURT

And Now, this ___ day of OCT. 2001, upon consideration of the Plaintiffs' Complaint,

Petition for Special Relief and supporting documents, a Preliminary Injunction is Granted and it

is Ordered as follows:

A hearing on the continuance of the injunction is scheduled for the 15 day of Nov.,

2001, at 9:00 in Courtroom 200.

Pending said hearing, the Defendant is enjoined from soliciting or enrolling students who

would otherwise attend Plaintiff School Districts,

---

Pending argument, the defendant is enjoined from soliciting or enrolling students who

would otherwise attend Ephrata Area School District.

Defendant is further enjoined from attempting to collect from Ephrata Area School

District any amounts for invoices previously billed or to collect from the Secretary of Education

any amounts previously invoiced to Ephrata Area School District.

BY THE COURT:

_(signature)_

PAUL K. ALLISON
JUDGE

Attest:

Copies to:

Michael I. Levin, Esquire
1402 Mascus Mill Business Park, 1800 Byberry Rd., Huntingdon Valley, PA 19006

Peter J. Mooney, Esquire
1800 One Liberty Place, Philadelphia, PA  19103

NOTICE OF ENTRY OF ORDER OR DECREE
PURSUANT TO PA.R.C.P. NO.236
NOTIFICATION THE ATTACHED DOCUMENT
HAS BEEN FILED IN THIS CASE
PROTHONOTARY OF LANCASTER CO., PA
DATE:
NOV 1 5 2001

A TRUE COPY
ATTEST: _____
PROTHONOTARY-CLERK

RECEIVED
OCT 2 2 2001

F I L E D
OCT 19 2001
GINNY ISHMAN
PRO. & CLERK of COURTS

any amounts for invoices previously billed or to collect from the Secretary of Education any
amounts previously invoiced to school districts.

BY THE COURT:

_[signature]_

William L. Henry, Judge

---

Attorney ID: 21232
Allison C. Snyder, Esquire
Attorney ID: 86335
Levin Legal Group, P.C.
1402 Masons Mill Business Park,
1800 Byberry Road
Huntingdon Valley, PA 19006
(215) 938-6378
(Co-counsel for Plaintiffs)

Attorney ID: 09837
Black and Davidson
82 West Queen Street
P.O. Box 513
Chambersburg, PA 17201-0513
(717) 264-5194
(Co-counsel for Plaintiffs)

IN THE COURT OF COMMON PLEAS OF
FRANKLIN COUNTY, PENNSYLVANIA
Civil Action—Law and Equity

CHAMBERSBURG AREA SCHOOL
DISTRICT, GREENCASTLE-ANTRIM
SCHOOL DISTRICT, TUSCARORA
SCHOOL DISTRICT, WAYNESBORO
AREA SCHOOL DISTRICT, and
SHIPPENSBURG AREA SCHOOL
DISTRICT,
    Plaintiffs,

vs.

THE NATIONAL ORGANIZATION FOR
CHILDREN, INC., et al.,
    Defendants

No: 2002-110

ORDER

AND NOW, this ___18___ day of __January__ 2002, upon consideration of
the Plaintiffs' Complaint, Petition for Special Relief and supporting documents, a Preliminary
Injunction is GRANTED and it is Ordered as follows:

A hearing on the continuance of the injunction is scheduled for the __28th__ day of
__January__ 2002, at __10:00 a.m.__ in Courtroom __1__.

Pending said hearing, the Defendants are enjoined from soliciting or enrolling students
who would otherwise attend Chambersburg Area School District, Greencastle-Antrim School

PROTHONOTARY
FRANKLIN COUNTY PA
2002 JAN 18  P 3 35
LINDA L. BEARD
PROTHONOTARY
DEPUTY

Attest: A TRUE COPY
_[signature]_
LINDA L. BEARD, PROTHONOTARY

District, Tuscarora School District, Waynesboro School District and Shippensburg Area School District.

Defendants are further enjoined from attempting to collect from the Plaintiff School Districts any amounts for invoices previously billed or to collect from the Secretary of Education any amounts previously invoiced to the Plaintiff School Districts.

BY THE COURT:

_____
, Judge

---

10/24/2001  22:40   1-24-353-5888                        JUDGE THOMAS KISTLER        PAGE  02

IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

WILD ROSE AREA SCHOOL DISTRICT,
TUSCARORA AREA SCHOOL DISTRICT,            :   NO.  2001-2088
BALD EAGLE AREA SCHOOL DISTRICT and
STATE COLLEGE AREA SCHOOL DISTRICT          :

vs                                          :

NITTANY ACADEMY, a/k/a T.E.A.C.H.           :
CHARTER SCHOOL, a/k/a TEACH-THE KINDERGARTEN
NITTANY CHARTER SCHOOL                       :

O R D E R

AND NOW, October 11, 2001, after argument with counsel, for Plaintiff School Districts and the Defendant, but without taking of any testimony and without any evidentiary proceeding, the following temporary injunction is GRANTED in favor of Plaintiffs:

1.   Defendant shall be permitted to continue in the program on or before October 10, 2001, but shall be precluded and prohibited from opening or soliciting any further student involvement in the program after this date.

2.   Defendant shall be precluded from any direct or indirect efforts to be compensated by the affected school districts and/or the Pennsylvania Department of Education for contributions related to children enrolled in charter schools rather than in the home school district.

BY THE COURT:

_____
Thomas King Kistler, Judge

CRANBERRY AREA SCHOOL
DISTRICT, FRANKLIN AREA SCHOOL
DISTRICT, and OIL CITY AREA
SCHOOL DISTRICT,
    Plaintiffs

    vs.

THE NATIONAL ORGANIZATION FOR
CHILDREN, INC., a/k/a EINSTEIN
ACADEMY, a/k/a T.E.A.C.H. CHARTER
SCHOOL, a/k/a TEACH – THE EINSTEIN
ACADEMY CHARTER SCHOOL, a/k/a
the E-ACADEMY CHARTER SCHOOL,
and a/k/a T.E.A.C.H. THE E-ACADEMY
CHARTER SCHOOL, MIMI
ROTHSCHILD, a/k/a MIMI ROTH, a/k/a
MIMI ROTHCHILD, a/k/a MIRIAM
MANDELL; HOWARD MANDELL, a/k/a
HOWIE MANDELL; MURRAY
POPKAVE, LINDA CRUZ, ANNA
FRIEDRICH, AGNES MAE SMITH;
NESBETH LANE, a/k/a NESBETH LANE,
and DR. LILLIAN KURETU, M.D., a/k/a
DR. LILLIAN KURATU, M.D.,
    Defendants.

IN THE COURT OF COMMON PLEAS OF
VENANGO COUNTY, PENNSYLVANIA

Civ. No. 63 – 2002

## OPINION OF COURT

We have for consideration Plaintiffs' Petition for Special Relief. After teleconference on the matter, and upon careful review of authority and pleadings filed by counsel, the Petition for Special Relief will be granted.

This Court is aware of proceedings that have taken place involving these same defendants in Butler and Adams Counties. Similarly, We find that actions involving schools within this county, and more importantly, students who are residents of this county and are acquiring an education within this county, are matters properly before this Court. Accordingly, venue in Venango County is proper.

This Court is aware of proceedings underway in Commonwealth Court involving these same defendants, to consolidate cases brought in various counties under Pa.R.C.P. 213.1. We would endorse such consolidation. We are prepared to vacate or modify the attached Order of Court, if necessary, depending on the outcome of the proceedings in Commonwealth Court.

The parties have agreed to enter stipulations, in lieu of a full evidentiary hearing. Oral argument on the continuance of the special relief will be held on March 22, 2002, at 8:30 a.m. in Court Room 1.

BY THE COURT:

_____
WILLIAM WHITE, President Judge

## ORDER

AND NOW, this _25th_ day of _January_, 2002, upon consideration of the Plaintiffs' Complaint, Petition for Special Relief and supporting documents, a Preliminary Injunction is GRANTED and it is Ordered as follows:

A hearing on the continuance of the injunction is scheduled for the _22nd_ day of

_March_, 2002, at _8:30 a.m._ in Courtroom ___1___.

Pending said hearing, the Defendants are enjoined from soliciting or enrolling students who would otherwise attend Cranberry Area School District, Franklin Area School District or Oil City Area School District.

Defendants are further enjoined from attempting to collect from the Plaintiff School Districts any amounts for invoices previously billed or to collect from the Secretary of Education any amounts previously invoiced to the Plaintiff School Districts.

BY THE COURT:

_____, Judge

JUDGES CHAMBERS

PAGE 83

Exhibit D

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

PENNSYLVANIA SCHOOL BOARDS
ASSOCIATION, INC., the CAMERON
COUNTY SCHOOL DISTRICT, the
BUTLER AREA SCHOOL DISTRICT,
the MARS AREA SCHOOL DISTRICT,
and the POCONO MOUNTAIN SCHOOL
DISTRICT,

      Petitioners

      v.

CHARLES B. ZOGBY, Secretary of
Education Designate of the
Commonwealth of Pennsylvania, and the
PENNSYLVANIA DEPARTMENT OF
EDUCATION,

      Respondents

: : : : : : : : : : : : : : :

No. 213 M.D. 2001

BEFORE: HONORABLE WARREN G. MORGAN, Senior Judge

      HEARD: May 9, 2001

OPINION NOT REPORTED

MEMORANDUM OPINION BY
SENIOR JUDGE MORGAN

      FILED: May 10, 2001

Nearly four years ago, the Pennsylvania General Assembly
enacted the "Charter School Act," [1] adding a new article to the Public School Code
of 1949. Charter Schools may be established in several ways, either within a
single school district or on a regional basis. Sections 1717-A and 1718-A of the
Charter School Act, 24 P.S. §§17-1717-A and 17-1718-A. Pursuant to Section

---

1723-A, 24 P.S. §17-1723-A, all resident children of the Commonwealth qualify
for admission to a charter school. The districts that have students attending a
charter school must pay the charter school for such attendance as set forth in
Section 1725-A of the Act, 24 P.S. §17-1725-A. The Department of Education is
not involved in the chartering process. If, however, a school district fails to make
required payments to a charter school, Section 1725-A(a)(5), 24 P.S. §17-1725-
A(a)(5) requires the Secretary of Education to deduct such amount from any and
all state payments made to the district after receipt of documentation from the
charter school.

Among the numerous Charter Schools presently chartered and
operating are the "SusQ-Cyber School," chartered as a high school program by
the Berwick, Bloomsburg and Milton School Districts, and the Western Pa. Cyber
Charter School, chartered by the Midland Borough School District. The SusQ-
Cyber School has an enrollment of approximately 100 students from 15 school
districts. The Western Pa. Cyber Charter School has a present enrollment of
some 525 students from 105 school districts. Petitioners allege that 5 more
"cyber-schools" have been chartered and will begin operations in the Fall of
2001. The "cyber" schools differ from other charter schools in that all coursework
is offered on-line via an Internet connection. The student "attends" school at a
remote site, usually, although not necessarily at the student's home.

Petitioners, the Pennsylvania School Board Association and four
Pennsylvania School Districts, have filed a petition for review in our original
jurisdiction seeking declaratory judgment, equitable relief and mandamus.

---

[1] Act of March 10, 1949, P.L. 30, as amended, added by the Act of June 19, 1997, P.L. 225, 24
P.S. §§17-1701-A – 17-1732-A.

Petitioners allege that, although the "cyber" schools may possess valid charters, they are "unlawful" under the Public School Code for various reasons, including failure to comply with compulsory attendance laws. Moreover, petitioners allege that respondents intend to withhold money from the school districts on June 1, 2001 to pay the existing cyber charter schools. Petitioners further allege that the payment of this money will harm school districts, which have had no opportunity to participate in the approval of the "cyber" schools. Petitioners request peremptory mandamus as well as preliminary injunctive relief to enjoin the Department of Education from paying some $800,000 to Western Pa. Cyber Charter School on June 1, 2001. This money represents amounts billed to Pennsylvania School Districts, including the petitioning Districts, but which those Districts declined to pay voluntarily.

Equity may grant a preliminary injunction if the petitioner's right to relief is clear, the need for relief is immediate, and the injury will be irreparable if the injunction is not granted. Zebra v. Pittsburgh Area School District, 449 Pa. 432, 296 A.2d 748 (1972). Because the grant of a preliminary injunction is a harsh and extraordinary remedy, it is to be granted only when and if each criterion has been fully and completely established. Committee of Seventy v. Albert, 381 A.2d 188 (Pa. Cmwlth. 1977). A party requesting a preliminary injunction must show that the harm to be prevented cannot be compensated by money damages, that greater injury would result by refusing the injunction than by granting it, and that an injunction would restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Singzon v. Department of Public Welfare, 496 Pa. 8, 436 A.2d 125 (1981).

Here, petitioners raise numerous issues of first impression relating to the validity of the "cyber" charter schools. Despite the seriousness of the issues and the potential effect on school districts across the state, we cannot say that petitioners' interpretations of the various statutes are sufficiently "clear" so as to justify preliminary injunctive relief. Rather, the two "cyber" schools presently in operation possess valid charters granted pursuant to the Act. This fact alone raises a presumption that the schools are lawful. Petitioners' challenges to the "cyber" schools are not sufficiently clear as to overcome this presumption for the purpose of preliminary relief.

Petitioners' request for preliminary injunctive relief essentially involves the payment of money. Our courts have held that harm which can be compensated by money damages does not qualify as "irreparable" for the purpose of preliminary injunctive relief. Martin es GP, Inc. v. Pepper, Hamilton & Scheetz, 529 Pa. 241, 602 A.2d 1277 (1992). Although petitioners' testimony established that deduction of the funds on June 1, 2000 would impact the budgets of the School Districts, there was no testimony to show a deduction would require the immediate reduction of essential services or place any of the petitioning School Districts in immediate financial jeopardy. As recognized by respondent, if petitioners should ultimately prevail in their claim that the "cyber" charter schools are not authorized by Law, petitioners would have recourse to the Department of Education.

Respondents have filed preliminary objections to the petition for review raising, *inter alia*, a question of failure to join indispensable parties, i.e., the "cyber" charter schools who stand to lose funding if the relief requested by petitioners were granted. Although the preliminary objections are not presently before the court for disposition, a chancellor may consider the preliminary objections for the purpose of determining whether or not a preliminary injunction should issue. Aitkenhead v. Borough of West View, 397 A.2d 878 (Pa. Cmwlth. 1979). Nick Trombetta, Chief Administrative Officer of the Western Pa. Cyber Charter School, credibly testified that funding to the school is not forthcoming on June 1, 2001, the activities of the School would be severely curtailed and its continued viability brought into question. While not deciding the question, it appears that respondents have raised a serious question concerning whether Western Pa. Cyber Charter School, and perhaps other entities, are indispensable parties to the present proceeding. As noted by respondent, an indispensable party is one whose rights are so directly connected with, and affected by, the litigation that no relief can be granted without infringing upon those rights. Reichley v. North Penn School District, 537 A.2d 391, 392 (Pa. Cmwlth. 1988). Western Pa. Cyber Charter School is operating lawfully and is lawfully entitled to funds pursuant to the Charter School Act. It appears, therefore, that respondent's indispensable party argument has merit and is sufficient in its own right to deny the requested relief.

While refusing the requested relief may inconvenience petitioners, the testimony of Mr. Trombetta established that if the funding were enjoined, the

continued operation of Western Pa. Cyber Charter School would be in jeopardy. Thus, we conclude that greater injury would result by granting the requested relief than by denying it.

Finally, we do not believe that preliminary relief is needed to preserve the status quo. While petitioners here challenge only the "cyber" charter schools, the Charter School Act requires school districts to pay for students attending all charter schools, and, in the absence of such voluntary payment, to suffer withholding of funding. In other words, when students resident in a certain district are enrolled in a charter school, the district is required to pay for those students. The students at issue here are presently and legally enrolled in the cyber charter schools. The fact that petitioners have raised challenges relating to whether "cyber" schools meet certain requirements of the Public School Code does not alter the fact that the students are presently enrolled in the "cyber" charter schools and are not attending school in their home school district. Therefore, the status quo is that the charter school and not the resident school district that is presently entitled to the funding. Petitioners' requested relief would not preserve the status quo but would substantially alter it.

Accordingly, petitioners having failed to show the requisite elements needed for preliminary injunctive relief, we enter the following ORDER.

Warren G. Morgan, Senior Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

PENNSYLVANIA SCHOOL BOARDS
ASSOCIATION, INC., the CAMERON
COUNTY SCHOOL DISTRICT, the
BUTLER AREA SCHOOL DISTRICT,
the MARS AREA SCHOOL DISTRICT,
and the POCONO MOUNTAIN SCHOOL
DISTRICT,

        Petitioners

    v.             :   No. 213 M.D. 2001

CHARLES B. ZOGBY, Secretary of
Education Designate of the
Commonwealth of Pennsylvania, and the
PENNSYLVANIA DEPARTMENT OF
EDUCATION,

        Respondents

**O R D E R**

AND NOW, this 11ᵗʰ day of May, 2001, following hearing on petitioners' request for preliminary injunctive relief and peremptory mandamus, said requests are DENIED.

_Warren G. Morse_
Warren G. Morgan, Senior Judge

Certified from the Record
MAY 1 1 2001
and Order Exit

Exhibit E

THE GENERAL ASSEMBLY OF PENNSYLVANIA

PRINTER'S NO. 2176

# HOUSE BILL
## No. 1733 Session of 2001



INTRODUCED BY STAIRS, COLAFELLA, CLYMER, McILHATTAN, SCHULER,
GRUCELA, MUNDY, ROEBUCK, STERLA, THOMAS, BELARDI, CAPPELLI,
DAILY, DeLUCA, FAIRCHILD, FRANKEL, HALUSKA, HESS, JOSEPHS,
LAUGHLIN, MANDERINO, MANN, MARKOSEK, MELIO, S. MILLER,
PRESTON, READSHAW, SAYLOR, SAYLOR, SCRIMENTI, SHANER,
STABACK, STETLER, TANGRETTI, E. Z. TAYLOR, TIGUE, TRICH,
WILT, WOJNAROSKI, WRIGHT, YUDICHAK, ZIMMERMAN AND ZUG,
JUNE 12, 2001

REFERRED TO COMMITTEE ON EDUCATION, JUNE 12, 2001

AN ACT

Providing for the licensing, regulation and funding of cyber
schools.

The General Assembly of the Commonwealth of Pennsylvania
hereby enacts as follows:

Section 1.  Short title.

This act shall be known and may be cited as the Cyber School
Act.

Section 2.  Legislative findings and purpose.

The General Assembly finds and declares as follows:

(1)  Since the enactment of the Charter School Law,
applicants have sought charters to operate cyber schools as
cyber charter schools.

(2)  Because the technology involved readily enables
cyber schools to draw students from throughout this
Commonwealth, cyber schools can operate without significant

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

involvement with individual school districts, including the
district that granted the charter.

(3)  Because the technology permits students enrolled in
a cyber school to access instructional programming on an
irregular schedule and without being physically present in an
educational facility, cyber schools do not fit the
requirements of the Charter School Law to have a suitable
physical facility and to provide a minimum number of days or
hours of instruction.

(4)  The Charter School Law does not provide an adequate
framework for evaluating a cyber school application, holding
an approved cyber school accountable and funding the
operation of the cyber school.

(5)  The General Assembly in enacting this act intends to
provide a framework that is more appropriate to the
technological possibilities of cyber education, to facilitate
the utilization of cyber technology to improve student
learning and to hold cyber schools accountable for meeting
measurable academic standards and demonstrating gains in
student achievement.

Section 3.  Definitions.

The following words and phrases when used in this act shall
have the meanings given to them in this section unless the
context clearly indicates otherwise:

"Charter School Law." Article XVII-A of the act of March 10,
1949 (P.L.30, No.14), known as the Public School Code of 1949.

"Correction service." The procedure for receiving and
correcting all tests and other student work in a timely manner,
providing appropriate comments and suggestions for correction of
errors and apparent weaknesses, promptly returning the corrected

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30

- 2 -

20010H1733B2176

1 tests and other student work to the student concerned and
2 recommending other assignments and areas of inquiry.
3 "Cyber school." An elementary school, a secondary school or
4 any combination thereof which has a computer system connected to
5 the Internet, or any other distance learning technology, as its
6 primary mode of delivery of its instructional programming and in
7 which students do not receive more than 50% of their instruction
8 in a physical classroom from an onsite teacher.
9 "Department." The Department of Education of the
10 Commonwealth.
11 "Internet." An electronic communications network that
12 connects computer networks and organization computer facilities
13 around the world.
14 "Public School Code." The act of March 10, 1949 (P.L.30,
15 No.14), known as the Public School Code of 1949.
16 "School entity." A school district, intermediate unit, joint
17 school or area vocational-technical school under the act of
18 March 10, 1949 (P.L.30, No.14), known as the Public School Code
19 of 1949.
20 "Secretary." The Secretary of Education of the Commonwealth.
21 Section 4. License required.
22 (a) General rule.--A cyber school shall not enroll students
23 within this Commonwealth unless the cyber school has obtained
24 from the secretary a license issued in the manner and form
25 prescribed by this act.
26 (b) Exception.--Notwithstanding subsection (a), no license
27 shall be required and the provisions of this act shall not apply
28 to the delivery of instructional programming by a school entity
29 exclusively to resident students of the school entity.
30 Section 5. Application for license.

- 3 -

20010H1733B2176

1 (a) General rule.--Before any license is issued to a cyber
2 school, a verified application shall be submitted to the
3 secretary in writing and on a form prepared and furnished by the
4 department.
5 (b) Name.--An application for a license shall be submitted
6 by, and in the name of, a nonsectarian corporation not-for-
7 profit, as defined in 15 Pa.C.S. § 102 (relating to
8 definitions), or by, and in the name of, a school entity.
9 (c) Contents.--The application for a license shall include
10 all of the following:
11 (1) The name, mailing address and telephone number of
12 the proposed cyber school.
13 (2) The name, mailing address and telephone number of
14 the contact person for the application.
15 (3) If the application is submitted by a nonsectarian
16 corporation not-for-profit, a copy of the filed articles of
17 incorporation for the proposed cyber school.
18 (4) If the application is submitted by a nonsectarian
19 corporation not-for-profit, the governance structure of the
20 proposed cyber school, including the bylaws.
21 (5) The grade or age levels to be served by the proposed
22 cyber school.
23 (6) The mission and educational goals of the proposed
24 cyber school, the curriculum to be offered, the equipment,
25 material, instructional staff, correction service and support
26 services that will be made available to students; and the
27 methods of assessing student achievement, including
28 participation in the Pennsylvania State Assessment System as
29 provided for in 22 Pa. Code ch. 4 (relating to academic
30 standards and assessment) or in any successor to that

- 4 -

20010H1733B2176

chapter.

(7) The enrollment policy and criteria for evaluating applications for enrollment in the proposed cyber school.

(8) The procedures that the proposed cyber school will use to suspend or expel students and to notify the school district in which a student resides that the student has been suspended or expelled from the cyber school or is otherwise no longer enrolled in the cyber school.

(9) The financial resources that will be utilized to equip, maintain and operate the proposed cyber school, the projected annual budget for the school and the provisions that will be made for auditing the school under section 437 of the Public School Code.

(10) The procedures that will be established to review compliance from parents regarding the operation of the proposed cyber school.

(11) The place or places at which tests will be given and face-to-face interaction between teachers and students will occur.

(12) An explanation of how the proposed cyber school will assure that each student receives a minimum of 180 days of instruction per year, 900 hours of instruction at the elementary level per year, 990 hours of instruction at the secondary level per year or an explanation of how the proposed cyber school will assure that each student receives equivalent instruction sufficient to be deemed by the secretary as in compliance with section 1327 of the Public School Code.

(13) The number and professional qualifications of the employees of the proposed cyber school.

(14) Any agreements that have been entered into or plans that have been developed with school districts regarding participation of the proposed cyber school's students in extracurricular activities.

(15) A report of the criminal history record, pursuant to section 111 of the Public School Code, for all trustees, officers and employees of the proposed cyber school.

(16) An official clearance statement regarding child injury or abuse from the Department of Public Welfare as required by 23 Pa.C.S. Ch. 63 Subch. C.2 (relating to background checks for employment in schools) for all trustees, officers and employees of the proposed cyber school.

(17) An explanation of how the proposed cyber school will provide adequate liability and other appropriate insurance.

(18) Any additional information the secretary may deem necessary in order to determine the adequacy of the program of instruction and the financial integrity of the proposed cyber school.

(d) Notice.--The department shall publish notice of the license application in the Pennsylvania Bulletin and shall provide for a period of at least 30 days for the submission of public comments on the license application.

(e) Public records.--The license application, any document submitted in support of the license application, any public comment on the license application and any document prepared by the department with regard to the license application shall be a public record for purposes of the act of June 21, 1957 (P.L.390, No.212), referred to as the Right-to-Know Law.

(f) Hearing.--After completion of the public comment period
and a review of the license application, including any public
hearing the secretary deems necessary and any public comments,
the secretary shall issue a written decision approving or
disapproving the application. Notice shall be provided and such
hearing shall be conducted in accordance with 65 Pa.C.S. Ch. 7
(relating to open meetings).

(g) Approval.--The secretary shall not approve the license
application unless the secretary determines that the proposed
cyber school:

(1) Has submitted an application that fully complies
with subsections (a), (b) and (c).

(2) Is capable of providing an adequate program of
instruction that will increase learning opportunities.

(3) Will be accountable for meeting measurable academic
standards and for demonstrating gains in student achievement.

(4) Will be viable and accountable from a financial
standpoint.

Section 6.  Issuance of license.

(a) General rule.--Upon approval of a license application
pursuant to section 5, the secretary shall issue a license to
the proposed cyber school for a term of no less than three years
and no more than five years. The license shall incorporate the
license application with any revisions therein required by the
secretary and shall set forth any conditions imposed by the
secretary on the cyber school's operation.

(b) Amended license.--The cyber school shall not deviate
materially from the license issued pursuant to subsection (a)
unless the cyber school applies for and receives an amended
license. The procedure for obtaining an amended license shall be

- 7 -

20010H1733B2176

the same as the procedure prescribed under section 5 for
obtaining a license.

Section 7.  Renewal of license.

(a) General rule.--A cyber school may apply for renewal of
its license for a term of five years.

(b) Application.--Not later than one year prior to the
expiration of the term of its current license, a cyber school
that seeks to renew that license shall submit a license renewal
application to the secretary that includes all of the following:

(1) All of the information required by section 5(c) for
an initial application, as updated or otherwise revised.

(2) Such additional information as the secretary may
require in order to assess the performance of the cyber
school during the term of the expiring license.

(c) Notice.--The department shall publish notice of the
license renewal application in the Pennsylvania Bulletin and
shall provide for a period of at least 30 days for the
submission of public comments on the license renewal
application.

(d) Public record.--The license renewal application, any
document submitted in support of the license renewal
application and any public comment on the license renewal
application and any document prepared by the department with
regard to the license renewal application shall be a public
record for purposes of the act of June 21, 1957 (P.L.390,
No.212), referred to as the Right-to-Know Law.

(e) Public hearing.--After completion of the public comment
period and a review of the license renewal application,
including any public hearing the secretary deems necessary and
any public comments, the secretary shall issue a written

- 8 -

20010H1733B2176

1 decision approving or disapproving renewal of the license.
2 Notice shall be provided and such hearing shall be conducted in
3 accordance with 65 Pa.C.S. Ch. 7 (relating to open meetings).
4 (f) Approval.--The secretary shall not approve renewal of
5 the license unless the secretary determines that the cyber
6 school:
7 (1) has submitted a license renewal application that
8 fully complies with subsection (b);
9 (2) has provided and is capable of continuing to provide
10 an adequate program of instruction that will increase
11 learning opportunities;
12 (3) has been and will continue to be accountable for
13 meeting measurable academic standards and for demonstrating
14 gains in student achievement;
15 (4) has been and will continue to be viable and
16 accountable from a financial standpoint; and
17 (5) has operated and will continue to operate in
18 accordance with its license.
19 (g) Revisions and conditions.--If the secretary approves the
20 renewal of the license, the secretary may require revisions in
21 or impose conditions on the license previously issued pursuant
22 to section 6 or section 12.
23 Section 8. Operation of cyber school.
24 (a) Not-for-profit.--Except as provided in subsection (c), a
25 cyber school shall be organized and operated as a corporation
26 not-for-profit, in accordance with 15 Pa.C.S. (relating to
27 corporations and unincorporated associations).
28 (b) Board of trustees.--Except as provided in subsection
29 (c), a cyber school shall be governed by a board of trustees
30 that shall have the powers and duties of the board of directors

- 9 -

20010H17338217G

1 of a corporation not-for-profit, in accordance with 15 Pa.C.S.
2 All meetings of the board of trustees shall be held within this
3 Commonwealth and in accordance with 65 Pa.C.S. Ch. 7 (relating
4 to open meetings).
5 (c) Exceptions.--
6 (1) Subsections (a) and (b) shall not apply to a cyber
7 school if the cyber school's license application was
8 submitted by and in the name of a school entity or if the
9 cyber school's charter was surrendered under section 12(a) by
10 a corporation not-for-profit organized in whole or in part by
11 a school entity.
12 (2) A cyber school to which subsections (a) and (b) do
13 not apply shall be organized and operated as part of a school
14 entity in the same manner as an additional school established
15 under section 502 of the Public School Code is operated by a
16 school district.
17 (3) Subsection (d)(1) shall not apply to a cyber school
18 organized and operated as part of a school entity. A cyber
19 school organized and operated as part of a school entity may
20 contract for any service only to the extent and in the manner
21 the school entity of which it is a part may contract for that
22 service.
23 (4) Subsection (d)(9), (10), (11) and (12) shall not
24 apply to a cyber school organized and operated as part of a
25 school entity. Employees of a cyber school organized and
26 operated as part of a school entity:
27 (i) shall be employees of the school entity;
28 (ii) shall have the same rights under the Public
29 School Code, the act of July 23, 1970 (P.L.563, No.195),
30 known as the Public Employe Relations Act, and any other

- 10 -

20010H17338217G

1  provisions of law as other employees of the school
2  entity; and
3       (iii) shall be covered by the appropriate collective
4  bargaining agreement or agreements applicable to other
5  employees of that school entity.
6   (d) Powers and duties.--A cyber school:
7       (1) may contract for management, administrative or
8  curriculum services to be provided by an entity that is a
9  corporation, partnership or limited liability company under
10  15 Pa.C.S., only if, after reviewing the negotiated contract,
11  the secretary determines that:
12       (i) the contractual relationship will be consistent
13  with the cyber school's license and with the fiduciary
14  obligation of the cyber school's board of trustees under
15  15 Pa.C.S. § 5712 (relating to standard of care and
16  justifiable reliance); and
17       (ii) the cyber school's board of trustees will have
18  real and substantial authority and responsibility for the
19  educational decisions;
20       (2) shall be nonsectarian in all operations and shall
21  not provide any religious instruction;
22       (3) shall not utilize any public funds to directly or
23  indirectly provide or otherwise support instruction for
24  students enrolled in a home education program pursuant to
25  section 1327.1 of the Public School Code;
26       (4) may sue and be sued only to the same extent and upon
27  the same condition that political subdivisions and local
28  agencies may sue and be sued;
29       (5) shall not unlawfully discriminate in any matter;
30       (6) shall comply with 65 Pa.C.S. Ch. 7;

- 11 -

20010H1733B2176

1  the cyber school's records and facilities;
2       (8) shall submit an annual report to the department
3  sufficient to demonstrate that the cyber school is operating
4  in accordance with its license;
5       (9) shall hire, assign, evaluate, discipline and
6  discharge all employees of the cyber school and shall
7  determine the level of their compensation and the terms and
8  conditions of their employment, provided that employees shall
9  have the right to organize and bargain collectively under the
10  provisions of this act, the Public Employe Relations Act and
11  Article XI-A of the Public School Code;
12       (10) notwithstanding paragraph (1) of this subsection,
13  shall assure that no person is permitted to teach in the
14  cyber school unless that person:
15       (i) has the appropriate State certification required
16  by Article XII of the Public School Code for a person to
17  teach in the public schools of this Commonwealth;
18       (ii) meets the qualifications in sections 1109 and
19  1209 of the Public School Code; and
20       (iii) is an employee of the cyber school;
21       (11) shall be considered a public employer for the
22  purposes of the Public Employe Relations Act and, upon
23  formation of one or more collective bargaining units, shall
24  bargain with the employees based on the provisions of this
25  act, Article XI-A of the Public School Code and the Public
26  Employe Relations Act;
27       (12) shall enroll all employees in the Public School
28  Employe's Retirement System in the same manner as set forth
29  in 24 Pa.C.S. § 8301(a) (relating to mandatory and optional

- 12 -

20010H1733B2176

1 membership), provided that if the cyber school fails to make
2 payments to the Public School Employee's Retirement System,
3 the secretary shall make those payments and shall deduct the
4 payments from the amount the cyber school would otherwise
5 receive pursuant to section 9;
6
7 (13) may enroll students who reside anywhere within this
8 Commonwealth;
9 (14) may limit enrollment to a particular grade level or
10 levels or to a particular area or areas of concentration as
11 set forth in the license application;
12 (15) except as provided in paragraph (14), shall not
13 discriminate in its enrollment policies or practices on the
14 basis of intellectual ability, measures of achievement or
15 aptitude, status as a person with a disability, proficiency
16 in the English language or any other basis that would be
17 unlawful if the cyber school were a school entity;
18 (16) shall comply with Federal laws and regulations
19 governing children with disabilities; and
20 (17) shall comply with all provisions of 22 Pa. Code Ch.
21 4 (relating to academic standards and assessment) or any
22 successor to 22 Pa. Code Ch. 4, that are applicable to a
23 charter school under the Charter School Law, provided that to
24 the extent that an applicable provision of this act, or of an
25 applicable regulation promulgated hereunder, conflicts with a
26 provision of 22 Pa. Code Ch. 4, or any successor to 22 Pa.
27 Code Ch. 4, the cyber school shall comply with the provision
28 of this act or of the regulation promulgated hereunder.
29 Section 9. Funding.
30 (a) General rule.--A cyber school shall not impose a tuition
charge on a student, require a student to provide or pay for a

- 13 -
20010H1733B2176

1 computer or related equipment or Internet access or condition
2 enrollment on any gift, donation or contribution from a student
3 or the student's parent or guardian.
4 (b) Prohibition.--A cyber school shall not receive any
5 corporation not-for-profit shall not receive any funding from a
6 school entity.
7 (c) Payments.--
8 (1) The secretary shall make payments to a cyber school
9 out of appropriations by the General Assembly for that
10 purpose. The secretary shall determine the schedule for
11 making such payments and the amount of each individual
12 payment, provided that the secretary shall not make payments
13 to a cyber school for a fiscal year in excess of that cyber
14 school's actual audited costs for that fiscal year that are
15 reasonable and appropriate.
16 (2) In lieu of making payments on the basis of a cyber
17 school's actual audited costs, the secretary may, by
18 regulation, establish a uniform annual payment for cyber
19 schools that is based on the Statewide average costs of the
20 cyber schools operating within this Commonwealth, provided
21 that each individual cyber school shall be entitled to appeal
22 to the secretary for an additional payment on the grounds
23 that its just and reasonable costs exceed the Statewide
24 average costs calculated by the secretary.
25 (3) In no event shall payments pursuant to this section
26 to a cyber school for a fiscal year exceed on a per pupil
27 basis an amount which is 75% of the Statewide average per
28 pupil expenditure by school districts within this
29 Commonwealth for that fiscal year.
30 Section 10. Revocation of license.

- 14 -
20010H1733B2176

1  (a)  General rule.--During the term of a license issued or
2 renewed in accordance with this act, the secretary may revoke
3 the license if, after notice and public hearing in accordance
4 with 65 Pa.C.S. Ch. 7 (relating to open meetings) and after
5 consideration of any public comments, the secretary determines
6 that:
7      (1)  the cyber school has failed to operate in accordance
8 with its license or any conditions imposed on the license;
9      (2)  the cyber school has failed to operate in accordance
10 with any conditions, standards or procedures contained in the
11 charter it surrendered pursuant to section 12;
12      (3)  the cyber school has failed to meet the requirements
13 for student performance set forth in 22 Pa. Code Ch. 4
14 (relating to academic standards and assessment) or any
15 successor to 22 Pa. Code Ch. 4;
16      (4)  the cyber school has failed to meet generally
17 accepted standards of fiscal management or generally accepted
18 auditing requirements;
19      (5)  the cyber school has been convicted of fraud;
20      (6)  a trustee, officer or employee of the cyber school
21 has been convicted of fraud in relation to the cyber school's
22 license application, the cyber school's license renewal
23 application or the cyber school's operation;
24      (7)  the cyber school has engaged in false, deceptive or
25 misleading advertising or other false, deceptive or
26 misleading representation in recruiting or enrolling
27 students; or
28      (8)  the cyber school has violated any provisions of this
29 act or regulations promulgated hereunder, any provisions of
30 any other laws or regulations of this Commonwealth or any

- 15 -

20010H1733B2176

1 provisions of any relevant Federal laws or regulations.
2      (b)  Notice.--The department shall publish notice of any
3 hearing pursuant to subsection (a) in the Pennsylvania Bulletin
4 and shall provide for a period of at least 30 days for the
5 submission of public comments on whether or not the cyber
6 school's license should be revoked.
7      (c)  Public record.--Any document submitted regarding a
8 revocation of the cyber school's license, any public comment on
9 whether or not the license should be revoked and any document
10 prepared by the department with regard to the revocation or
11 possible revocation of the license shall be a public record for
12 purposes of the act of June 21, 1957 (P.L.390, No.212), referred
13 to as the Right-to-Know Law.
14 Section 11.  Adjudication.
15      Any decision by the secretary to approve or disapprove a
16 license application, approve or disapprove the renewal of a
17 license, revoke or refuse to revoke a license or grant or deny
18 an appeal for additional payments shall be an adjudication under
19 2 Pa.C.S. (relating to administrative law and procedure). Any
20 person aggrieved by such an adjudication may appeal that
21 adjudication in accordance with 2 Pa.C.S.
22 Section 12.  Transition.
23      (a)  Surrender of charter.--Any cyber school that, on the
24 effective date of this act, has a charter to operate as a
25 charter school pursuant to the Charter School Law shall
26 surrender that charter at the end of the then-current school
27 year. In lieu of its surrendered charter, the cyber school shall
28 receive from the secretary a license under this act without the
29 necessity of submitting an application pursuant to section 5. A
30 license issued by the secretary in accordance with this

- 16 -

20010H1733B2176

1   subsection shall be valid for the remainder of the term of the

2   surrendered charter and may be renewed in accordance with this

3   act. During the term of any license issued in accordance with

4   this subsection, the cyber school shall adhere to the

5   conditions, standards or procedures contained in the surrendered

6   charter and to the provisions of this act and of the regulations

7   promulgated hereunder.

8       (b)   Prohibition.--Beginning on the effective date of this

9   act, no charter to operate as a charter school shall be

10   approved, granted, signed, renewed or otherwise issued for a

11   cyber school pursuant to the Charter School Law.

12   Section 13.   Regulations.

13       The secretary shall promulgate such regulations as are

14   necessary to implement and administer the provisions of this

15   act.

16   Section 14.   Effective date.

17       This act shall take effect in 60 days.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID ANGSTADT, et al.,      :
    *Plaintiffs*         :
                          :   4:CV-02-0145
      vs.            :
                          :
MIDD-WEST SCHOOL DISTRICT,  :
    *Defendant*         :
                          :

### Order

AND NOW, in consideration of the pleadings and memorandum of law filed by the parties, and after a full and complete hearing on Plaintiffs' Motion for a Preliminary Injunction, it is hereby Ordered that said Motion is denied based upon the findings of fact and conclusions of law set forth in the Memorandum Opinion accompanying this Order.

Date: _____                    _____
                                          James F. McClose, Jr.
                                          United States District Judge